1
2
3
4
5
6

7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

EDMONDS SCHOOL DISTRICT,                    )
                                            )
10          Plaintiff/Appellant,            )    No.
                                            )
11      v.                                  )    COMPLAINT
                                            )
12  A.T., a minor child, and R.T. and I.T, his  )
    parents,                                )
13                                          )
            Defendants/Appellees .          )
14  _____)

15      The Edmonds School District ("District"), by and through its attorneys, appeals   the

16  Findings of Fact, Conclusions of Law, and Order entered by Administrative Law Judge

17  Michelle C. Mentzer on July 20, 2016. This appeal is pursuant to 20 U.S.C. §1415(i)(2) and

18  WAC 392-172A-05115.

19                          I.      JURISDICTION

20      1.1     This Court has jurisdiction of this matter pursuant to 20 U.S.C. §1415(i)(2).

21      1.2     Venue in the Western District of Washington at Seattle is appropriate since

22  defendants A.T.. and his parents R.T. and I.T. are residents of Snohomish County, Washington,

23  and the District is a municipal corporation located in Snohomish County, Washington.

24                          II.     PARTIES

25      2.1     Plaintiff is the Edmonds School District, a municipal corporation organized under

26  the laws of the State of Washington, and located at 20420 68th Ave W, Lynnwood, WA 98036.

COMPLAINT - 1
Case No.

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\00000-09999\02038\02038.42078\FEDERAL DISTRICT COURT\DCMP COMPLAINT.DOCX

2.2     Defendants A.T.. and his parents R.T. and I.T. are residents of Snohomish County, Washington, who reside within the Edmonds School District. The true identities of A.T.., R.T. and I.T.. are known to all parties.

### III.     FACTS

3.1     An administrative hearing was held before Administrative Law Judge Mishelle Mentzer, under Special Education Cause No. 2015-SE-0106X (OAH Docket No. 12-2015-OSPI-00227). The hearing was held on March 22, 23, 24, 25, 28 and May 19, 2016, The main issues at the hearing were whether the District violated the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400-1491, by failing to offer a free appropriate public education (FAPE) to A.T. and whether the parents were entitled to reimbursement for their unilateral, private residential placement at the Provo (Utah) Canyon School.

3.2     On July 20, 2016, ALJ mailed her Findings of Fact, Conclusions of Law, and Order, a copy of which is attached as **Exhibit A.**

3.3     Regarding appeals, the IDEA states:

> Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A).

### IV.     CAUSE OF ACTION

4.1     Pursuant to the IDEA and Washington State's special education law, chapter 28A.155 RCW and WAC 392-172A, the District offered A.T. a free appropriate public education (FAPE) for the 2014-15 and 2015-16 school years.

4.2     Despite having offered A.T. a FAPE, the ALJ issued an order holding that the District failed to offer a FAPE to the student. (See Exhibit A at 50-51). In addition, the ALJ

COMPLAINT - 2
Case No.

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\00000-09999\02038\02038.42078\FEDERAL DISTRICT COURT\DCMP COMPLAINT.DOCX

1    ordered that the District violated the IDEA by providing an "inappropriate interim alternative

2    educational setting." (Ex. A at 50) Regarding the parents' unilateral placement of the student at

3    the Provo Canyon School ("Provo"), the ALJ held that this placement "was appropriate, and

4    continues to be appropriate" and that the District should reimburse the parents for tuition and for

5    the transportation services that brought the student to the school. (Ex. A at 51). Finally, the ALJ

6    ordered that A.T.'s prospective placement after discharge from Provo shall be determined by the

7    Provo treatment team and a private psychologist, Stacy Cecchet, Ph.D, and that the District shall

8    pay for Dr. Cecchet's services (Ex. A at 51).  The ALJ issued this order even though the

9    evidence at the hearing demonstrated that the parents' unilateral placement at Provo did not meet

10   the standards for reimbursement under the IDEA. Under the IDEA, residential placement at

11   public expense is not warranted when the primary purpose of the placement is to address a

12   child's medically-related mental health needs. Because A.T.'s placement at Provo was

13   medically-related, reimbursement under the IDEA is not warranted. In addition, the other errors

14   alleged by the parents did not result in a denial of FAPE. Because the ALJ erred in ordering

15   reimbursement in holding that the District violated the IDEA by denying A.T. a FAPE, and

16   abrogating the procedures for developing an IEP and the resulting placement, the ALJ's ruling

17   should be reversed.

18        4.3    As a party who is aggrieved by the ALJ's decision, the District is entitled to

19   appeal the ALJ's decision and order under 20 U.S.C. § 1415(i).

20                            **V.    RELIEF REQUESTED**

21        The District requests that this Court enter an order:

22        (a) reversing the orders of ALJ Mentzer entered on July 20, 2016;

23        (b) declaring that the District provided A.T. with a FAPE;

24        (c) denying the parents' request for reimbursement at public expense for the private

25   placement of A.T. at Provo;

26

COMPLAINT - 3
Case No.

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\00000-09999\02038\02038.42078\FEDERAL DISTRICT COURT\DCMP COMPLAINT.DOCX

1    (d) denying the relief ordered by the ALJ that A.T.'s prospective placement shall be at

2    Provo;

3    (e) denying the relief ordered by the ALJ that A.T.'s prospective placement after

4    discharge from Provo shall be determined by the Provo treatment team and a private

5    psychologist, Stacy Cecchet, Ph.D, and that the District shall pay for Dr. Cecchet's services and

6    the designated placement; and

7    (e) granting the District such other, further and different relief as the Court deems just

8    and equitable in the premises.

9

10   DATED this 22st day of September, 2016.

11                                        VANDEBERG JOHNSON & GANDARA, LLP

12

13                                        By _____

14                                            William A. Coats, WSBA # 4608
                                             Erin Sullivan-Byorick, 35404
15                                        Attorneys for Plaintiff
                                          Edmonds School District

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT - 4
Case No.

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\00000-09999\02038\02038.42078\FEDERAL DISTRICT COURT\DCMP COMPLAINT.DOCX



**MAILED**
JUL 20 2016
SEATTLE-OAH

STATE OF WASHINGTON
OFFICE OF ADMINISTRATIVE HEARINGS
One Union Square • 600 University Street • Suite 1500 • Seattle, Washington 98101
(206) 389-3400 • (800) 845-8830 • FAX (206) 587-5135 • www.oah.wa.gov

July 20, 2016

Parents
4020 167ᵗʰ Place SW
Lynnwood, WA 98037

Jean Mirabal, Student Services Executive Director
Edmonds School District
20420 - 68ᵗʰ Avenue West
Lynnwood, WA 98036

Charlotte Cassady, Attorney at Law
Cassady Law
113 Cherry Street # 99651
Seattle, WA 98104

William A. Coats, Attorney at Law
Erin Sullivan-Byorick, Attorney at Law
Vandeberg Johnson & Gandara
PO Box 1315
Tacoma, WA 98401-3791

**RECEIVED**
JUL 21 2016
VANDEBERG JOHNSON & GANDARA

In re:  Edmonds School District
        OSPI Cause No. 2015-SE-0106X
        OAH Docket No. 12-2015-OSPI-00227

Dear Parties:

        Enclosed please find the Findings of Fact, Conclusions of Law, and Order in the above-referenced matter.  This completes the administrative process regarding this case.  Pursuant to 20 USC 1415(i) (Individuals with Disabilities Education Act) this matter may be further appealed to either a federal or state court of law.

        After mailing of this Order, the file (including the exhibits) will be closed and sent to the Office of Superintendent of Public Instruction (OSPI).  If you have any questions regarding this process, please contact Administrative Resource Services at OSPI at (360) 725-6133.

Sincerely,

Michelle C. Mentzer
Administrative Law Judge

cc:    Administrative Resource Services, OSPI
       Matthew D. Wacker, Senior ALJ, OAH/OSPI Caseload Coordinator

**EXHIBIT A**                                          2038.42078

STATE OF WASHINGTON
OFFICE OF ADMINISTRATIVE HEARINGS
FOR THE SUPERINTENDENT OF PUBLIC INSTRUCTION

| | |
|---|---|
| IN THE MATTER OF: | OSPI CAUSE NO. 2015-SE-0106X |
| | OAH DOCKET NO. 12-2015-OSPI-00227 |
| EDMONDS  SCHOOL DISTRICT | FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER |

A hearing in the above-entitled matter was held before Administrative Law Judge (ALJ) Michelle C. Mentzer in Lynnwood, Washington, on March 22, 23, 24, 25, 28, and May 19, 2016. The Parents of the Student whose education is at issue[1] appeared and were represented by Charlotte Cassady, attorney at law. The Edmonds School District (District) was represented by William Coats and Erin Sullivan-Byorick, attorneys at law. The following is hereby entered:

## STATEMENT OF THE CASE

The Parents filed a due process hearing request (complaint) on December 17, 2015.  The case was originally assigned to ALJ Matthew D. Wacker.  The Parents' complaint requested an expedited schedule for the case on the ground that it concerned discipline.  By order issued January 8, 2016, ALJ Wacker ruled that the complaint did not raise any issue subject to the expedited timelines for hearing and decision set forth in Washington Administrative Code (WAC) 392-172A-05140 through -05175.  On February 23, 2016, the case was reassigned to ALJ Michelle C. Mentzer, to ensure the availability of an ALJ for the due process hearing.

Prehearing conferences were held on December 28, 2015, January 4, January 15, February 9, and March 7, 2016.  Prehearing orders were issued on December 28, 2015, January 8, February 4, February 10, March 8, March 10, and March 14, 2016.

The due date for the written decision was continued to thirty (30) days after the close of the hearing record, pursuant to a joint motion for continuance.  *See* Third Prehearing Order of February 10, 2016.  The hearing record was originally scheduled to close on June 20, 2016, when closing briefs were due.  However, the Parents requested a continuance of that due date to June 22, 2016.  The District agreed to the request, and it was granted by order issued June 20, 2016.  The ALJ requested that the parties file a stipulation concerning the meaning of abbreviations used in a certain exhibit.  The parties filed that stipulation on June 23, 2016.  The ALJ also requested that the parties file a stipulation concerning the meaning of certain numerical codes used in another exhibit.  The parties filed that stipulation on July 14, 2016.  The hearing record therefore closed on July 14, 2016, with the filing of the final stipulation.  Thirty days thereafter is August 13, 2016.  The due date for the written decision is therefore **August 13, 2016.**

---

[1]  In the interests of preserving the family's privacy, this decision does not name the parents or student. Instead, they are each identified as "Parents," "Mother," "Father," and/or "Student."

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

## EVIDENCE RELIED UPON

The following exhibits were admitted into evidence:

Parents' Exhibits[2]
P-1 through P-16;
P-18 through P-41;
P-43 through P-146;
P-148;
P-150, only pages 7 – 9;
P-151;
P-152, only pages 1 – 33; 35 – 49; 58 – 62; 66 – 76; 81 – 82; 100 – 102;
P-153 through P-155; and
P-159 through P-173.

District's Exhibits[3]
D-1;
D-7, only pages 20 – 21;
D-21, only pages 2 – 11; and
D-27.

The following witnesses testified under oath.  They are listed in order of their appearance:

The Mother of the Student;
The Father of the Student;
Wade Taylor, Provo Canyon School, therapist;
Ben Francis, Provo Canyon School, teacher;
Joyce Scott, District assistant principal;
Corinne Daycross, District general education teacher;
Lea Un, District general education teacher;
Guy Becker, District home instruction teacher;
Andrea Hillman, District principal;
Beverly Cartwright, PsyD, District school psychologist and behavior specialist;
Jan Beglau, District secondary special education director;
Nathan Powell, Provo Canyon School, special education coordinator;
Christine "Cricket" Sutton, District school psychologist and behavior specialist;
Stacy Cecchet, PhD, private psychologist; and
Jean Mirabal, District executive director of student services.

---

[2]  The following exhibits were withdrawn by the Parents prior to the hearing and not offered in evidence.
They were therefore removed from the Parents' exhibit binders: Exhibits P-17; P-42; and P-152 pages 34,
50 – 57, 63 – 65; 77 – 80, and 83 – 99.

[3]  The following exhibits were withdrawn by the District prior to the hearing and not offered in evidence.
They have therefore been removed from the District's exhibit binder: D-2 through D-6; D-7 pages 1 – 19,
22; D-8 through D-20; D-21 pages 1, 12 - 25; and D-22 through D-26.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 2

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

## ISSUES

1.    Whether the District violated the Individuals with Disabilities Education Act (IDEA) and denied the Student a free appropriate public education (FAPE) by:

   a. Failing to provide an evaluative placement for the Student after his long-term suspension from the District;
   b. Failing to provide an appropriate residential placement for the Student in a timely manner after his long-term suspension from the District and subsequent deterioration;
   c. Significantly excluding the Parents from the educational process by failing to reconvene the Student's individualized education program (IEP) team in light of Dr. Stacy Cecchet's evaluation, the Student's long-term suspension, chronic absences and deterioration at the end of the 2014-15 school year, and inability to attend school during the 2015-16 school year;
   d. Failing to provide an interim alternative educational setting (IAES), convene his IEP team, or initiate a reevaluation after the Student's suspension;

2.    Whether Provo Canyon School, including all associated related services, is and has been an appropriate placement for the Student;

3.    Whether the Parents are entitled to their requested remedies:

   a. Declaratory relief that the District had denied the Student FAPE;
   b. Declaratory relief that the District has not offered appropriate programming and placement to the Student;
   c. Declaratory relief that the Parents' unilateral and requested programming and placement have been and are appropriate;
   d. Declaratory relief that the Student is in need of residential placement;
   e. An order that the District shall place the Student at Provo Canyon School prospectively; and
   f. An order that the District shall reimburse the Parents for tuition and related services associated with the placement at Provo Canyon School.

*See* Fourth Prehearing Order of March 8, 2016.

## FINDINGS OF FACT

   In making these Findings of Fact, the logical consistency, persuasiveness and plausibility of the evidence has been considered and weighed. To the extent a Finding of Fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than the conflicting evidence.

Background

1.    The Student was born to a teenage mother who was killed during a drug deal when he was 18 months old. The identity of the Student's biological father is unknown. Child Protective Service (CPS) reports indicate the Student was exposed to street drugs in utero and alcohol during breast-feeding. Before the mother's death, there were more than 24 CPS allegations of child neglect and abuse against her. The Student was removed from her custody before she

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

died, when he was 15 months old, and placed with his maternal grandparents. While living with the grandparents, he was diagnosed with speech delay, delayed socio-emotional functioning, disruptive behaviors, fecal and urinary incontinence, and suspected of having Attention Deficit Hyperactivity Disorder (ADHD). He was placed in a developmental preschool. P-144:3-4; P-152:30-31.[4]

2.     Throughout the years he lived with the maternal grandparents, there were CPS allegations of abuse and neglect against them. The Student was removed from their home when he was three and a half years old and placed in Washington State custody. He experienced a failed adoption when he was three years and eight months old, due to behavioral problems and the inability to form a loving parent-child bond. Approximately a month later he went into foster care with the Parents, where he lived with them and with the Mother's 10 year-old biological daughter. The Parents adopted the Student when he was approximately four and a half years old.   In their care, the Student engaged in tantrums, aggression toward others, property destruction, and was expelled from several preschools. Throughout his development he has engaged in moderate fire-setting. Also throughout his development he has had a strange relationship with food, hoarding it when there is no need, and concerned that there will not be enough for later. This stemmed from his early experiences of malnourishment and starvation. P-144:4-5; P-152:31; Testimony of Mother.

3.     By age six, the Parents began to doubt their ability to form a bond with the Student, who did not pursue physical contact and who struggled to make eye contact. Despite these problems the Student was an avid reader, good with computers, and interested in science and social studies. At age eight or nine, he had read all of the Harry Potter books. The Parents supported his interests at home, first by teaching him to read and visiting the library, then by filling in things he missed when pulled out of class. Testimony of Mother. His affinity for reading has continued to the present, and often serves to calm or focus him. Testimony of Taylor, Cecchet and Mother.

4.     The Student attended school in the District from preschool to 10th grade. Throughout those years, he was continuously eligible for special education and continuously had an IEP. Through the spring of his 2nd grade year, his special education eligibility category was Developmental Delay; since that time it has been Health Impairment, based on an ADHD diagnosis. P-2; P-4; P-6; P-11.

5.     The Student's special education services have always been exclusively behavioral, and never academic. This includes learning behaviors (executive functioning deficits) as well as interpersonal behaviors. His last two District evaluations, in 5th and 8th grades, did not include IQ testing or standardized academic testing. P-18; P-26. His prior evaluation, in 2nd grade, found his full scale IQ to be 118. His standardized academic scores at that time were 81st to 99th percentiles in math, 59th to 94th percentiles in reading, and 85th to 97th percentiles in writing. P-11:7-9. Recent testing upon entering a residential school in 10th grade also found high standardized scores, despite the Student's truancy and very low grades in high school: 84th percentile in math, and 74th percentile in reading. P-152:81-82.

---

[4] Citations to the exhibits are in the following format. "P-144:3-4" refers to Parent Exhibit P-144, pages 3-4.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 4

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

6.    The Student has always had difficulties with social connections. He loves to make friends and does so initially, but drives them away by annoying or offensive behavior and his inability to read social cues. The Student desperately seeks human connections and has little awareness why he is so often rejected. He would not open up or articulate his problems when counseling was attempted. Testimony of Mother and Sutton.

7.    A Behavior Intervention Plan (BIP) has been part of his IEP for many years. In some years he also had an Aversive Intervention Plan. P-2 through P-6; P-9; P-10; P-12; P-13; P-15; P-16; P-19 through P-21; P-24; P-28; P-39; P-75. For his first few years of elementary school, the Student was placed in a self-contained class for children with emotional-behavioral disorders. The academic level in the class was below the Student's level, so the Parents supplemented his education at home. In the spring of his 3rd grade year, the Student started attending some mainstream classes. P-13:1, 14; Testimony of Mother. By the spring of his 4th grade year, he was in the mainstream environment full-time, with his special education behavioral services delivered in that environment. P-16:13.

8.    At the transition to middle school, the Student's IEP team decided his behavioral needs required a more restrictive placement: 40% of his time in 7th grade was in a special education setting. P-21:1, 10. He returned to a full-time mainstream setting in the IEPs adopted in the spring of 7th grade and the spring of 8th grade, with his special education services delivered in that setting. P-24:15; P-28:13. Once in high school, in the spring of 9th grade, he was placed in a special education setting for 4% of the time, with the remainder in a mainstream setting. P-39:13. The Student played trumpet in school band from elementary through high school, and was considered a good player. In high school, however, his behavior put him in conflict with the band teacher and he did very poorly. P-64: Testimony of Mother and Sutton.

9.    District behavior specialist Christine Sutton, who is also a school psychologist, was involved with the Student in his 9th and 10th grade years (2013-2014 and 2014-2015), except during a maternity leave from early-June 2014 to early-November 2014. For the first few months of 9th grade she worked with him directly for 15 minutes twice a week. P-28:13; Testimony of Sutton. The District then changed from having behavior specialists delivering instruction to students directly, to having special education teachers take over that function. The District believed it would be more organic to have behavioral instruction take place in a classroom, where behaviors occur. Testimony of Sutton. The Student (along with almost all others whose IEPs contained direct service time from a behavior specialist) had his IEP amended in January 2014 to reflect that his behavioral instruction would now be provided by a special education teacher. However, the Student's IEP adopted at that time did not include any time for the behavior specialist to consult with the Student's teachers. P-39:13. Despite this, Ms. Sutton continued to be quite involved with the Student's case, as evidenced in a number of emails and in her testimony.

10.    The record reflects that Ms. Sutton was the high school staff person who advocated for the Student the most, intervening on his behalf with teachers and administrators to urge them to follow the strategies outlined in his BIP. She demonstrated a great deal of compassion and informed concern. However, Ms. Sutton was not properly apprised on several matters of law that impacted the Student, as discussed in the Conclusions of Law, below. She was also not sufficiently aware of important background information about the Student that was reflected in prior District evaluations. Ms. Sutton testified that school staff had "not an ounce of clue on the

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 5

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

depth of his mental health or his previous – his history as a young child," and that she had "zero information" about his previous abuse and neglect until April 2015, when she received a private psychological evaluation report.  Tr. 814-15, 851-52 (Sutton).[5]  However, the District's 2010 evaluation stated:

> [The Student] was adopted when he was just under 4 years of age.  [The Student] had several care givers before.  His biological mother was a teen ager [sic] and died. He lived with biological grand parents [sic] until around 3 years of age (who he remembers still) until he was removed by CPS.  He was placed in two foster homes before being adopted.  [The Student] has behavior and anger issues at times.  He was asked to leave several daycare settings. . . .
>
> Medical Diagnosis
> ADHD, ODD per Dr. Alberda.  Reported by Tammy Beddoe RN [District educational health specialist]

P-18:5.  More extended information about the Student's childhood trauma was available upon inquiry: the Mother knows the Student's early childhood history in detail, having been privy to three four-inch binders from CPS.  Testimony of Mother.

11.   The District's next evaluation, in 2013, incorporated the early childhood information from the prior evaluation report by reference:

> Please see report submitted on 2/11/2010 by Tammy Beddoe Searson RN for the complete health and developmental history.

P-26:4.  The 2013 evaluation again stated that the Student's diagnoses were ADHD and ODD. Id.

12.   The Student's IEP included a BIP in both 9th and 10th grades.  P-28: 16-17; P-39:17-18.[6] The Student spent all of his time in general education in those years, except for 1.25 hours per week of behavioral services.  The BIPs list as the "Person(s) Responsible: *General education teacher* in collaboration with learning support and behavior specialist."  P-28:17; P-39:18 (emphasis added).  The Student's BIPs contain a wealth of information on his behaviors, their root causes, what triggers them, what exacerbates them, how to respond to them, how to reinforce good behavior, and what consequences should occur for inappropriate behavior.  Id. The BIPs are only two pages long.  Yet neither of the general education teachers who testified at the hearing (both of whom taught him for two years) received a BIP for him.[7]  One of them

---

[5]  Citations to the transcript of the hearing are in the following format:  "Tr. 814-15, 851-52 (Sutton)" refers to transcript pages 814-15 and 851-52 during the testimony of Ms. Sutton.

[6]  A successor BIP was adopted as part of a new IEP in January of the Student's 10th grade year (January 2015), but he only attended school for one day during the term of that BIP.

[7]  In the spring of the Student's 9th grade year, Ms. Sutton, the behavior specialist, attached a copy of the Student's BIP to an email she sent to the Student's math teacher, though the math teacher does not recall ever seeing the Student's BIP.  P-41:2; Testimony of Un.  Whether or not the math teacher received

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0108X
OAH Docket No. 12-2015-OSPI-00227
Page 6

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

has taught in the District for 14 years, and the other was not asked about her tenure but appeared to be a veteran teacher. The 14-year teacher did not know what "BIP" stood for,[8] and the other teacher testified she has never received a BIP for any student. Testimony of Un and Daycross. Jan Beglau, District secondary special education director, explained that general education teachers are given copies of "IEP at a Glance" a two-page summary of an IEP. It includes the accommodations, which is the only part of the IEP that general education teachers are responsible for carrying out, according to Ms. Beglau. When subsequently asked by District counsel whether general education teachers also receive copies of BIPs, Ms. Beglau responded that they did. Ms. Beglau's testimony on this matter is not found credible in light of the testimony of the two general education teachers to the contrary. D-7:20-21; Testimony of Beglau.

13.    On January 6, 2015, during 10th grade, the Student was found hiding in the girls' bathroom for the third time that school year. He had locked all of the stalls except the one next to him, and had stuffed toilet paper into the cracks of the door to the stall he was in. The Student was emergency expelled. A manifestation determination meeting was held, where it was determined that the Student's conduct was not a manifestation of his ADHD. The emergency expulsion was converted to an eight-day suspension. Upon return to school, the Student was assigned a full-time, one-on-one aide for an initial period of six weeks to ensure the safety of other students. He was removed from the class during which the last bathroom incident had occurred, and returned to receiving regularly scheduled time with the behavior specialist, Ms. Sutton. P-65; P-69. None of the documentation states how many minutes per week he was to see Ms. Sutton. His IEP was not amended to reflect this, or to reflect the addition of the one-on-one aide.

14.    At this time it became apparent to Ms. Sutton that more things may be going on with the Student from a mental health perspective. Salient for her in this regard were his truancy and his sleeping on park benches without thinking there was anything weird about doing so. Ms. Sutton explained that she is not a clinical psychologist and not capable of making diagnoses, so very frequently a parent will seek out someone with the proper expertise to make mental health diagnoses. When questioned about whether the *school district* needed to seek out such an evaluation, Ms. Sutton testified she would never tell a parent what they should or should not do. She reiterated that mental health conditions are not within her capacity to diagnose. At the prompting of District counsel, she added that she did not need additional information with respect to his educational program at that time. Testimony of Sutton. This, despite it being apparent to her that the Student may be having mental health problems, was having greatly increased truancy (an increase from 17.53 absences in 9th grade to 36.83 absences in the first half of 10th grade alone), his grades had plummeted to a GPA of 0.25 in the first half of 10th grade, and he was repeatedly hiding out in girls' bathrooms at school despite being apprehended each time. P-161:13; P-164:6.

---

it in the spring, it is clear from her testimony that she did not receive the BIP at the beginning of the school year.

[8]    Later in the testimony of the 14-year veteran teacher, after she had reviewed an IEP that had "Behavioral Intervention Plan" in bold letters at the top of some pages (P-39:17-18), she ventured a guess that this is what "BIP" stood for. Testimony of Un.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 7

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

15.   Ms. Sutton's belief that school districts do not have an obligation to obtain evaluations of suspected mental health disorders came out in another context as well.  Ms. Sutton testified that she always thought the Student was somewhere on the autism spectrum, though she herself was not capable of making a diagnosis.   The Student's atypicality and maladaptive social interactions led to him being alienated by school peers.   He acted out with anger and maladaptive behaviors at school as a result.  Testimony of Sutton; P-28:16; P-39:17.  Despite this, Ms. Sutton never referred the Student for a psychological evaluation to determine whether he suffered from autism.  There is no evidence Ms. Sutton ever shared with the Parents that she suspected their son had autism.  When the Parents eventually obtained a private evaluation, Ms. Sutton specifically raised her suspicion of autism with the private psychologist.   The psychologist evaluated for it.  Testimony of Cecchet.  It also appears Ms. Sutton suspected the Student of having a disorder related to food, noting his "weird" and "bizarre" behavior concerning food.  Tr. 761 (Sutton).  She did not refer him for an evaluation in this area, either.

16.   The Parents in this case tried many approaches and interventions to improve the Student's behavior and school attendance, all to no avail.  Ms. Sutton explained at the hearing that parent counseling could not have been added to the Student's IEP to help them in this regard, because she knows definitively that this service is not available under the IDEA. Testimony of Sutton.

17.   The Student's problematic behaviors occurred less frequently when he was in a small environment with a trusted, positive adult.  General education classes, on the other hand, could be a difficult place for him to negotiate.  P-75:36-37; Testimony of Sutton.  Nevertheless, the Student was placed in regular-sized general education classes.  When asked about this, Ms. Sutton explained that small classes at the Student's academic level did not exist at his high school.   The only small classes available were at too low of an academic level for him. Testimony of Sutton.

18.   January 21, 2015 was the Student's second day of school after returning from the eight-day suspension discussed above.  On that day, the Student engaged in conduct that resulted in another emergency expulsion, which was converted to a long-term suspension (see below). Except for a single day in May 2015, the Student never attended school in the District again following the incident on January 21, 2015.  Except for that one day, he was perpetually truant after his long-term suspension.

19.   An overview of the Student's attendance, grade point averages, and discipline for 8th, 9th and 10th grades is set forth below:

Attendance
8th grade       7:58 absences (of which 6.75 were excused)
9th grade       17.53 absences (of which 5.83 were excused)
10th grade      56.83 absences (of which 4.83 were excused)

Grade point average
8th grade       2.92
9th grade       1.36
10th grade      0.13

Discipline

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

| 8th grade | No information in the record. |
|---|---|
| 9th grade | 16 formal disciplinary offenses, resulting in: |

- Lunch detention on five different dates
- In-school suspension on two different dates
- Placement on no-hall-pass list on two different dates, then for the last month of the school year
- Emergency expulsion for fighting, converted to a two school-day suspension

| 10th grade | 8[9] formal disciplinary offenses (in less than half-year of attendance) resulting in: |
|---|---|

- Lunch detention for approximately two months;
- One-day suspension;
- Undetermined discipline merged with first emergency suspension listed below, due to proximity in time;
- Emergency expulsion for hiding in girls' bathroom, converted to eight school-day suspension; and
- Emergency expulsion for physical altercation with dean of students, converted to 45 school-day suspension.

P-32;[10] P-36; P-44; P-45; P-60; P-65; P-69; P-79; P-161:8, 10, 13-14; P-164:1, 6.

20.    In the summer after 9th grade, in July 2014, the Parents filed an At Risk Youth (ARY) petition with juvenile court and the petition was granted.  It required the Student to, among other things, attend school, participate in counseling, do chores at home, and abide by a curfew.  The Student did not comply with the conditions of the ARY order and was repeatedly placed in juvenile detention as a result.  P-49 through P-51; P-53; P-146; D-1; Testimony of Mother and Father.

21.    Beginning near the end of 9th grade and continuing into 10th grade, the Student had significant criminal involvement.  He was charged with the following offenses during the year-and-a-half period from May 2014 to December 2015:

9th grade
Aiming or discharging firearm

---

[9]  There were five incidents for which formal discipline was issued to the Student in 10th grade.  He was charged with at least eight offenses committed in the course of those five incidents.  However, there may actually have been more than eight offenses charged.  For the last two incidents (the ones that resulted in emergency expulsions), formal discipline documents are absent from the record.  For those two incidents, there is manifestation determination paperwork explaining in narrative form what happened, but it does not list the disciplinary offices charged, which may have been multiple.  P-69; P-79.  Multiple criminal charges arose from the final incident -- assault, possessing a dangerous weapon at school, and maliciously damaging property (P-146:3) -- so it is possible that multiple school disciplinary offenses arose from that incident as well.

[10]  Exhibit P-32 is the Student's disciplinary history for 9th grade.  It contains codes that were not explained at the hearing.  At the ALJ's request, the parties submitted a stipulation concerning the meaning of the codes and other matters referred to in Exhibit P-32.  That stipulation was received on July 14, 2016, and is relied upon in the chart in text, above.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

Reckless burning, 2nd degree[11]
Criminal trespass, 2nd degree
Unlawful drug paraphernalia use
Theft, 3rd degree

10th grade
Malicious mischief/domestic violence, 3rd degree
Assault, 4th degree (at school, January 21, 2015)
Dangerous weapons on school premises (at school, January 21, 2015)
Malicious mischief, 3rd degree (at school, January 21, 2015)
Malicious mischief/domestic violence, 3rd degree
Theft, 3rd degree
Four probation violations

P-146.   The domestic violence incidents resulted in damage to walls, breaking the Father's glasses, and accidentally splitting the Mother's lip while trying to close a door.  The Parents found no disciplinary strategies were working to manage the Student's behaviors, which included yelling, arguing and backtalk.  The Student also stole items including: a BB gun from a peer; an iPod from a neighbor's house; girls' underwear; money from a teacher's desk; and tools, phones and money from the home and from family members' purses.  The Student had grossly poor personal hygiene, despite the Parents working with him over the years on step-by-step hygiene practice.  In high school, he was not using soap, wearing dirty clothes, not brushing his teeth, and not washing his hair.  He appeared unaware of how he was perceived. Peers would refuse to sit next to him and made comments about his body odor.  P-144:5; Testimony of Mother.   During high school, the Student eloped from home with increasing frequency and for longer periods of time.  He spent time with homeless and transient people and eventually slept on the street and in the woods.  He said he liked these people, they were his friends, and he wanted to get away from rules and conflicts with his Parents.  Id.

Long-term suspension through residential placement by Parents: January 22, 2015 through December 14, 2015 (10th grade)

22.   On January 21, 2015, the Student refused his aide's request to take his daily planner or binder out of his backpack.  The paraeducator eventually took him to the dean of students.  The dean discussed the importance of organizing his assignments.  When the dean asked for his backpack, the Student got agitated and tried to flee.  The dean took hold of the backpack, at which point the Student became physically aggressive.  The Student head-butted the dean and kicked his desk, damaging it.  They ended in a struggle on the floor.  Additional staff were able to control the Student.  This was first report of the Student being physically aggressive at school since his emergency expulsion for fighting in 9th grade.  His behavior specialist, Ms. Sutton, was "shocked" at the unprecedented level of his behavior.   Tr. 784 (Sutton).   A search of the Student's backpack revealed a powerful slingshot known as a "wrist rocket", 30 large ball

---

[11]   The Reckless Burning charge resulted from the Student and peers reportedly being in the woods behind an apartment complex with the seven-year old sister of one of the peers.  The peers left, and the Student was found with the seven-year old, having built an uncontained fire to keep her warm.  P-144:8.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 10

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

bearings, and a lighter.  The Student was emergency expelled the next day, January 22, 2015.
P-79:2; P-83:1; Testimony of Scott, Sutton and Father.

23.  On January 27, 2015, a manifestation determination meeting was held regarding the
January 21st Incident.  The Student's conduct was found not to be a manifestation of his
disability.  The only disability considered was ADHD.  P-79.  The behavior specialist, Ms.
Sutton, led the manifestation determination meeting.  Throughout her testimony, Ms. Sutton
never mentioned the Student's ODD diagnosis, referring repeatedly and exclusively to ADHD.
Assuming Ms. Sutton knew about the ODD diagnosis (it is stated in both the District's 2010 and
2013 evaluations), she nevertheless did not consider it during the manifestation determination:
She believes the law requires manifestation determination teams to consider only the disability
(here ADHD) that underlies a student's eligibility category (here Health Impairment) and the
effects of that disability.  Ms. Sutton testified that she "know[s]" the Student, and knows "more
than whatever a document is going to say about what [his] disability is."  Tr. 879 (Sutton).
However, her interpretation of the "letter of the law" is that during a manifestation determination,
it is impermissible to consider disabilities other than as explained above.  *Id.*  Accordingly, ODD
is never mentioned in the paperwork determining whether the Student's conduct toward the dean
(which was oppositional, defiant and aggressive) was the manifestation of a disability.
The team considered only the impulsivity that results from ADHD:  It found that, although the
Student is impulsive due to ADHD, he does not have a documented disability in the area of
physical aggression and he was aware that the contents of his backpack were inappropriate for
school.  The team overlooked the fact that "Aggression" and "Conduct Problems" were found to
be "of major concern" in his most recent evaluation, which stated he "has difficulty inhibiting his
externalizing behaviors such as . . . aggression."  P-26:6.

24.  Also on January 27, 2015, the District adopted the annual revision of the Student's IEP.
The IEP meeting was combined with the manifestation determination meeting that day.  The
combined meeting took approximately 30 minutes.  The Father signed the IEP, but he recalls no
discussion about the Student's IEP services at that meeting.  Testimony of Father; P-75:23.
The Father's testimony in this regard is found credible because 30 minutes is a short time in
which to complete a manifestation determination regarding a serious infraction and to review,
discuss and adopt a complex document like the Student's IEP.  The Father's testimony in this
regard is also found credible because it was uncontradicted: he testified before any of the
District witnesses testified, and none of them contradicted him.

25.  A private psychologist, Stacy Cecchet, PhD,[12] began an evaluation of the Student the next
month, in February 2015.  She provided an opinion at the hearing about whether the Student's
January 2015 IEP was appropriate for him.  She opined that the educational program and

---

[12]  Dr. Stacy Cecchet received a PhD in clinical psychology from Seattle Pacific University in 2012.  As
part of her graduate work she did an 18-month rotation at one of the Washington State Children's Long-
term Inpatient Program (CLIP) residential facilities, the Child Study and Treatment Center (CSTC).  After
receiving her PhD, she completed a postdoctoral fellowship in pediatric psychology at Johns Hopkins
University, where she practiced at the Kennedy Krieger Institute's Behavioral Management Clinic.  Dr.
Cecchet has participated in a number of research projects and has published several articles in
professional journals.  For the last three years, she has maintained a clinical practice in Everett,
Washington, working with children and adolescents with significant behavioral, mental health and
academic issues.  P-145; Testimony of Cecchet.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 11

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

placement of the January 2015 IEP were "not at all" inappropriate for him.  The amount of behavioral services, 1.25 hours per week, she found "wildly inappropriate" for his needs, and stated "no goals would be able to be accomplished" in that amount of time.  Also, the IEP was inappropriate in her opinion because it did not provide for a residential placement.  Dr. Cecchet stated that the Student needed a residential placement at the time the IEP was written. Tr. 975-78 (Cecchet).

26.   The annual goals in the January 2015 IEP were the same goals as in the previous year's IEP.  All four of the Student's goals concerned behavior.  The baseline percentages and target percentages for each goal remained unchanged, indicating no progress had been made during the prior year.    P-39:9-10;  P-75:9-10.[13]    No changes were made in the Student's accommodations, modifications, special education services or placement.  He continued to be in general education classes except for 1.25 hours per week, which was to be spent with a special education teacher or paraeducator working on behavior goals, just as in the previous year. P-39:11, 13-14; P-75:11, 14-15.

27.   The section of the new January 2015 IEP concerning Present Levels of Educational Performance had teacher comments raising concerns.  The three paragraphs below are from three different teachers:

> [The Student] began the year as attentive and thoughtful.  Then, he was not here for a while on any regular basis.  Then he became both attentive and hyper-hyper-active (at least when he is here).  He works at things but doesn't complete everything.  He has missed a lot.  He is distracted by himself, and by technology.  I don't know how he will fair in the great reckoning that is the semester grade, but I do not understand how he will make this work with his 17 absences.

> Hit and miss.  Some days are good, others not so much.  Tries to help but needs guidance as to appropriate times.  More attempts at appropriate interaction than last year.  (Regarding organization of materials)  Still a major challenge, even with in-class binder.

> I have not seen [the Student] for quite some time, but when he was in my class, it still required some work to get him to work on his assignments.  He got easily distracted because he wanted to sit with his friends, but whenever I let him, it was almost certain that he wouldn't get anything done.

P-75:6.

28.   Two teachers testified at the hearing.  Both taught the Student in 9th as well as 10th grades.  The Student's science/engineering teacher wrote the middle comment of the three teacher comments quoted above.   P-75:6.  On November 17, 2014, the Student received formal

---

[13] The only exception to this record of no progress was as follows:  On one of the Student's four annual goals he improved by 10%.  The baseline and target levels in the previous IEP were 30% and 80%, respectively.  The baseline and target levels in the new IEP were 40% and 80%, respectively.  P-39:9; P-75:9.  He thus improved his baseline from 30% to 40% over the course of the prior year.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

discipline for two offenses in her class: "[a]nnoying [o]thers" and being "[u]ncooperative." Despite numerous redirects, the Student had persisted in touching other students' computers and bothering classmates. His punishment was folded into a later emergency expulsion. P-65. Two days later, on November 19, 2014, the Student engaged in three offenses in the same class: "disruptive conduct," "disobedience of the reasonable instructions of school authorities," and "vandalism." On that date, he whipped the cable of some headphones and refused to stop. Then, against repeated instructions to desist, he repeatedly used the power button on a computer to turn it on and off, which harms the computer, and repeatedly pushed keys to cause it to make noise. He also changed the settings on a neighboring computer to be read-aloud. The disciplinary notice for the one-day suspension he received also stated: "Most every class period is spent making poor decisions that are disruptive and potentially harmful to equipment". P-60. On the date of these events, the science/engineering teacher wrote an email about the Student to the dean of students. No copy of her email is in the record. However, the dean forwarded it to the assistant principal stating:

> I'm really at a loss with this kid. Discipline is ineffectual with him. We might need to do a serious meeting with family, maybe shorten day and increase supervision even more. I don't know.

P-58:1.[14]

29.   At the time of her testimony at the hearing, the science/engineering teacher did not recall any disciplinary issues with the Student or problems he had with peers that stood out in her mind. After being shown the documents concerning the incidents described above, she testified that the events happened almost a year and a half ago, and she has more than 150 students per year. She also makes an effort to forget bad behavior from one day to the next, since teenagers are not the same person the next day; she strives to make every day a fresh start for them. Testimony of Daycross. By January 2015, the dean of students wrote:

> [I]t might be that some of the classrooms have been poisoned too much by his presence [naming the science/engineering teacher and one other] that ISS [In School Suspension] might be the best place for him for the remainder of the semester during those classes.

P-68:1.   The science/engineering teacher gave the Student a C+ and an F for the two semesters of 9th grade, respectively, and an F for the first semester of 10th grade. P-164:6.

---

[14] The record contains a disciplinary notice dated January 9, 2015 for the November 17, 2014 offenses. The notice states that discipline for the November 17, 2014 offenses would be folded into an emergency expulsion for more recent conduct (which occurred in early-January 2015).   P-65.   There is no explanation in the record for the time lag between the November 17th events and the January 9th disciplinary notice. The record also contains a disciplinary notice dated December 4, 2014 for offenses that occurred on November 19, 2014. P-60. There is no explanation in the record as to why discipline for the November 19th events was issued so much more promptly than discipline for the November 17th events. While different offenses are cited in the two notices, the conduct is fairly similar. It is possible that there was only one date of misconduct instead of two, given the proximity in time of the two dates and the odd sequence of the discipline letters. This question need not be resolved, nor can it be on the present record.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 13

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

30.   The other teacher who testified at the hearing was the Student's math teacher.  She initiated formal discipline against the Student during his 9th grade year for continually refusing to stay for Achievement Time.  Achievement Time is the last 15 minutes of a period, during which students who are having difficulty in the class are required to stay.  P-41:2; P-45; Testimony of Daycross.  The Student was frequently absent from math class during 9th grade, did not turn in assignments, and got an F on the final examination.  Nevertheless, on the statewide math assessment that year he scored at the highest level.  The math teacher recalled no behavioral issues between herself and the Student, although she stated that there is always one kid who disrupts the class, and that year it was him.  In 10th grade, she does not remember him being present much.  Testimony of Un.  The math teacher gave the Student a D and an F for the two semesters of 9th grade, respectively, and a D for the first semester of 10th grade.  P-164:6.

31.   As discussed above, neither of these teachers received a copy of the Student's BIP.  They were supposed to implement the BIP in their classes by using the interventions and strategies in the BIP to address behavioral issues.

32.   More teacher feedback is found in rating scales that two unnamed teachers completed in the spring of the Student's 10th grade year.  The rating scales were for the Behavior Assessment System for Children – 2nd Edition (BASC-2), administered by Dr. Cecchet.  The teachers rated the Student as having very severe behavioral problems across a wide range of areas.  One teacher rated the Student at the most severe level ("clinically significant") in nine of the 14 areas rated, and the second most severe level ("at risk") in four of the remaining five areas.  The other teacher rated him at the most severe level in seven of the 14 areas, and the second most severe level in four of the remaining seven areas.  P-144:13.

33.   The Student's BIP was amended as part of the annual revision of his IEP in January 2015 The significant changes from the prior year's BIP were as follows.  P-39:17-18; P-75:36-38.  First, the prior BIP stated the Student was receiving "regularly scheduled times" with the school behavior specialist, though it did not state how often or for how long.  P-39:18.  It is puzzling that the January 2014 BIP still stated this, since the January 2014 IEP *removed* all behavior specialist minutes and assigned them to a special education teacher.  P-28:13; P-39:13.  In any event, the new BIP of January 2015 made clear that the Student's IEP did not include any service minutes from the behavior specialist.  In place of the statement that the Student would receive "regularly scheduled times" with her, language was inserted that did not commit the District to either consultation or direct service time from the behavior specialist: "It is important for [the Student] to have positive relationships with adults that he can trust, such as his counselor or school behavior specialist."  P-75:37.  The new IEP, like the previous one, included no service minutes from a school counselor, either direct or consultative.  P-39:13; P-75:14.

34.   The second change in the Student's January 2015 BIP was as follows:  The prior BIP told staff to reinforce desired behaviors and ignore or minimize unwanted behaviors.  The new BIP added that expected social behavior should be explicitly taught, in addition to being reinforced, and named an emotional regulation curriculum that would be beneficial.  The final change was a statement in the new BIP that when agitated, the Student should be given a brief time to calm down, either alone in a supervised area or with a trusted adult.  P-39:18; P-75:37.

35.   As mentioned above, shortly before the January 2015 IEP meeting, the District had approved a full-time, one-on-one safety aide for the Student based on the third girls' bathroom incident.  P-69.  The aide was to serve for at least six weeks.  However, the January 2015 IEP

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

included no provision for an aide, even for a temporary period, despite a District administrator acknowledging that the aide made the Student's placement more restrictive. P-75; Testimony of Beglau.

36.   After the manifestation determination meeting on January 27, 2015, the Student's January 22nd emergency expulsion was converted to a long-term suspension of 45 school days.  The District calculated this would allow him to return on April 13th. P-80; P-82; P-83.[15]

37. .  The Student's juvenile probation officer, Leah Price, MSW, maintained close contact with the family and with Ms. Sutton of the school district.  P-111; P-130; P-131; P-136; P-139.

38.   During most of his long-term suspension (January 22 to April 12, 2015), the Student was either in juvenile detention or had eloped from home:

| | |
|---|---|
| January 21 to February 2, 2015 | Juvenile detention |
| February 5 to 19 | Juvenile detention |
| February 20 to 22 | Eloped |
| February 25 to March 3 | Juvenile detention |
| March 4 to 10 | Eloped |
| March 11 to 23 | Juvenile detention |

D-1; P-96; P-134:4; P-146.  Ms. Sutton was informed about his detentions and elopements at the time.  P-93; P-96:1; P-102:1; P-105; P-106:2.  The juvenile court ordered Aggression Replacement Training (ART); the Student began it but did not complete it due to elopement from home. P-89; P-134:6.

39.   On February 2, 2015, the District approved 1.25 hours per week of tutoring for the Student during his long-term suspension, to take place at the District administrative offices. D-21:6. The tutoring was exclusively in behavior (matching the 75 minutes per week of behavior services in his IEP), with no academic services.  District staff believed they were not obligated to provide any general education to the Student during his nearly three-month suspension.  P-93; Testimony of Beglau.  All agreed, however, that the more unstructured time the Student had on his hands, the more detrimental it would be for him. Testimony of Sutton.

40.   A prior written notice (PWN) implementing the behavioral tutoring was issued February 24th, and the first tutoring session took place on March 4th.  P-95; P-97; D-21:7.  Prior to March 4th, the Student was unavailable for tutoring because he was almost continuously in juvenile detention or missing due to elopement.

41.   The tutor was a certificated teacher working full-time for the District as a home instructor. The tutor has a master's degree in counseling as well as teaching, and has strong skills in

---

[15]  The suspension letter stated the suspension could be shortened to allow his return on April 3, 2015 (instead of April 13th) if Student met certain conditions.  P-82; P-83.  However, this reprieve would only allow him to attend one additional school day (April 3rd): the intervening period between April 3rd and April 13th was spring break. D-27:2; P-106:2.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 15

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

building relationships with challenging students. Testimony of Becker and Beglau. The tutoring sessions were to occur once a week. However, later on the day of the first tutoring session the Student eloped from home again. Ms. Sutton and the Father informed the tutor of the Student's elopement. The Student did not show for his scheduled tutoring appointment the following week. Ms. Sutton and the Father said they would let the tutor know if the Student returned and was available for tutoring. D-21:8; P-105; Testimony of Becker and Father. The Student was missing from March 4 to March 10, 2015, then was in juvenile detention from March 11 to March 23rd (see chart above). The Student lived at home and did not elope from March 24th through the end of his suspension on April 13, 2015. There is no evidence the District attempted to re-start his tutoring during this three-week period. The Parents did not contact the tutor during this period to ask that tutoring be restarted. Testimony of Becker and Father.

42.   As mentioned above, the District believed it was not obligated to offer any general education to the Student during his long-term suspension. However, Ms. Sutton, the juvenile probation officer, the Parents, the tutor, and a school counselor worked on getting access for the Student to some online academic courses called eLearning. This was approved by the District on March 10, 2015. No assessment was done regarding whether this method of learning would be beneficial for the Student, or whether he had computer access. (The Student informed the tutor on March 4th that his Parents no longer allowed him computer access at home.) The Student's IEP team did not make or review the decision on eLearning. D-21:7-8, 10-11; P-96:1; P-98:1-2; P-101; P-102:1-2, 4; Testimony of Becker; Father; Sutton; Beglau. The Student never enrolled in any eLearning class. Testimony of Sutton.

43.   In late-February 2015, Dr. Cecchet began a forensic psychological evaluation of the Student as a result of a court order for diagnostic clarification. Dr. Cecchet conducted assessments on two dates, administering five standardized emotional-behavioral assessments. Some of the assessments used rating scales completed by teachers and the Parents. Dr. Cecchet reviewed extensive records concerning the Student, and interviewed his Parents, his juvenile probation officer, and Ms. Sutton. P-144; Testimony of Cecchet. At the time of her evaluation, the Student was failing all classes except for Geometry, where he had a D. He was also eloping from home three to four times per week, and was gone from the home for up to three nights at a time, more on weekends than during the week. (In the months after Dr. Cecchet conducted her interviews, his periods of elopement lengthened.) The Student told Dr. Cecchet about enjoying the company of homeless or transient individuals, and sleeping in the woods or on the streets with them when away from home. He would transport himself to nearby cities by walking, skateboarding, taking the bus, and accepting rides from others. P-144.

44.   Dr. Cecchet met with the Parents on April 21, 2015, and provided them with her report that day (though the report is dated two weeks earlier, April 7th). The Parents gave the report to the District on April 22nd, the day after they received it. P-112:1. However, District representatives already knew the major findings of the report more than three weeks before the Parents did: the Student's juvenile probation officer had informed Ms. Sutton about those findings on March 30th. P-106:1.

45.   Dr. Cecchet ruled out Autism Spectrum Disorder (and the related, but less severe, Social Communication Disorder) because the Student does not have stereotyped or repetitive behaviors, restricted interests, or self-stimulating behaviors. Although he is a more rigid and concrete thinker than average, he is able to understand abstract concepts. She also ruled out Fetal Alcohol Syndrome (FAS). FAS requires confirmed evidence of maternal alcohol

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 16

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

consumption, and in its most expressed form causes unusual facial features. Also, FAS is not characterized by the atypical sensory experiences and thoughts the Student experiences. Testimony of Cecchet.

46.   The major new finding of Dr. Cecchet's evaluation was a diagnosis of prodromal schizophrenia. Prodromal schizophrenia is the first stage of the illness, where it manifests in a "flickering" rather than fully expressed fashion. It will almost always develop into full-on schizophrenia, though early intervention and the reduction of life stresses can reduce the impact of the disease.   Unlike bipolar disorder, where the patient returns to baseline functioning between episodes, a person with prodromal schizophrenia never returns to his or her previous baseline once they have entered the prodromal phase. Dr. Cecchet believes the onset of the Student's prodromal schizophrenia occurred approximately 18 months prior to her evaluation. She assessed the Student in February and March 2015. Testimony of Cecchet; P-144:1. Eighteen months earlier was fall 2013 – the start of his 9th grade year.

47.   Dr. Cecchet explained that children who do not have fully expressed schizophrenia often appear to be on the autism spectrum and are often misdiagnosed until they are older and their schizophrenia is more fully expressed. The schizophrenia diagnosis was based on a number of factors, including the Student seeing and hearing things that others around him did not see or hear:  a huge owl swooping over some basketball hoops and seen by none of the other players "because it flew too fast"; the Student seeing his dog walk in front of him indoors, when he later realized the dog had been outdoors the whole time; a face appearing on a wall that the Student was staring at while in juvenile detention; hearing his name being whispered over and over; seeing a person whose face was hidden because the person had a sweatshirt that zipped all the way up past their face to the top of the head (he followed this person into the girls' bathroom at school because the person had taken his iPod there).[16]   Dr. Cecchet also found the Student experiences paranoia or the questioning of others' motives, difficulty with maintaining logic or focus, eccentric thoughts, tangential speech, and is often viewed as odd or peculiar by others. P-144; Testimony of Cecchet.   When asked how confident she was in the prodromal schizophrenia diagnosis, Dr. Cecchet replied: "Very confident.  I cannot think of another diagnosis that would more accurately capture what [the] Student has experienced or what his records indicate." Tr. 940 (Cecchet).

48.   Prodromal schizophrenia is often accompanied by significant changes in behavior, such as the Student's struggle with everyday tasks like personal hygiene, attending school, and communicating effectively. Younger males with prodromal schizophrenia typically engage in more aggressive behavior. Additional symptoms the Student had that are common in prodromal schizophrenia are disturbed sleep-wake cycles, diminished emotional expression, apathy, and difficulty interpreting social cues. P-144; Testimony of Cecchet.

---

[16] The Student did not provide this account to anyone at school when he faced discipline for going into the girls' bathroom. Providing this account to a third party, long after the discipline was issued, does not lead to an inference that it was a falsification invented for purposes of avoiding discipline. Dr. Cecchet believes the Student was truthfully relating what he experienced, though she believes it was a hallucination. Testimony of Cecchet.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 17

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

49.  Dr. Cecchet explained the educational impact of schizophrenia: One of the diagnostic components of schizophrenia is cognitive disorganization.  This makes it very difficult for the individual to complete tasks in the right order throughout the day and to maintain academic focus.  Schizophrenia also had a major impact on the Student's truancy.  Especially given the co-morbidity with ADHD, the Student is highly susceptible to following impulses that lead to places and activities other than school.  While most people have an "angel" and a "devil" sitting on their shoulders, so to speak, counseling differently about impulses, the Student lacks the former.  If thoughts of returning home or returning to school occur, he is easily distracted from them.  When he does want to go home, his impaired cognitive organization sometimes prevents him from executing the multi-step process of getting there.  The Student's problems with truancy are caused by a "perfect storm" of schizophrenia, ADHD, and significant attachment issues from early childhood.  Tr. 940-944 (Cecchet).  ADHD makes it hard to follow directions, and students are often reprimanded and indirectly get the message that they are bad kids.  If they try their hardest and are not able to conform in the academic environment, there is not a lot of reason to keep trying.  Instead of trying to follow directions, they may turn to saying "no" and become oppositional, progressing from ADHD to ODD.  Children with the Student's severe social difficulties often turn to a more disenfranchised set of peers, where truancy is more common.  That is what happened in the Student's case.  Testimony of Cecchet.

50.  The collective description of the Student that Dr. Cecchet received from his Parents, the school, and his juvenile probation officer included the following:  "all describe him as odd, with atypical eye-gaze, and as having peculiar or eccentric thoughts . . . avolition and apathy . . . [and a] perceived inability to show empathy or regret."  P-144:6.  Describing the Student's inner life, Dr. Cecchet summarized as follows:

> He is uncomfortable with many social exchanges due to a deficit in understanding covert social rules and a pervasive dislike of physical affection. . . . Most notable are [the Student's] apprehension and mistrust of others, [and] his marked deprecation of his self-worth.  Although he permits others to exploit and mistreat him, he persists in desiring closeness and affection, which he achieves through acts of defiant, aggressive, and dangerous behavior. . . . He is likely distracted by inner thoughts that intrude on his social communication.  Pervasive instability and ambivalence intrude constantly into the stream of [the Student's] everyday life, resulting in fluctuating attitudes, erratic or uncontrolled emotions, and a general capriciousness and undependability. . . . Dejection, depression, and self-destructive acts are common.  His anguish and despair are genuine, but they are also a means of expressing hostility, a covert instrumentality to frustrate and retaliate.

P-144:15.

51.  Dr. Cecchet recommended antipsychotic medication with careful medication management.  She explained that illegal drugs, alcohol, and tobacco are known to worsen schizophrenia symptoms and must not be used; marijuana triggers psychosis in many instances.  P-144; Testimony of Cecchet.

52.  Dr. Cecchet "strongly" suggested residential treatment due to the Student's "significantly worsening dangerous behavior and elopement."  She provided a number of other recommendations (such as individual therapy, family therapy, behavioral parent training, and classroom accommodations) which can also be provided by a residential treatment facility.  She

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 18

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

explained that the Student's educational needs, which were not being met in part due to truancy and elopement, would be met at the full-time school in a residential placement. "[W]ithout residential care, he would not be able to function in a school setting." Tr. 1016 (Cecchet). Dr. Cecchet recommended the most intensive inpatient psychiatric treatment program for youth available in Washington State: the Children's Long-term Inpatient Program (CLIP). It is a public program providing 24-hour psychiatric care, staffed by psychiatrists, social workers, registered nurses, teachers, and other clinical experts. CLIP is funded by Medicaid, but also accepts private insurance and other income sources. Dr. Cecchet recommended CLIP instead of private residential programs because finances are a limiting factor for the Parents, and CLIP accepts Medicaid. There are no other residential programs in Washington State – public or private – that are appropriate for the Student. P-144; Testimony of Cecchet.

53.    The portion of the CLIP application that students read and sign (and which the Student signed) describes the program in part as follows:

> CLIP is a voluntary residential treatment program for youth ages 5-17 years old. Any youth over the age of 13 years old must agree with the need for treatment and sign in as a voluntary client upon admission.

> CLIP treatment is provided in a secure environment that is supervised 24 hours a day, 7 days a week. . . . Each CLIP program has a school on campus as well as recreational therapy, family therapy, skills groups, and individual therapy. The facility runs on structured schedule. Treatment focuses on addressing the clinical needs you, your family and community team have identified prior to admission. Treatment is geared towards assisting you to becoming safe and to gain the skills necessary to transition back to your community. The average length of stay is from 6-12 months.

P-134:16. Dr. Cecchet informed the Parents, and explained in her testimony, that it is a lengthy and difficult process to qualify for a CLIP bed. It takes up to a year to get accepted into CLIP. After being accepted to the program, a child is then put on a waiting list for a particular CLIP facility. This second process takes up to a year as well. Testimony of Cecchet.

54.    At the hearing, Dr. Cecchet was cross-examined by the District about the reasons for her recommendation of residential placement:

> Q:   Isn't it his mental health, his need for medication support, his need for psychological counseling, his need to be in a secure facility, isn't that the basis and why he needs residential treatment?

> A:   Due to a lot of things, [the] Student is not able to function across any settings of his life without residential support, including academic setting, including home setting, and including the community setting.

Tr.1031 (Cecchet). Dr. Cecchet attributed the Student's high standardized test scores upon entering Provo to his being an avid reader, interested in things he hears about and reads, and naturally supplementing his learning in that way. Testimony of Cecchet.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 19

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

55.   District staff found Dr. Cecchet's evaluation detailed, thorough and highly informative upon reading it.   P-114:1; P-116:1; P-117:1.   No District witness criticized or contradicted the evaluation at the hearing.   Upon receiving the report, Ms. Sutton informed District staff in an email that it was unknown how long it would take for the Student to access the residential program mentioned in Dr. Cecchet's report:

> [A] big variable remains in determining next steps in that we don't have a time frame for when [the Student] will be able to access the CLIP program referenced in the evaluation.

P-114:1.    A school psychologist at another District school who became involved with the Student the following month, Beverly Cartwright, PsyD, also knew directly from the Mother about the difficulties of acquiring a place in the CLIP program.   Testimony of Cartwright.   Thus, two District psychologists closely involved with the Student's case knew that acceptance into the public residential program was uncertain, and that even assuming he was accepted, it was likely to be a lengthy period before a bed actually opened up for him.

56.   A week after receiving Dr. Cecchet's report, on or about April 28, 2015, District staff had a "pre-meeting" without the Parents.   The purpose of the meeting was to discuss the Student's program for when he returned from his long-term suspension.   P-116:1; P-119; P-120; P-122. The next day, on or about April 29th, some District staff had a conference call with the Parents about the same subject.   P-123:2.   The number of District staff on that call, as well as what was discussed during that call, are disputed.   Testimony of Mother, Beglau and Sutton.   It is undisputed that it was not an IEP meeting, as there is no meeting invitation or any other IEP documentation.   During the April 29th conference call, the Parents expressed interest in the Student attending the District's small alternative high school rather than returning to his previous comprehensive high school.   They said Student was embarrassed about the events that occurred at his previous high school and wanted a fresh start.   He also had a friend at the alternative high school and was interested in attending. P-123; Testimony of Father.

57.   The District never convened a meeting with the Parents to discuss Dr. Cecchet's residential placement recommendation, even as it became clear in the months following her report that the Student was refusing to attend school and receiving no educational benefit from his current placement.   The District never initiated a reevaluation[17] to determine whether its January 2013 evaluation, now more than two years old, should be revised in light of subsequent events and in light of Dr. Cecchet's new diagnosis.   The District never convened an IEP meeting to determine whether a change of placement was needed in light of Dr. Cecchet's report.   The Parents did not know that school districts could fund private residential placements.   The Parents thought the District had offered them all it had to offer and they were on their own financially if the Student needed residential placement.   Testimony of Mother and Father.

58.   The record contains a notice of a meeting to occur on May 7, 2015 for the purpose of reviewing the Student's IEP.   There is also a PWN of the same date, stating the Student would now be attending the District's alternative high school.   P-126.   The Parents testified they never

---

[17]   The term "reevaluation" as used herein includes an "assessment revision," which is a less comprehensive form of reevaluation.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

saw these documents until reviewing the exhibits a few days before the hearing. They were very surprised to see them. Testimony of Father and Mother. District staff acknowledge that the Parents were not included in the May 7th meeting. Testimony of Hillman and Cartwright. It is odd, then, that attached to the meeting notice is a log of alleged attempted contacts with the Mother on May 4th and 6th about the meeting. The spaces on the contact log to indicate her responses are empty. P-126:2. Dr. Cartwright testified after the Parents, and did not contradict their testimony that they never received the May 7, 2015 meeting invitation or PWN. Testimony of Cartwright. It is found that the Parents did not receive the May 7, 2015 meeting invitation or PWN. In attendance at the May 7th meeting were two staff from the alternative high school, two staff from the Student's current high school, and the District secondary special education director. Testimony of Hillman. The PWN of May 7, 2015 was prepared by Dr. Cartwright and states that, given the recent psychological evaluation and the Student's need for more intensive and individualized instruction, he would now attend the District's alternative high school. The PWN rejected return to a comprehensive high school with a larger student population due to the Student's very problematic activities. The PWN did not consider, reject, or even mention Dr. Cecchet's strong recommendation for residential placement. P-126:1.

59. Staff at the May 7, 2015 meeting decided on the alternative high school's part-time STEP program for the Student, if the Parents were willing. Testimony of Hillman and Cartwright. STEP stands for Student Transitional Education Program. Testimony of Hillman. STEP is a transitional program for students who have a tenuous connection, or have lost connection, with high school. The STEP program is part-time in order to help them reestablish a relationship with school. Individual programs vary, but the principal's testimony indicated it is approximately half-time. The alternative high school also has a special education program, the Intensive Learning Support (ILS) program, that is separate from STEP. Staff thought ILS might serve the Student at some later point. *Id.* District staff anticipated the Student would attend the alternative high school through the end of the school year in June 2015, and into the next school year if it proved to be a good fit. Testimony of Hillman and Sutton.

60. Dr. Cartwright told the Mother that the Student's mental health issues would need to be taken care of before he would be successful at school. Testimony of Father. The Mother misunderstood this to mean he could not return to school until those issues were taken care of. Testimony of Mother. Dr. Cartwright testified she would never have said what the Mother alleges. Testimony of Cartwright. Dr. Cartwright's testimony is found more reliable than the Mother's on this point. The evidence is clear that the District planned for the Student's return to school in April 2015, and he returned to school in May 2015, despite the diagnosis of schizophrenia, which had not yet been successfully treated.

61. Dr. Cartwright testified that an IEP meeting would have been scheduled no more than a week into the Student's attendance at the new placement if he had continued to attend. However, there is no meeting invitation in the record, nor even the beginning of an email thread checking on the availability of team members or proposing possible meeting dates. There was no testimony that such matters were verbally discussed, either. In light of the absence of such evidence, and in light of Dr. Cartwright's preparation of the May 7, 2015 meeting invitation and PWN that were never sent, her testimony regarding an imminent IEP meeting is not found reliable.

62. When District staff decided to change the Student's placement to a partial-day program at the alternative high school, they did not amend his IEP, which called for a full-day program at a

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 21

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

comprehensive high school. Similarly, in January 2015 they had not amended his IEP to reflect the addition of a full-time, one-on-one safety aide intended to last for six weeks, even though the District director of secondary special education, Jan Beglau, believed that the aide rendered his placement more restrictive. Testimony of Beglau. Ms. Beglau explained that IEP amendments are not generally done for temporary changes to a student's program: it is too time-consuming to assemble and reassemble IEP teams for temporary changes. Testimony of Beglau. When asked what the outside limit on "temporary" was — 10 days, a month, six weeks, or something else — Ms. Beglau responded that she would not be comfortable putting a definite limit on it; the circumstances are different in each individual's case. When asked why temporary IEP amendments with explicit beginning and ending dates are not done, especially where parents agree with the changes so that a written amendment could be adopted without convening a meeting, she responded that the District prefers to err on the side of having the team there for support and to ensure everyone is on the same page. Testimony of Beglau.

63.   On May 14, 2015, the Student and his Father visited the alternative high school and met with its principal. Testimony of Hillman. The Student attended the STEP program there on May 18th. On that day he met for 20 minutes with the school's school psychologist, Dr. Cartwright. Dr. Cartwright planned to meet with the Student again the next day, and the Student said he would come. Testimony of Father and Cartwright.

64.   After his one day of attendance at the STEP program on May 18, 2015, the Student refused to attend thereafter despite the Parents' efforts. Testimony of Father. Dr. Cartwright arranged with the Parents to speak with the Student by phone on May 22nd, to no avail. P-125; Testimony of Cartwright. The Student never attended school again that school year. The District did not initiate a reevaluation or convene an IEP meeting to determine the reasons for, or to address, the Student's school refusal or how schizophrenia might impact his education. After Dr. Cartwright's failed telephone contact on May 22, 2015, later that day the principal of the alternative high school asked Ms. Sutton if she would reach out to the family. On June 2nd, Ms. Sutton belatedly responded that she would, but she acknowledges that she never followed through. P-129:1; Testimony of Sutton. The principal of the alternative school testified the Mother asked that the school or the District not contact the family any more. Testimony of Hillman. The Mother denies this ever occurred. She testified she did not say this, nor would she ever say something like this, as the Parents were looking for help for the Student. Testimony of Mother. The Mother's testimony in this regard is found credible. There is no reflection in any document (including email or notes) that the Mother made this request, and the Mother is correct that the Parents maintained close contact with the District and were always seeking help.

65.   The STEP program and the alternative high school were described in detail to Dr. Cecchet at the hearing. She was then asked to render an opinion on whether a transfer to that school and that program would change her opinion that the Student's January 2015 IEP was inappropriate. Dr. Cecchet stated it would still be inappropriate if implemented in that setting, particularly because it is a part-day, not a full-day program. The number of interventions the Student needs, and opportunities to practice the skills he is learning, cannot be accomplished with a part-time schedule. Also, the Student does very poorly with unstructured time, which he would have a lot of on a part-time schedule. Testimony of Cecchet.

66.   On June 1, 2015, Compass Health conducted a mental health assessment of the Student. He was found eligible for a program called "wraparound with intensive services" beginning July

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

17, 2015. As part of this program, he was to receive once-weekly individual and/or family therapy. Compass Health was also to handle his medication management beginning August 19, 2015. P-128; P-132; P-133.[18] The Student subsequently eloped from home and missed two medication management appointments and three therapy appointments in August and September 2015. P-134:7. There is no evidence he continued any services with Compass Health thereafter.

67.   Following his one day of attendance at the alternative high school on May 18, 2015, the Student was in juvenile detention, on runaway status, or in psychiatric hospitalizations during most of the time until December 14, 2015, when the Parents enrolled him in a residential facility.

| | |
|---|---|
| May 27 to June 1, 2015 | Juvenile detention |
| June 9 to 10 | Eloped |
| June 11 to 30 | Juvenile detention |
| July 13 to 27[19] | Juvenile detention |
| August 12 to 18 | Juvenile detention |
| August 28 | Psychiatric hospitalization |
| August 28 to September 3 | Juvenile detention |
| September 3 to 30 | Eloped |
| September 30 to October 3 | Psychiatric hospitalization |
| October 5 to November 1 | Juvenile detention |
| November 2 | Psychiatric hospitalization |
| *November 3 to 12* | *No information in record as to Student's status[20]* |
| November 13 to 14 | Psychiatric hospitalization |
| *November 14 to ???* | *No information in record as to Student's status* |
| ??? to December 1 | Juvenile detention |
| December 1 to 5 | Eloped |
| December 14 | Enrolled in Provo Canyon School |

P-130; P-131; P-134:2, 4; P-135; P-146; D-1; Testimony of Father.

68.   The first psychiatric hospitalization listed above, on August 28, 2015 (non-overnight) was the first such hospitalization in the Student's life. Three more followed in quick succession.

---

[18]  Compass Health had previously provided mental health services to the Student in 2008 and for several months in late-2010 and early-2011. P-1314:3.

[19]  The Mother's list of detention dates in the CLIP application states this period of detention ended July 21, 2015.  P-134:4.  However, this date appears to be an error.  Juvenile court records state the detention continued until July 27, 2015. P-146:2.

[20]  For November and December 2015, the record does not contain definite information about the Student's whereabouts during two periods, which are noted in the chart above as *"No information in record as to Student's status"* or with question marks.  The chronology prepared by the District does not list the Student as living away from home during these two periods.  However, that chronology lists December 1, 2015 as the end of a juvenile detention period, but does not state when that period began. D-1.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 23

Office of Administrative Hearings
One Union Square, Suite 1500-
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

69.   The Student appears to have begun using illegal drugs during the summer of 2015, after 10th grade.  As of April 2015, when Dr. Cecchet wrote her report, he had consistently tested negative for drugs.  P-144:8.  (There was drug testing in connection with the ARY order of July 2014.  P-50.)  On June 1, 2015, he told the Compass Health evaluator that his only drug use was trying marijuana once.  P-128:4.  However, by mid-August 2015, the Father reported that the Student was using both marijuana and methamphetamine, and sometimes stayed awake for up to five days at a time.  P-133:3-4.  At the end of September 2015, after a 28-day elopement, the Student tested positive at Children's Hospital for benzodiazepines, methamphetamine and opiates.  P-135:1.

70.   The Student never appeared for school in the 2015-2016 school year.  The District did not initiate a reevaluation, convene an IEP meeting, or take any other steps in response.  The Student's 28-day elopement in September 2015 ended when he was apprehended shoplifting on September 30th.  On that date he was admitted to Children's Hospital for a three-day psychiatric hospitalization, where he was also treated for a foot infection acquired while living on the streets.  Children's diagnosed the Student with conduct disorder, and noted his previous diagnoses of prodromal schizophrenia and ADHD.  He was also diagnosed with provisional substance use disorder, having tested positive at Children's for the substances mentioned above.    Children's recommended he enter a residential facility, as Dr. Cecchet had recommended six months earlier.  P-135.[21]

71.   In August 2015, the Parents began contacting residential schools for the Student. Testimony of Mother and Father.  One school in Utah would have admitted the Student, but it did not accept Medicaid and the costs would not have been sufficiently covered by the Parents' insurance.  Two facilities in Oregon said the Student needed longer-term treatment than they could provide.  A third facility in Oregon did not accept Medicaid and the costs would not have been sufficiently covered by the Parents' health insurance.  Provo Canyon School (Provo) in Utah seemed appropriate and it was the first to accept the Student.  P-134:7; Testimony of Mother.

72.   On September 8, 2015, the Mother filled out an application for the CLIP program.  P-134.[22] CLIP requires that all other options be exhausted first, so the Parents contacted the other residential programs mentioned above before submitting their CLIP application.  The Parents have still not received an interview from CLIP.  Testimony of Mother and Father.

---

[21]  The Parents did not provide a copy of the Children's Hospital report to the District until a few months later, in early-January 2016.  At the time they received the Children's report, the Parents did not know the District could fund the residential placement that Children's had recommended.  They thought the District had offered them all it had to offer.  Testimony of Mother and Father.

[22]  Although the CLIP application is dated September 8, 2015, it lists events that occurred after that date, such as September 30, 2015 and the month of November 2015.  P-134:2-3.  It may be that the Mother began writing the application on September 8th but did not complete it until a later date (the application is extensive), or she completed it on September 8th but amended and updated it later.   There was no testimony to explain the discrepancy in dates.  The Mother did testify that she completed and filed the CLIP application.  Testimony of Mother.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 24

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

73.   The Student's last elopement was from December 1 to 5, 2015.  The Parents knew he was scheduled to start at Provo on December 15th, but did not tell the Student this.  Instead, they entertained him with movies and restaurants in an attempt to avoid another elopement before December 15th.  However, the Student started talking about going to see friends in Everett, where he went on his last elopement.  They decided to accelerate his departure by one day.  An adolescent transport service picked him up from the family home in the early morning hours of December 14, 2015 and transported him to Provo that day. P-163:1; Testimony of Father.

74.   On November 30, 2015, the Parents met with their counsel for the first time. Testimony of Father.  On December 1, 2015, Parents' counsel provided written notification to the District of the Parents' intent to seek reimbursement for a unilateral private residential school, and their belief that the District's current educational program did not offer the Student a FAPE.  P-140.  That was nine business days before the placement began on December 14, 2015.  The Parents filed their due process hearing request on December 17, 2015.  P-142.

Provo Canyon School

*School and program overview*

75.   Provo has separate facilities for middle and high school students, and for boys and girls.  The Student is in the boys' high school, which has 73 – 74 students.  Testimony of Taylor.  The largest dormitory in the boys' high school has 20 students, with four students sharing a room.  Dormitories have alarms that sound upon exiting, but are not locked.  Classrooms at the school are not locked, but the school itself is.

76.   Provo's departments are Clinical (therapists); Medical (psychiatric and nursing); Educational (teachers); and Student Life (dormitory staff and behavioral aides at school).  A typical weekday starts with morning chores, hygiene, breakfast, and medication administration.  Students leave the dorms and are in school from 8:45 a.m. to 3:20 p.m., followed by group therapy sessions at 3:30 p.m.  In the evening they do activities, meals and homework.  On weekends, they sleep in longer, do deeper cleaning chores, and do leisure activities such as sports, watching movies and television, reading, and writing letters.  Testimony of Taylor.

77.   Before living in the regular dorms, students start in the Stabilization and Assessment Area (Stabilization), which has space for 20 students, living four per room.  Students live and study there while they acclimatize and their behavior is assessed.  In Stabilization, the students wear a uniform: bright green shirts and flip-flops.  They participate in recreational therapy and other therapies while in Stabilization.  Stabilization has a higher staff ratio than other areas at Provo.  They receive increased therapeutic and academic services until stability is achieved.  Teachers usually give one-on-one academic instruction for the period students are there.  Students may return to Stabilization later, if needed to deal with acute issues.  P-152:16-20; P-155; P-160; Testimony of Taylor and Powell.  The Student was in Stabilization from his arrival on December 14, 2015, until January 21, 2016.[23]

---

[23] There is some evidence the Student returned to Stabilization at some point in February 2016 (P-169:1; Testimony of Francis), but both his primary therapist and the special education coordinator testified this did not occur.  It is not reflected in the progress notes for any of his therapies: individual, family, or group

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 25

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

78.   There are approximately 16 teachers in the boys' high school for the 73 – 74 students. All but three of the teachers are certified in special education; the remaining three are working toward their special education certification.   (Of the Student's teachers, only his geometry teacher does not yet have a certificate in special education.)   There are regular education classes and classes for lower-performing students.   The former have no more than 15 students; the latter have no more than 8 students.   The Student is in all regular education classes.[24] There are six classes per day, plus one study hall and a lunch period.   Summer is part of the regular school year, and academics continue.   Teachers meet weekly to discuss and review the performance of their students.   P-159; P-160; Testimony of Powell.

79.   Classes are very structured to encourage appropriate behaviors.   If a student exhibits inappropriate behavior and does not respond adequately to teacher prompting, the student may be asked to leave the classroom and meet with Student Life staff in the hallway.   They may be out of class for the remainder of the class period or just for 5 – 10 minutes.    P-155; P-159; Testimony of Taylor.

80.   The goal of Provo's treatment program is for students to progress through five stages of personal change. An orientation period precedes the first stage.   The stages have names, but it is more informative for present purposes to provide their descriptions:  (Orientation) Student is anxious, distrustful, etc.; (Stage 1) Student has little to no thoughts of changing, doesn't see that a problem exists; (Stage 2) Student is thinking about changing, starting to recognized their mistakes; (Stage 3) Student is preparing to change, attempting to figure out how to change; (Stage 4) Student is making change happen, actively learning skills, taking accountability; and (Stage 5) Student is maintaining change, dedicated to self-discipline and self-awareness. P-150:7-9.

81.   When students arrive at Provo, they are given a number of assessments and a preliminary treatment plan is adopted, later replaced by a master treatment plan.   P-152:22-33.   The Student has one individual session with his primary therapist each week, and the two of them have one family therapy session each week by telephone. Testimony of Taylor.

82.   Group therapy is also part of the program.   Students participate in selected groups depending on their individual needs.  Group types include dialectical behavior therapy, life skills (e.g., hygiene, budgeting, dating), substance abuse, recreational therapy, trauma, depression, anger management, and groups composed of students who live in the same dormitory.  P-152:14-21; P-160; Testimony of Taylor.   There are recreational outings as well.   In February 2016, the Student went on a ski/snowboarding outing, but missed another in February and one in March due to a shoulder injury.  P-152-2; P-167:25.

---

therapy.  P-159; Testimony of Taylor and Powell.  It is unnecessary to resolve this issue, and it cannot be resolved on the current record.

[24]  The Student's classes are smaller than 15 students.  There are 8 – 12 in his classes.  Testimony of Powell and Francis.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

83.   A "treatment team" consisting of staff from each of the four departments meets weekly to review student progress.   An individual student will be discussed for 5 - 20 minutes at these weekly meetings.   A more in-depth review of each student's progress is conducted monthly. Students must generally make satisfactory progress in all four departments in order to advance to the next of the five stages.   P-160; Testimony of Taylor.

84.   Medication management is provided by a Provo psychiatrist.   P-152:101.   Medication administration includes observing as students consume their medications.   If a student declines to take his medication, a Student Life staff member will discuss it with them.   This is usually enough to persuade a student to take his medication, but if it is not, the refusal is logged and medical staff follow up.   Testimony of Mirabal.

85.   As Provo students move closer to completing the program, their treatment teams make recommendations for their next placement.   Next placements can include less intensive residential placements, group homes, part-time outpatient programs run by hospitals, and placement in a school district.   Testimony of Taylor.[25]

*Student's Progress at Provo*

86.   At the time of the hearing, the Student had moved through most of the second stage. Upon entering Provo, his issues included: not taking medications; abusing substances; reports of thought disorders; hypersensitivity; quickness to anger; misperception of social situations; resistance to treatment; a desire to live on the streets; and poor insight into boundaries and limits.   With medication management and participation in a therapeutic environment, he made significant progress within a few weeks.   When he arrived, he engaged in storytelling that may have suggested a tenuous grip on reality, but his psychotropic medications are being carefully managed and this tendency has improved over time.   He has also improved his ability to focus, comply with boundaries and rules, be more cooperative, demonstrate safe behavior with others, and engage in better self-care.   He has demonstrated a little more insight into the problems of his past behavior, and been able to admit to past problems in conversations with his family.   To continue making progress, the Student needs to initiate improvements in organization, self-care, social skills with family and peers, and gain more insight into the need for personal responsibility to manage these social relationships.   At the time of the hearing, the Student had a few friends he could relate to and get along with, but he still tended to have difficulty keeping friends.   P-152:1-21, 35-37, 100-102; P-160; P-167; Testimony of Taylor.

87.   As of the time of the hearing, the Student's participation in group therapy had been "fair". He started out not very interested and distracted.   Over time he became more polite, attentive and cooperative.   He has not yet invested significantly in gaining insight into his behavior and emotions.   His difficulties with hygiene have been extreme.   His primary therapist opined that, as of the time of the hearing, he did not think the Student would be successful even in a less restrictive residential environment because he had not yet internalized the behavioral and emotional skills he needs to learn to manage in a less-restrictive environment.       P-160; Testimony of Taylor; P-152:5-21; P-167.   The Student's primary therapist believes he needs

---

[25]   Another less-restrictive option than a residential school that was not mentioned in Mr. Taylor's testimony is a special day school for students with emotional-behavioral disorders.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

residential placement in order to participate in a school environment. This is due to the degree of his difficulty with cooperation, self-management, focus, and social management. The Student would not have been able to even make it back and forth to school without residential placement, in his opinion. Testimony of Taylor.

88.   The Student arrived at Provo with strong reading and math skills, despite having been truant for a prolonged period and failing his classes before that. He tested above 74% of students nationally in reading, and above 84% of students nationally in math. P-152:81-82; Testimony of Francis. At the time of the hearing, his grades were as follows: Geometry A; English C+; History A; Physical Science B+; Art C; and P.E. B+. Testimony of Powell. His grades were much lower when he first arrived due to impulsivity, inattentiveness and resistance, but have improved over time. P-152:76; P-170:1. The Student readily asks for help and enjoys being involved in conversations. His class participation is enthusiastic but not always appropriate. He continues to be distracted easily, especially when peers are behaving inappropriately. The Student has been removed from class on occasion, but has always been able to return to the classroom. There are no incident reports showing seriously escalated behavior. His biggest problem in class is that he wants to ask a lot of questions and make a lot of comments, sometimes blurting out. He likes to know things, and when he knows something he likes to talk about it. His comments and questions in class are on point, but peers often feel he should talk less in class. They roll their eyes and make comments under their breath. His U.S. History teacher testified at the hearing. In history class, the Student has never been defiant and has never had to be removed for behavior intervention in the hallway. He is very interested in history and his attention does not seem to waiver. He chooses to sit at the front desk and gets his homework assignments done, with late assignments only two or three times. P-155; P-159; P-169; Testimony of Taylor, Powell, and Francis.

89.   Teachers' written comments in his progress reports are generally positive, and even include numerous statements that he gets along well with peers and the teacher. The exceptions are P.E., where teacher comments are negative (struggles to follow directions, not very compliant with staff, struggles to complete assigned tasks without prompts) and Physical Science, where teacher comments are mixed, with a fair amount of negative comment. Interestingly, the Student has a good grade in both of these classes (B+). Testimony of Powell. All teachers noted his main problem in class, mentioned above: being distracting and inappropriately speaking out in class. P-169.

90.   The Student has stated he wants to remain at Provo and finish high school there. Testimony of Taylor. At the time of the hearing, Provo's most recent projection for when the Student will be able to leave for a less restrictive setting is late-August 2016 (end of his 11th grade year). This projection may change based on discussions by his treatment team. Testimony of Taylor. The most recent therapeutic report prior to the hearing, dated March 15, 2016, stated this:

> **Reasons For Continued Stay:**
> [The Student] has a 2 year history of no school attendance and living on the streets. He has a long history of refusal to follow rules. He has had a lot of mood swings and poor judgment. He is very poor at knowing how to structure his life and maintain positive balance in his lifestyle choices. He is easily distracted and obsessive about certain things he wants and struggles to make wise choices without significant structure around him.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 28

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

**Status of Continuing Care/Discharge Planning:**
Plans are still somewhat unclear. It is possible that we will seek a step-down program (or group home) to help him continue to make better choices while still not back in a home environment all the time. He will certainly need iop [intensive outpatient] or php [partial hospital program] if he returns directly home. He has failed with these levels of care before, but if he makes sufficient progress (including in his willingness to be open to such treatment interventions) then these will be recommended to help him adjust to being at home and have supports to help him recognize how to use his improved coping skills in his home environment.

P-152:3-4; Testimony of Taylor (about meaning of abbreviations in quote).

91.   In telephone conversations with the Parents, which occur every weekend in addition to family therapy sessions during the week, the Student expresses excitement about school and pride in his accomplishments. Testimony of Father. He mails home his school progress reports together with letters to the Parents. He is excited to calculate his grade point average and tell them about it. The Student now tells the Mother he loves her, something she had not heard in several years. In family counseling sessions he has become more positive in tone and energy, and more engaged. He talks about playing soccer and football with the kids at school. He says he is working on his social skills and social cues so he can have friends. The Mother perceives his self-esteem as having risen, and says he feels accepted in the environment, which is motivating him. Testimony of Mother. Records of family therapy sessions (attended mostly by the Mother and occasionally by the Father) show the Mother quite distrustful of the Student in the first few months at Provo, then becoming more positive and hopeful in early March 2016, after he had been there almost three months. P-167.

92.   Dr. Cecchet provided an opinion at the hearing that Provo was "absolutely" an appropriate placement for the Student. Tr. 906-07. She visited Provo in April 2016, met with his treatment team, and reviewed their classroom interventions. She also observed the Student in three environments: a class, at lunch time, and standing in line for medication administration. Testimony of Cecchet.    Dr. Cecchet previously worked at a CLIP facility and believes it appropriate for the Student, but after visiting Provo she believes Provo is preferable for the Student because of its stronger academic component. Academics are more tailored to each child's individual needs at Provo. Both CLIP and Provo would provide medication management and medication administration, which are crucial for the Student's functioning. He was almost completely noncompliant with taking his medications before entering residential treatment, and had begun to take illegal drugs, the use of which Dr. Cecchet stated was secondary to his mental health problems. Testimony of Cecchet.

*District's criticism of Provo*

93.   Jean Mirabal, District executive director of student services, and Jan Beglau, District director of secondary special education, visited Provo in March 2016.[26]   They observed the

---

[26]   Because Ms. Mirabal, and not Ms. Beglau, provided expert opinion testimony about the appropriateness of Provo, only Ms. Mirabal's background will be provided here. Her curriculum vitae is not in the record; the following is based on the limited testimony she gave concerning her background.

Office of Administrative Hearings
One Union Square, Suite 1500.
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

following environments: two classes, P.E., Stabilization, cafeteria, residence hall, medication management, and an assembly. They also interviewed Provo staff. Testimony of Mirabal. Ms. Mirabal testified about the visit. She does not believe Provo is appropriate for the Student for the following reasons.

94. Ms. Mirabal believes Provo is a far more restrictive setting than the Student needs educationally, though she stated she cannot speak to his health or medical needs. Testimony of Mirabal. Provo is highly restrictive because it is a secured, residential facility with no typically-developing peers among whom the Student could find role models. *Id.*

95. Ms. Mirabal characterized the teaching style she observed as lecture-based, with no engagement, no checking for understanding, no discourse between students, and no differentiated instruction. Ms. Mirabal observed one full class and part of another. Her testimony about lack of engagement and discourse is contradicted by written comments from the Student's teachers, and by the testimony and declarations of Mr. Francis and Mr. Powell, all of which state the Student engages verbally with teachers about the class subject matter, and even does so to an excessive degree. It is possible the Student is the only one at Provo who does this (though that is unlikely), but in any event he is doing it, so observations of other students are of limited relevance. Ms. Mirabal also noted that the science classes do not have laboratories. *Id.*

96. Ms. Mirabal observed no data collection on academics or behavior during the classes she visited. *Id.* Concerning academics, students are graded every two weeks at Provo. Their percentage grades in each class are documented. P-152:43, 76; P-159; P-170. The fact that Ms. Mirabal did not "observe" testing or grading during the classes she visited is of little relevance given the evidence that student academic achievement is consistently assessed. Concerning behavior, Ms. Mirabal is correct that the teachers' written comments concerning behavior and participation (which teachers document every few weeks) contain subjective observations on behavior, not quantitative data. P-169. However, behavior is extensively documented in therapeutic notes concerning each individual session, family session, and group therapy session the Student attends. (The notes on the group sessions are not just about the group activity; they are particular to the Student and how he functioned in the group.) P-152:5-2; P-167. Despite the criticism of Provo, the District offered no evidence that *the District itself* collected data on the Student's progress. The Mother testified that the Parents never received any IEP progress reports during middle school or high school. (The Student had IEPs throughout elementary school, and the Mother testified she knows what an IEP progress report is.) She further testified that, among all of the educational records the District produced in response to the Parents' discovery requests, there were no IEP progress reports. Testimony of Mother. No District witness contradicted the Mother on these matters, and all District witnesses testified after she provided this testimony. For these reasons, the Mother's testimony on these matter is found credible. There is no evidence the District did any data collection on the Student's IEP goal progress.

---

Ms. Mirabal is the district's executive director of student services. She is responsible for supervising and directing special education, English language learning programs, health services, elementary counseling, Title and LAP services (by which Ms. Mirabal may have meant Title I and Learning Assistance Programs). Testimony of Mirabal.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 30

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

97.   Ms. Mirabal testified, contrary to Provo's special education coordinator, Nathan Powell, concerning the number of Provo teachers who hold special education certificates. Ms. Mirabal testified she was told that only 3 or 4 Provo teachers hold that certification. Mr. Powell testified that all but 3 of the 16 teachers have that certification, and the remaining three are working on it. Testimony of Powell.   Mr. Powell's testimony is found more credible than Ms. Mirabal's because he is the supervisor of Provo teachers and has greater knowledge about their credentials. Also, of the Student's six teachers, five have special education certification. If 78% of the teaching staff lack this certification, as Ms. Mirabal testified, it would be improbable that only one teacher among the Student's six lack it. For these reasons, Mr. Powell's testimony is credited on this matter.

98.   Ms. Mirabal found it "curious" that private-pay students stay at Provo on average 6 – 9 months, while students placed there by school districts stay 12 months or more. Tr. 1055 (Mirabal). However, there is no evidence concerning which of the following reasons (or some other reason) may account for the difference in length of stay: manipulation by Provo to retain students for unnecessarily long periods where school districts are footing the bill; a limited ability to pay by some families that causes them to withdraw their children sooner than would be best for them; or more severe emotional/behavioral needs on the part of students placed by school districts than students privately placed by parents. In the absence of such evidence, there is no negative inference that can be drawn from the fact that Ms. Mirabal related.

99.   Ms. Mirabal asserted that Provo teachers do not receive as high a level of professional development and evaluation as District teachers do. The District offered no evidence concerning the content of its own professional development or evaluation procedures, other than Ms. Mirabal saying they use an observation protocol called "Danielson." (Danielson was never explained.) Tr. 1053 (Mirabal). The record contains several tools used in Provo teacher evaluations: a pre-observation and post-observation form for evaluators to use when observing a teacher; a 32-point checklist to use during such an evaluation; and an annual evaluation form for grading teachers on a variety of skills (which form can also be used for a 90-day evaluation). 152:48-61. There was no testimony establishing how these forms are used at Provo, other than Ms. Mirabal stating that Provo teachers are evaluated twice a year, a frequency she approves of. However, as mentioned above, there is no evidence from the District on these matters either. Ms. Mirabal's assertion that Provo teachers do not receive as high a level of professional development and evaluation as District teachers is not supported by any evidence.

100.   Finally, Ms. Mirabal observed that students appeared grim and lacking in joy at Provo, not interacting in hallways, while playing basketball, or in an assembly. The Provo witnesses, all of whom testified prior to Ms. Mirabal, did not address this matter (though the Parents could have re-called Provo witnesses for rebuttal testimony if they so chose). There is no evidence in the record regarding the levels of happiness of other students, but regarding this Student's level of happiness, the record indicates significant improvement since he has been at Provo. In addition to greater participation in therapeutic and academic activities over time, he expresses pride at his accomplishments at Provo, love toward his Parents, and a desire to stay at Provo through high school graduation – a full year longer than Provo currently anticipates he will stay.

*Cost of Provo and transportation To Provo*

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

101. The Parents utilized an adolescent transport service, Bill Lane & Associates of Upland, California, to transport the Student to Provo. The Student was taken from the family home in the middle of the night and transported by automobile and air to Provo, at a cost of $4,731.27. P-163:1; Testimony of Father. The District offered no evidence to challenge the appropriateness of the transportation service or its cost.

102. From the date the Student arrived, December 14, 2015, through April 30, 2016, the cost for his attendance at Provo was $44,469. P-151.[27] The Mother has paid $11,310 and the Father has paid $19,110 toward this amount, and they still owe $14,049, according to the Father. The Provo invoice indicates that a health insurance plan covered some portion of the charges for approximately one month (January 20 through February 16, 2016), with the Parents having a co-pay of $1,160 for January. It is unclear exactly how much the Parents' insurance paid toward the total amount owed. The District offered no evidence to challenge Provo's cost as unreasonable or above that of comparable residential facilities.

## CONCLUSIONS OF LAW

**The IDEA**

1. The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated thereunder, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

2. The IDEA and its implementing regulations provide federal money to assist state and local agencies in educating children with disabilities, and condition such funding upon a state's compliance with extensive goals and procedures. In *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 102 S. Ct. 3034 (1982) (*Rowley*), the Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the Act, as follows:

> First, has the state complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley, supra*, 458 U.S. at 206-207 (footnotes omitted).

3. A "free appropriate public education" consists of both the procedural and substantive requirements of the IDEA. The *Rowley* court articulated the following standard for determining

---

[27] The Provo invoice lists different tuition amounts for different months (*see* P-151). There was no testimony explaining this. Because of this, an overall figure for the period is given rather than a monthly figure.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 32

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

the appropriateness of special education services:

> [A] "free appropriate public education" consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act.

*Rowley*, 458 U.S. at 188-189.

4.      For a school district to provide FAPE, it is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity." *Rowley*, 458 U.S. at 200 - 201. An IEP must be "reasonably calculated to enable the child to receive educational benefits." *Id.*, 458 U.S. at 207. "[A] school must provide a student with a 'meaningful benefit' in order to satisfy the substantive [FAPE] requirement[ ]." *M.M. v. Lafayette School Dist.*, 767 F.3d 842, 852 (9th Cir. 2014) (internal citation and quotation marks omitted).

5.      The burden of proof in an administrative hearing under the IDEA is on the party seeking relief, in this case the Parents. *See Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528 (2005).

**Whether the Student was in need of residential placement in order to receive a FAPE**

6.      Parents who unilaterally enroll a student in a private school are entitled to reimbursement only if: (1) the district placement violated the IDEA; and (2) the Parents' private school placement is proper under the IDEA. *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 15, 114 S. Ct. 361 (1993).

7.      Reimbursement for a residential placement is only appropriate if it is "necessary to provide special education and related services." *Seattle Sch. Dist. vs. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996). A residential placement is "necessary" when the "student is incapable of deriving educational benefit outside of a residential placement." *Ashland Sch. Dist. v. Parents of R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009). If a placement is a response to medical, social, or emotional problems . . . quite apart from the learning process," then it is not necessary under the IDEA. *Clovis Unified Sch. Dist. v. Calif. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990).

8.      The District acknowledges the Student was unable to benefit from any educational program that could be offered within the District. Its closing brief states:

> While the District is capable of providing a full continuum of services for an educational program, [the Student's] medical condition had progressed to the point where *he was unable to access those services*. . . . And by the time Dr.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0108X
OAH Docket No. 12-2015-OSPI-00227
Page 33

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

Cecchet evaluated him, [the Student] *was incapable of benefitting from any educational program:*

Q: And without this medically-based program, did you think he could function in a school program?
A: I think *without residential care*, he would not be able to function in a school setting.

District's Closing Brief at 40-41 (emphasis added; quotation is from Dr. Cecchet's testimony).

9.     Thus, the District in effect acknowledges that residential care was the only way the Student could derive benefit from an educational program.   The District makes a different argument as to why it should not have to provide the educationally-required residential placement:

[The Student's] progress from year to year and his high academic capability *when he is mentally stable* demonstrates that *when medical issues are not a factor*, he can and does benefit from the educational services and the general education setting at the District.

District's Closing Brief at 35 (emphasis added).   However, the District cannot insulate itself from the medical problems of its students.   If those medical problems prevent the students from benefitting from an education without certain services in the educational setting, then the District must provide those services.   The District's argument quoted above is akin to a district arguing that it should not have to fund a nurse to serve a medically fragile student who needs a nurse in class in order to attend school.   *If medical issues were not a factor*, that student could easily benefit from the educational services the District offers, as the District argues above.   Similarly, if psychiatric issues were not a factor, the Student here easily has the intellectual ability to benefit from the District's placement.   Sadly, students cannot be separated from their disabilities.   The District must take students as it finds them, and provide the related service of nursing (for the medically fragile student) and the environment of a residential placement (for the Student here).   Because if these services are not provided, neither of these students will receive any benefit from their education.

10.     The District cites the Fifth Circuit standard for determining whether a residential placement is necessary to provide FAPE.   The Fifth Circuit standard is somewhat more restrictive than the Ninth Circuit's standard.   It requires not only that the placement be necessary for the child to receive an educational benefit, but also that the placement be "primarily oriented" toward enabling the child to obtain an education.   *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 299 (5th Cir. 2009).   The Ninth Circuit has not adopted the "primarily oriented" part of the Fifth Circuit's test.   Therefore, in a case like the present one, where a residential placement is necessary *both* for the student to receive needed psychiatric treatment, *and* for the student to receive any educational benefit, a tribunal in the Ninth Circuit need not engage in the exercise of designating one as "primary" and another as "secondary."

11.     The District also places mistaken reliance on a highly distinguishable Ninth Circuit case, *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175 (9th Cir. 2009).   In *Ashland*, the student performed very well academically, but was hospitalized and then residentially placed due to depression and suicide attempts.   The student in *Ashland*

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 34

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

*maintained strong academic performance*, and even participated **in** a program at Southern Oregon University for talented and gifted children. During the latter part of seventh grade, however, [the student] became depressed, began to talk about suicide [and later made suicide attempts].

*Id.*, 587 F.3d at 1179 (emphasis added).   In contrast to *Ashland*, the Student's academic performance in this case was abysmal, then he completely refused to go to school and was receiving no educational benefit whatsoever from the District's placement.

12.     The present case is also unlike a prior case decided by this ALJ, *Monroe Sch. Dist.*, 110 LRP 66272 (SEA WA 2009). · In *Monroe*, an adopted child with partial fetal alcohol syndrome and several mental health diagnoses engaged in violent, criminal behavior outside of school. However, he was attending school, making academic progress, and had no recent disciplinary incidents at school, though he had some social difficulties.   Residential placement was necessary to address his mental health issues and to prevent further criminal involvement, but it was not educationally necessary.   The undersigned found the district denied FAPE by failing to properly report IEP goal progress and failing to implement some IEP goals.   However, residential placement was found to be neither a necessary nor an appropriate remedy for these IDEA violations.

13.     Dr. Cecchet persuasively explained why the Student's truancy was causally related to his disabilities (*see* Findings of Fact, above).  The District offered no evidence to the contrary. The evidence establishes it was highly likely that absent a secure residential setting, the Student would continue his now-ingrained school refusal, preferring living on the streets to attending school.  All other interventions had failed in getting him to attend school, including: parental efforts, school behavior specialist efforts, specially designed instruction in behavior, mental health counseling, a juvenile court order requiring school attendance, an attempt at wrap-around care, and several psychiatric hospitalizations.   School refusal that has not responded to other interventions has resulted in school districts being required to provide residential placements.   *See, e.g., M.M. v. New York City Dept. of Educ.*, 26 F. Supp. 3d 249 (S.D.N.Y 2014) (student who got good grades when she attended school, but who was absent from school for weeks and months at a time, required residential placement in order to receive an education; district argued that the student "has inappropriately benefitted from the restrictive environment at [the residential placement] because it has treated her psychiatric problems, which is a medical benefit, not an educational one.  This argument is also meritless, since, as the IHO found, the psychiatric treatment [the student] received at [the residential placement] appeared to facilitate her education."); *Lexington County Sch. Dist. One v. Frazier*, 2011 U.S. Dist. LEXIS 107813, 111 LRP 62693 (D.S.C. 2011) (student was perpetually truant and unresponsive to the services the district provided to address his school refusal, which was related to his disability; student's mental health needs were not segregable from his educational needs and he required residential placement; he would not be able to obtain any benefit from the IEP designed by the district if he refused to attend school altogether.  In the present case, not only does the Student's disability-related, long-term truancy indicate the need for residential placement, but so does his aberrant and violent behavior at school (repeatedly secreting himself in girls' bathrooms, violently attacking the dean of students, and bringing weapons to school).

14.     For these reasons, it is found that the District violated the IDEA and denied the Student a FAPE by failing to offer him residential placement, which he required in order to receive an

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

educational benefit.  The Parents argue the Student required residential placement by January 2015, though they did not unilaterally provide that placement until December 14, 2015. However, since the only remedy the Parents seek is expenses for the residential placement from December 14, 2015 forward, it is unnecessary to decide exactly what date prior to that time the Student began to need residential placement.  It is sufficient to conclude, as is concluded here, that he needed such a placement to receive FAPE as of December 14, 2015.

**Whether Provo Canyon School has been an appropriate placement for the Student since he enrolled on December 14, 2015**

15.     The evidence establishes that Provo has been an appropriate placement for the Student since he enrolled on December 14, 2015.  As found above, the Student required a residential placement in order to receive a FAPE.  Provo is a residential placement that has provided him appropriate therapeutic and academic services.  He is attending school again, after a prolonged period of truancy, and is making academic as well as behavioral progress.

16.     The testimony of Dr. Cecchet concerning the appropriateness of Provo for the Student is found more persuasive than the testimony of Ms. Mirabal to the contrary, for the reasons articulated in the Findings of Fact concerning each of Ms. Mirabal's criticisms.  The one criticism not in dispute is that Provo does not provide access to typically-developing peers, as the District's placement does.  A private placement does not need to satisfy the IDEA's least-restrictive environment requirement[28] to be proper under the Act.  *C.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 991 (8th Cir. 2011); *Warren G. v. Cumberland County. Sch. Dist.*, 190 F.3d 80, 83-84 (3rd Cir. 1999); *Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss*, 144 F.3d 391, 399-400 (6th Cir. 1998).  However, in this case it is concluded that a residential placement *is* the Student's LRE because he derived no educational benefit from the placement the District offered.  Mainstreaming "is a policy which must be balanced with the primary objective of providing handicapped children with an 'appropriate' education." *Wilson v. Marana Unif'd Sch. Dist.*, 735 F.2d 1178, 1183 (9th Cir. 1984); accord, *B.S. v. Placentia-Yorba Linda Unif'd Sch. Dist.*, 306 Fed. Appx. 397, 400 (9th Cir. 2009, unpublished).

17.     For these reasons, Provo is found to have been an appropriate placement for the Student since he enrolled on December 14, 2015.

**Whether Parents provided adequate notice to District before placing the Student at Provo**

18.     The Parents provided written notice of their intent to seek reimbursement for a unilateral private placement nine business days before the start of that placement.  Reimbursement may be reduced or denied under the IDEA if notice is not given 10 business days before such a placement:

---

[28] The IDEA's least-restrictive environment mandate requires that:
>       To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.
20 USC §1412(a)(5)(A); *see* WAC 392-172A-02050; 34 CFR §300.114.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

(4) The cost of reimbursement may be reduced or denied if:

(a)(i) At the most recent individualized education program meeting that the parents attended prior to removal of the student from the public school, the parents did not inform the team that they were rejecting the placement proposed by a school district to provide a FAPE to their student, including stating their concerns and their intent to enroll their student in a private school at public expense; or

(ii) *At least ten business days (including any holidays that occur on a business day) prior to the removal of the student from the public school, the parents did not give written notice to a school district of the information described in (a)(i) of this subsection;*

WAC 392-172A-04115(4) (emphasis added); *see* 20 USC §1412(a)(10)(C)(iii)(I); 34 CFR §300.148.

19.    The District argues that the Parents were shopping for a residential placement several months prior to giving notice, so they did not comply with the "purpose" of the notification requirement.  The District argues it was too late for it to cure the alleged denial of FAPE by the time the Parents gave notice, because they had already made up their minds to unilaterally place the Student by that time.  District's Closing Brief at 35-36.

20.    The IDEA does not require several months' advance notice, only ten business days. The District's argument that the Parents violated the spirit of the notice requirement fails because the notice requirement is unambiguous and precise: 10 business days.  If the District makes an offer of FAPE during those 10 business days, then prospective private placement will be denied on the ground that the District has now offered FAPE, regardless of whether the parents had made up their minds to reject it.[29]

21.    Because the Parents' notice was one business day short of the required 10 business days, the tribunal will exercise its discretion to reduce their reimbursement by one day.  No further reduction is warranted because the District did not quickly thereafter make an offer of FAPE; it had yet to make such an offer as of the end of the hearing.

**Alleged Violations From Period Before the Student Enrolled at Provo**

22.    The Parents do not seek compensatory education for the alleged violations of the IDEA that occurred prior to the Student's enrollment at Provo.  Other than declaratory relief, the only remedy they seek is Provo tuition and expenses.

23.    This decision concludes, above, that the District is responsible for Provo tuition and expenses based solely on the Student's need for residential placement and the District's failure

---

[29]  In this situation, it is possible that some private school tuition might be awarded as *compensatory education* for a *past* denial of FAPE.  However, the district's liability for *prospective* tuition payments would be cut off as of the date it offered FAPE.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 37

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

to offer him residential placement by the time he enrolled there. The resolution of this issue provides the full remedy the Parents have requested, other than declarations that earlier violations occurred. For this reason, instead of addressing the Parents' pre-Provo legal issues as written (some of which are oddly worded and difficult to address as written), the undersigned takes the liberty of addressing the pre-Provo legal issues in what she believes to be a better organized manner.

24.     The three pre-Provo issues of which the Parents complain all occurred after the Student's long-term suspension in January 2015. They are: the failure to provide an appropriate IAES; the failure to reevaluate the Student when a reevaluation was warranted; and the failure to convene an IEP meeting when circumstances required it. These three issues are addressed in turn.[30]

<u>The District violated the IDEA by providing an inappropriate IAES in that the District: (a) failed to provide PWN of the Student's change of placement to an IAES and a description of the IAES services; (b) failed to have the Student's IEP team determine his IAES services; and (c) failed to provide IAES services that would enable the Student to continue to participate in the general education curriculum and to progress toward meeting his IEP goals. The violations of the IDEA described in (b) and (c) denied the Student a FAPE</u>

25.     The Parents complain that the District failed to provide an IAES during the Student's long-term suspension. They cannot be blamed for thinking there was no IAES. The District did provide a minimal IAES, but it did not meet three requirements of the IDEA and was wholly inadequate.

26.     First, the District did not provide PWN to the Parents of the change of placement to an IAES or what services it proposed would be delivered in the IAES. The District's PWN about the manifestation determination did not include any of this information. Removing the Student from the placement specified in his IEP to an IAES for more than 10 school days was a change of educational placement. *See* 20 USC §1415(k)(1)(c); WAC 392-172A-05155(1); 34 CFR §300.536. A PWN must be issued to parents whenever there is a change of educational placement or a change in the provision of FAPE. *See* 20 USC §1415(b)(3); WAC 392-172A-05010(1); 34 CFR §300.503. The PWN must include: a description of the proposed action; an explanation of why the District is proposing it; a description of each evaluation procedure, assessment, record, or report used as a basis for the action; a statement that the parents have protection under the procedural safeguards of the IDEA; sources for the parents to contact to obtain assistance in understanding the IDEA; a description of other options the IEP team

---

[30] The Parents also complain that the District violated the IDEA by failing to provide an evaluative placement for the Student after his long-term suspension. However, the Parents did not present argument about this in their closing brief. Their closing brief does argue at length about two other issues: (1) Whether the District's January 27, 2015 manifestation determination came to the wrong conclusion; and (2) Whether the District was obligated to conduct a Functional Behavioral Assessment (FBA) before amending the Student's BIP in January 2015. Neither of these issues was raised in the Parents' complaint (*see* Issues statement, above). "The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process hearing request unless the other party agrees otherwise." WAC 392-172A-05100(3); *see* 34 CFR §300.512. The District has not agreed to add either of these issues to the case. They are therefore not addressed herein.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

considered and the reasons those options were rejected; and a description of other factors that are relevant to the district's proposal. *See* 20 USC §1415(c); 392-172A-05010(2); 34 CFR §300.503. Telling the Parents some of this information orally did not meet the statutory requirements. A PWN is a written document that commits a district to certain services, informs parents in definite terms (not subject to varying recollections of what was said orally) about important information concerning their child's education, and provides a written document can be either enforced or challenged in a due process proceeding.

27.    Second, it is a student's *IEP team* that must determine both the setting and the services for a student's IAES. The IDEA provides: "The interim alternative educational setting . . . shall be determined by the IEP Team." 20 USC §1415(k)(2); *see* WAC 392-172A-05150; 34 CFR §300.531. IDEA implementing regulations provide: "*the student's IEP team* determines appropriate services" to be provided in the IAES. WAC 392-172A-05145(4)(f) (emphasis added); *see* 34 CFR §300.530.

28.    The decision that the Student's IAES would consist of 1.25 hours per week of behavioral tutoring and would take place at District administrative offices was made by District administrators unilaterally; it was not made by the Student's IEP team. When the Student failed to attend after one session, the IEP team should have reviewed and amended the IAES because the student was not progressing toward meeting his IEP goals in the current IAES:

> If a student whose placement has been changed under 34 CFR § 300.530(c) or (g) is not progressing toward meeting the IEP goals, then it would be appropriate for the IEP Team to review and revise the determination of services and/or the IAES.

*Questions and Answers on Discipline Procedures,* 52 IDELR 231 (U.S. Department of Education, Office of Special Education and Rehabilitative Services (OSERS) 2009), Question C-3.

29.    The District's belated offer of eLearning was also not a decision made by the Student's IEP team. The Student (who is an avid reader with an interest in science and social studies) chose never to access eLearning. It is unclear whether he even had computer access at home during this period. There was also no reason to believe eLearning would meet the needs of a Student who did very poorly with unstructured time and who had a severe deficit in self-organizational skills. It was not determined appropriate by his IEP team and did not prove to be so.

30.    Third, the District wrongly believed that during the Student's long-term suspension it was only required to offer the 1.25 hours per week of special education in behavior set forth in his IEP. Since his IEP contained no academic goals, the District believed it need not offer any access to the general education curriculum during his nearly three months in an IAES. At the request of a few staff members, the District belatedly offered eLearning, a service that was not determined by the Student's IEP team to be appropriate for him.

31.    WAC 392-172A-05145(4) explains the requirements for services during an IEAS. It provides in pertinent part:

> A student who is removed from the student's current placement pursuant to

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

subsection (3) or (7) of this section must:

(a) Continue to receive educational services, that provide a FAPE, so as to enable the student to continue to participate in the general education curriculum, although in another setting, *and* to progress toward meeting the goals set out in the student's IEP;

WAC 392-172A-05145(4) (emphasis added); *see* 20 USC §1415(k)(1)(D)(i); 34 CFR §300.530. The last two phrases in the regulation quoted above are connected by the word "and". The student must not only receive services to enable him "to progress toward meeting the goals set out in [his] IEP," but must *also* receive services to enable him "to continue to participate in the general education curriculum, although in another setting." *Id.* The District failed to do the latter.

32.    The regulation quoted above applies to students removed from their current placements pursuant to subsection (3) or (7) of the regulation.  Subsection (3) concerns students, like the Student here, whose conduct was determined *not* to be a manifestation of their disability. Subsection (7) concerns students, like the Student here, whose conduct involved "special circumstances," such as a weapon.  Thus, the requirement to provide continued access to the general education curriculum, although in another setting, applied to the Student.

33.    In summary, the District committed three violations of the IDEA concerning the Student's IAES.  The third violation (designated (c) in the title of this section) was substantive in nature and therefore constituted a denial of FAPE.  The first two violations (designated (a) and (b) in the title of this section) were procedural in nature.

34.    Procedural violations of the IDEA amount to a denial of a FAPE only if they: impede a student's right to a FAPE; significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or cause a deprivation of educational benefits. 20 USC §1415(f)(3)(E)(ii); *see* WAC 392-172A-05105(2); 34 CFR §300.513.  Concerning (a), the absence of a PWN regarding the IAES setting and services has not been shown to have significantly impeded the Parents' opportunity to participate in educational decision-making.  The terms of the IAES in this case were simple, not complex; the Parents understood them, and no disputes arose about their meaning.  Also, the Parents already knew about their IDEA procedural protections and how to obtain information about them (subjects that would have been covered in a PWN) from prior PWNs they had received.  Finally, the absence of a PWN did not impede the Parents from challenging the terms of the Student's IAES: they have successfully done so in this proceeding.  Concerning (b), the Parents' opportunity to participate in decision-making was significantly impeded by the failure to have the Student's IEP team determine the contents and setting of his IAES, rather than District administrators unilaterally determining those things.  At an IEP team meeting for this purpose, the Parents could have asked that academic content be part his IAES rather than the Student going without any academic instruction for nearly three months.  The Parents could have raised the problem that so much time without structured activities would be highly detrimental for the Student.  The IEP team might have responded to these concerns with a more appropriate IAES.

35.    For these reasons, it is concluded that two of the District's three IDEA violations concerning the Student's IAES resulted in denials of FAPE.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 40

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

**The District violated the IDEA and denied the Student a FAPE by failing to reevaluate him when a reevaluation was warranted**

> *The District failed to obtain a psychological evaluation of the Student, and waited instead for the Parents to obtain a private psychological evaluation, despite the District behavior specialist suspecting the Student had an undiagnosed mental health disability, and despite subsequent changes in his behavior that indicated the same.*

36.    Reevaluations under the IDEA are not limited to triennial reevaluations. Rather, they must be conducted if the needs of a child "warrant" a reevaluation. 20 USC §1414(a)(2)(A)(i); WAC 392-172A-03015(1)(a); 34 CFR §300.303.

37.    A consistent theme of the District's defense in this case is that the Student's problems were medical (psychiatric) in nature, not educational in nature, and thus the District is not responsible for addressing them in the ways that the Parents assert. This argument is incorrect on a number of levels, one of which concerns the duty to evaluate.

38.    The IDEA defines "related services" covered by the statute to include "medical services . . . for diagnostic and evaluation purposes":

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including . . . medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 USC §1401(26)(A); *see* WAC 392-172A-01155(1); 34 CFR §300.34.

39.    The District behavior specialist, Ms. Sutton (who is also a school psychologist), thought the Student was on the autism spectrum since she began working with him in fall 2013, the start of his 9th grade year. Ms. Sutton was also concerned about his "weird," "bizarre" relationship with food. Later, when he started sleeping on park benches and secreting himself in girls' bathrooms, she began to suspect he was experiencing a new mental health problem. Finally, she was "shocked" at the Student's physical violence toward the dean of students, and saw it as unprecedented behavior for him. Through all of this, Ms. Sutton never submitted a referral for the Student to receive a mental health evaluation.

40.    Ms. Sutton made clear in her testimony that she viewed it as a parental choice whether to obtain a mental health evaluation, and stated she would not tell a parent what to do in that regard. She knew that *she* was not qualified to assess autism or other mental health conditions, but she did not believe the District had a duty to obtain such assessments elsewhere. With prompting from District counsel she added that she did not need additional information with respect to the Student's educational program at that time. However, autism has a profound impact on educational needs, which impact is notably different than that of ADHD. Ms. Sutton always thought the Student was on the autism spectrum, and later noted weird, bizarre and shocking behaviors by the Student *at school*, and suspected he was experiencing some new

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 41

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

mental health problem. But she did not refer him for a mental health evaluation.

41.      School districts "shall ensure that . . . the child is assessed in all areas of suspected disability." 20 USC §1414(b)(3)(B). The Ninth Circuit has made clear that the IDEA obligates school districts, *not parents*, to obtain evaluations in suspected areas of disability. *See Timothy O. v. Paso Robles Unif'd Sch. Dist.*, 822 F.3d 1105, ___[31] (9th Cir. 2016) (district violated IDEA where it intended to rely on an outside autism assessment that it expected the parents to obtain, and took no steps to ensure that the outside assessment actually took place); *N.B. v. Hellgate Elem Sch. Dist.*, 541 F.3d 1202, 1209 (9th Cir. 2008) (district may not abdicate its responsibilities under the IDEA by merely referring parents to a third party for testing; this violates the IDEA's requirement that districts ensure that students are assessed); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.), *cert. denied*, 513 U.S. 965, 115 S. Ct. 428 (1994) (district is legally obligated to procure its own evaluation; any failure of the parents to turn over portions of a specialist's report cannot excuse the district's failure to procure the same information for itself).

42.      Evaluations that are medical in nature must be obtained and funded by school districts if they are necessary to assess a student's suspected disabilities. *See Dept. of Educ., Hawaii v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1197-1200 (D.C. Haw. 2001) (district was required to pay for psychiatric hospitalization that was for diagnosis and evaluation); *MJC v. Special Sch. Dist. No. 1*, 2012 U.S. Dist. LEXIS 63843, 58 IDELR 288 (D.C. Minn. 2012) (district violated the IDEA by failing to obtain a medical evaluation at no cost to the parent to evaluate a student's suspected disability); *Letter to Parker*, 18 IDELR 963 (OSEP 1992) and *Letter to Anonymous*, 34 IDELR 35 (OSEP 2000) (school districts must ensure that a medical evaluation by a licensed physician is conducted at no cost to parents, if necessary to determine whether a child has a disability).

43.      In this case, the Student experienced severe declines and alarming changes in behavior that were more than sufficient to "warrant" a reevaluation. 20 USC §1414(a)(2)(A)(i). *See Oakland Unif'd Sch. Dist.*, 2015 U.S. Dist. LEXIS 152609, 66 IDELR 221 (N.D. Cal. 2015)("the threshold trigger for mental health assessment is relatively low and was triggered by Student's significant decline in his educational setting. The Court does not find persuasive the District's contention that all of Student's behaviors – drug use, association with negative peer group, material increase in absences and tardies, disengagement from class, unusually awkward behavior, lack of motivation or effort while at school, and flat affect – are attributable merely to entry into high school and to peer pressure."); *Rodriguez v. Indep. Sch. Dist. of Boise City*, 2014 U.S. Dist. LEXIS 42719, 63 IDELR 36 (D.C. ID 2014) (district violated IDEA by failing to reevaluate student whose anxiety led to prolonged school refusal; district "had no basis for concluding that [the student] could return to school at any time. Furthermore, it was not the parents' responsibility to prove [the student's] anxiety was more severe than usual; rather, it was [the district's] duty to evaluate [the student] in light of the parents' legitimate concerns and [the physician's] recommendation").

44.      Failing to evaluate the Student despite suspicions of additional, undiagnosed disabilities was a procedural violation of the IDEA. It must next be determined whether this procedural violation resulted in a denial of FAPE. Had the Student been evaluated sooner for autism, it

---

[31] *Timothy O.* is a recent decision to which LEXIS has not yet assigned page numbers within F.3d.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

might have been ruled out in favor of the diagnosis of prodromal schizophrenia much sooner than it was. Dr. Cecchet explained that schizophrenia in the early stages is commonly mistaken for autism. If the Student had been diagnosed with schizophrenia earlier (Dr. Cecchet believes the onset of the disease was approximately 18 months before her evaluation), then he could have begun treatment sooner and potentially avoided or minimized the truancy, school discipline, and self-destructive behaviors that occurred during the 18 months before Dr. Cecchet's evaluation. The District's failure to evaluate thus impeded the Student's receipt of FAPE. It also significantly impeded the Parents' opportunity to participate in decision-making about the provision of FAPE: the Parents were not told that Ms. Sutton – a school psychologist – suspected their son had autism. Had Ms. Sutton made the referral for an autism evaluation, the District would have solicited "information" and "input" from the Parents on what additional data should be collected (*see* WAC 392-172A-03025(1)(a) and (2)(a); 34 CFR §300.305) and, once the assessments were complete, the Parents would have been members of the group that determined the Student's educational needs in light of the reevaluation. *See* WAC 392-172A-03040(1)(a); 34 CFR §300.306. The Parents' participation rights were thus significantly impeded by the District's failure to reevaluate the Student. The information that would have come out of a reevaluation would have enhanced their ability to participate in decision-making about the services and placement needed for the Student to receive a FAPE.

45.     For these reasons, the District violated the IDEA and denied the Student a FAPE by waiting for the Parents to obtain a private mental health evaluation of the Student in spring 2015, where the District had suspected undiagnosed mental health conditions since fall 2013. During that entire period, Dr. Cecchet believes the Student was suffering from undiagnosed prodromal schizophrenia.

> *After the Parents obtained a private psychological evaluation, the District failed to revise its own evaluation in light of the private evaluation, and changed the Student's educational placement without revising its evaluation.*

46.     The Student's behaviors in 10th grade were so out-of-character that the District changed his educational placement in response to them. But it neglected to first review and revise its evaluation of the Student to consider Dr. Cecchet's evaluation, which provided a new and serious mental illness diagnosis and made a new placement recommendation: residential placement.[32] District administrators met on May 7, 2015, without inviting the Parents or Dr. Cecchet, and changed the Student's placement without first taking the steps outlined above. Not surprisingly, the new placement failed. The District had not evaluated the Student for more than two years – since January 2013, when he was in 8th grade. As discussed in the Findings of Fact, District staff were told of the uncertain and lengthy process of seeking acceptance to the state's public residential program, CLIP. Yet the District left the Parents to pursue that uncertain and distant option on their own, failing to reevaluate the Student to see whether he required residential placement *presently* as Dr. Cecchet opined – not at some uncertain point in the future – in order to receive a FAPE.

47.     A third-party evaluation provided to a school district by parents is a trigger that requires

---

[32] The District's argument that the change of educational placement was only *temporary*, and so it did not trigger IDEA-required procedures for a change of placement, is addressed in the section below.

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

the district to conduct its own reevaluation or assessment revision. *See N.B. v. Hellgate Elem. Sch. Dist., supra,* 541 F.3d at 1209 ("Hellgate failed to meet its obligation to evaluate [the student] in all areas of suspected disabilities after becoming aware of Dr. Gold's diagnosis" of an autistic component to the student's poor performance). Likewise, a significant change in placement should not be made without the knowledge that comes from conducting a reevaluation. *See Central Valley Sch. Dist.,* 115 LRP 17348 (SEA WA 2014) *and cases cited therein.* The District argues that changing the Student's program to the STEP program at the alternative high school did not render his placement any more restrictive or less restrictive, so it did not require a reevaluation. However, it is not only a change in restrictiveness that constitutes a change in educational placement. A change that "would substantially or materially alter the child's educational program" also constitutes a change in educational placement. *Letter to Fisher,* 21 IDELR 992 (U.S. Dept. of Educ., Office of Special Education Programs (OSEP) 1994). Here, the Student's instructional day was cut in half from what was set forth in his IEP: he went from a full-day program to a half-day program. That is a substantial and material change, and constituted a change in educational placement.

48. District school psychologist Dr. Cartwright testified that an *IEP meeting* would have been scheduled less than a week after the Student started at the new STEP placement. (This testimony was not found credible, for the reasons explained in the Findings of Fact.) The District extrapolates from this testimony that Dr. Cartwright planned to "evaluate" the Student in that timeframe. District's Closing Brief at 47-48. This is incorrect. Dr. Cartwright only testified that she planned to meet with the Student in the coming week and then initiate an *IEP meeting,* not a reevaluation. The record contains neither an evaluation consent form nor a PWN of the intent to reevaluate, and there was no testimony that these documents were issued. Issuance of these forms must occur before commencement of any reevaluation. *See* WAC 392-172A-03005(3); 34 CFR §300.301. It is clear from Dr. Cartwright's testimony that she intended to skip the reevaluation step and go straight to amending the Student's IEP based on what she and others saw during his first week at the alternative high school.

49. The District argues that it was prevented from completing the (non-existent) reevaluation by the Student refusing to return to school after attending for one day. District's Closing Brief at 48. This argument is unpersuasive for two reasons. First, the District had extensive and recent assessments, both formal and informal, from which to conduct its reevaluation. Dr. Cecchet's very recent evaluation was, as District special education administrators wrote, detailed and thorough. Input was also available from professionals who had extensive information about the Student: behavior specialist Ms. Sutton, the Student's juvenile probation officer, his teachers from the comprehensive high school, the Parents, and Dr. Cartwright (who only interviewed him once but who has a high level of understanding about high school students who are disconnected from school). The IDEA specifically allows for reevaluations to be conducted based on existing records, without the administration of new assessments, if the parents consent. 20 USC §1414(c)(1) and (c)(4); *see* WAC 392-172A-03025(1) and (5); 34 CFR §300.305. the District did not request this consent.

50. The second reason the District's argument is unpersuasive concerns the Student's school refusal. School refusal was an affirmative reason to reevaluate the Student, not a reason to decline to reevaluate. Dr. Cecchet provided uncontradicted testimony that the Student's school refusal was causally related to his disabilities. His school refusal needed to be evaluated as one of a constellation of behaviors preventing the Student from receiving any benefit from his education. *See District of Columbia Pub. Schools,* 114 LRP 11740 (SEA DC

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

2014) (student engaging in extreme truancy required reevaluation; "the failure of a handicapped student to cooperate with his or her educational program does not relieve a school district of its obligations under IDEA to provide the student with a FAPE. To the contrary, a student's lack of cooperation may instead indicate a need for reevaluation"); *Corpus Christi Indep. Sch. Dist.*, 57 IDELR 240 (SEA TX 2011). (student whose eligibility was based on ADHD had worsening problems with school avoidance and aggression; district violated the IDEA by failing to reevaluate him in the area of emotional disturbance).

51.    The District's failure to reevaluate the Student to consider Dr. Cecchet's evaluation, and its changing of his educational placement without a reevaluation, were procedural violations of the IDEA.  They caused a denial of FAPE.  The District failed to reevaluate the Student to consider Dr. Cecchet's strong recommendation for residential placement. The part-time, non-residential placement that District administrators chose without conducting a reevaluation was a failure.  Had the District considered and adopted Dr. Cecchet's recommendation for residential placement, the next eight months of truancy, elopement, and juvenile detention could have been avoided.  The failure to reevaluate also significantly impeded the Parents' right to participate in decision-making concerning the Student's educational needs.  As part of a reevaluation, the Parents could have advocated for the adoption of Dr. Cecchet's recommendations.

## The District violated the IDEA and denied the Student a FAPE by failing to convene an IEP meeting when circumstances required it

52.    The District changed the Student's educational placement in May 2015 from a full-day program at a comprehensive high school to the partial-day, transitional STEP program at an alternative high school without amending his IEP.  The intent was for the change in placement to last through at least the end of the school year.  The District's secondary special education director testified that it is too time-consuming to assemble and reassemble IEP teams for temporary changes.  She further testified that the District declines to do temporary IEP amendments by written agreement with parents, without convening an IEP meeting, because the District prefers to err on the side of holding meetings.  Here, the Parents agreed with the change of placement, so an IEP amendment could probably have been accomplished by written agreement without a team meeting, as permitted by the IDEA:

> In making changes to a child's IEP after the annual IEP meeting for a school year, the parent of a child with a disability and the local educational agency may agree not to convene an IEP meeting for the purposes of making such changes, and instead may develop a written document to amend or modify the child's current IEP.

20 USC §1414(d)(3)(D); *see* WAC 392-172A-03110(2)(c); 34 CFR §300.324.

53.    The IDEA allows school districts the flexibility to make temporary changes in educational placements, i.e., for periods less than the normal one-year term of an IEP.  However, if the change lasts longer than 10 school days, the IEP must be amended to reflect it and a PWN regarding the amendment must be issued.  In *Letter to Steinke*, 25 IDELR 533 (OSEP 1996), OSEP, stated:

> Under Part B [of the IDEA], if a public agency changes the educational placement of a student for more than 10 school days, it must comply with the

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

requirements of Part B, and any State requirements concerning change of placement, such as prior notice to the parents of the proposed action.

*Id.* The question presented to OSEP in *Letter to Steinke* concerned a temporary change of placement to a private school to help determine whether the private school would be an appropriate placement for the child. OSEP explained that, if it would help determine the appropriateness of an alternative placement,

> it would be permissible for the public agency to place the child at the private facility on a temporary basis for an assessment period not to exceed ten (10) school days. In OSEP's view, . . . a temporary placement of a student for up to ten school days is not a change in placement that implicates applicable procedural safeguards[.]

*Id.*

54.    An IEP amendment may be written to be explicitly temporary, using a delineated timeframe. Examples of such temporary IEP provisions are found in several cases from courts in the Ninth Circuit. *See Baquerizo v. Garden Grove Unf'd Sch. Dist.*, 2016 U.S. App. LEXIS 11307, 116 LRP 27029 (9th Cir. 2016, unpublished) (IEP team lacked updated information and therefore the IEP would be revisited after 30-days); *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1130-1131 (9th Cir. 2003) (if additional information is needed before a final placement decision can be made, school district may temporarily place the child in an interim program; to ensure that the temporary placement does not become a final placement, the district may develop an interim IEP with a specific time line); *N.E. v. Seattle Sch. Dist.*, W.D. WA, C15-1659, Order Denying Plaintiffs' Motion for Temporary Restraining Order and a Preliminary Injunction (10/27/15) (IEP team adopted multi-stage IEP containing two periods; after the first period ended, the placement described in the first period was not the student's stay-put placement).

55.    If an IEP team wishes to extend a temporary IEP provision for a longer time, it may amend the IEP again. If the parents do not agree to a particular amendment, so that it cannot be done without convening the IEP team, then the IEP team must be convened. Any IEP amendment must be accompanied by a PWN to parents. *See* 20 USC §1415(b)(3); WAC 392-172A-05010; 34 CFR §300.503.

56.    The District prefers to err on the side of holding IEP meetings, so it does not do temporary IEP amendments by written agreement, i.e., without holding an IEP meeting. However, the District's practice gives parents much less in the way procedural protections than if an amendment were done by written agreement without a team meeting. The District leaves parents with no written description of what will be done, forcing them to rely on oral understandings (or misunderstandings). The District makes no binding commitments on what it will provide, only oral ones, and commits to no end-date for the "temporary" period. The result is a change of educational placement that is unwritten and indeterminate in length. This violates the IDEA and denies parents' participation rights, whereas the procedure rejected by the District is sanctioned by the IDEA and protects parents' rights.

**Legal misconceptions reflected in District witnesses' testimony**

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 46

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

57.     District witnesses at the hearing articulated several misconceptions about the IDEA that guided their .decision-making about the Student.   These misconceptions emerged during testimony at the hearing and were not the subject of claims in the due process complaint. These legal misconceptions are set forth in the Findings of Fact and should be addressed so as not to propagate the errors among readers of this decision.    Because these legal misconceptions were not the subject of claims in the complaint, they play absolutely no role in the remedy awarded.

All of a student's disabilities must be considered when making a manifestation determination under the IDEA

58.     The District behavior specialist testified that when manifestation determination teams consider whether a student's conduct is related to his or her disability, the law requires that they consider only the disability underlying that student's eligibility category – not other disabilities the team may be aware of.  Thus, when she led the manifestation team that considered whether the Student's oppositional, defiant and aggressive conduct toward the dean of students was related to a disability, the team considered only ADHD, not ODD.  This was despite the Student's ODD diagnosis being long-standing and reflected in District evaluations.

59.     Cases from Washington and other jurisdictions make clear that IDEA manifestation determinations must not be restricted to the disability(ies) upon which a student's eligibility is based, to the exclusion of other disabilities.  *See Richland Sch. Dist. v. Thomas P.*, 2000 U.S. Dist. LEXIS 15162, 32 IDELR 233 (W.D. Wisc. 2000) ("At the time of the vandalism incident, P. was determined to be eligible for such education and related services, albeit for a different disability than the one he asserts led to his misconduct.  Under the statute's plain language, however, it appears that [former 20 USC] § 1415(k)(4)(C) applies to students alleging both a disability for which services are already being provided and a 'new' disability for which they are not.");  *Renton Sch. Dist.*, 111 LRP 39470 (SEA WA 2011) (district violated IDEA by restricting manifestation determination to consider only autism and intellectual disability, even though it had requested assessments for an acute mental illness apart from those disabilities, and those assessments were pending);   *Murrieta Valley Unified Sch. Dist.*, 53 IDELR 108 (SEA CA 2009) ("The manifestation determination team was obliged to consider all relevant information in Student's education files, relevant observations of teachers and relevant information from Student's parents, in determining whether Student's conduct was caused by, or had a direct and substantial relationship to Student's disability.  This the team did not do. . . The evidence was strong that to the extent the team did consider any of Student's disabilities as potential causal factors of Student's conduct, the team only considered Student's speech and language deficiencies, not Student's cognitive impairment or mental age");  *Snohomish Sch. Dist.*, 103 LRP 38279 (WA SEA 2003) (the student's episode of depression that occurred at the time of the misconduct can be considered a disability for the purposes of the manifestation determination, even though it is not the disability for which he previously received special education).  *See also Quincy (WA) Sch. Dist.*, 52 IDELR 170 (OCR Seattle 2009) (School district significantly changed the student's placement based on incomplete information.  It failed to consider a pending medical evaluation or evaluative data regarding a possible additional disability.  Instead, its decision was based merely on whether the student's misconduct was a reflection of his specific learning disability, which was his eligibility category).

General education teachers who are responsible for implementing a student's BIP must be given copies of that BIP

Findings of Fact, Conclusions of Law and Order                                          Office of Administrative Hearings
OSPI Cause No. 2015-SE-0106X   .                                                        One Union Square,. Suite 1500
OAH Docket No. 12-2015-OSPI-00227                                           600 University Street
Page 47                                                                                       Seattle, WA 98101-3126
                                                                                                    (206) 389-3400  1-800-845-8830
                                                                                                    FAX (206) 587-5135

60.     General education teachers in the District are routinely given copies of "IEP at a Glance" for the special education students in their classes, but not the students' BIPs. Both of the general education teachers who testified at the hearing had behavior problems with the Student that resulted in formal discipline. But neither of them had received his BIP, which contained a wealth of information on how to address his behavior problems.

61.     If general education teachers are responsible for implementing a student's BIP in their classes (as was the case here, by the explicit terms of the Student's BIP), then those general education teachers must receive a copy of the BIP.

Parent counseling is a related service under the IDEA

62.     The District behavior specialist testified that parent counseling is not available under the IDEA and cannot be part of any IEP. The Parents in this case were having great difficulty getting the Student to attend school, despite many efforts on their own and despite enlisting the help of the juvenile court system via an ARY petition that required school attendance.

63.     "Related services" are defined in Washington special education regulations to include "parent counseling and training". WAC 392-172A-01155(1); *see* 34 CFR §300.34(a). Related services are supportive services "as are required to assist a student eligible for special education to benefit from special education." *Id.* If a student is routinely truant despite parental efforts, parent counseling or training is a supportive service that could assist the student to benefit from special education.

School districts must offer a placement needed to provide a student with FAPE even if that placement is not available within the school district

64.     It is assumed that District staff know what is stated in the title of this section, which stems from the requirement that a full continuum of educational placements be made available to students based on their individual needs. *See* WAC 392-172A-02055; 34 CFR §300.115. However, the District behavior specialist testified that the Student needed small classes for behavioral reasons. She further testified that the only small classes offered at his high school were at too low a level to be academically appropriate for him. He was therefore placed in larger general education classes. His academic needs were satisfied at the expense of his behavioral needs, and this for a Student whose only area of special education was behavioral.

65.     It is unclear from Ms. Sutton's testimony whether she believed the Student would simply have received *greater benefit* from small classes, or that, due to his behavioral problems, he *needed* small classes to be educated appropriately. If it was the latter, and the IEP team shared her belief, then the District was obligated to place the Student in small classes that were academically appropriate for him regardless of the fact that such classes did not currently exist at his high school. If the District did not wish to create such classes at his high school, then it was obligated to place the Student in another District school, another school district, or a private school that *did* offer such classes. A student's individual need for services or settings drives the placement decision; the placements currently available within a school district do not drive the services or settings a student receives.

**Remedies**

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 48

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

66.     .When a tribunal considers an equitable remedy, it must consider the equities existing on both sides of the case. *Reid v. District of Columbia,* 401 F.3d 516, 524 (D.C. Cir. 2005).

67.     The Parents were cooperative with the District throughout.  While the District engaged in a number of IDEA violations, it did not engage in inequitable conduct toward the Parents above and beyond those violations.  For these reasons, the comparative equities in the case do not alter the award otherwise indicated by the evidence.

*Reimbursement*

68.     The District shall pay all tuition for the Student's attendance at Provo.  The District may subtract the amounts paid by the Parents' health insurance toward that tuition, provided that doing so would not violate the following regulation, which states that school districts:

> (c) May not use a student's benefits under a public benefits or insurance program if that use would:
>
> (i) Decrease available lifetime coverage or any other insured benefit;
>
> (ii) Result in the family paying for services that would otherwise be covered by the public benefits or insurance program and that are required for the student outside of the time the student is in school;
>
> (iii) Increase premiums or lead to the discontinuation of benefits or insurance; or
>
> (iv) Risk loss of eligibility for home and community-based waivers, based on aggregate health-related expenditures;

WAC 392-172A-07005(c); *see* 34 CFR §300.154.  If the Parents believe that using their health insurance to pay part of the Student's Provo tuition would violate this regulation, the Parents are required promptly to provide evidence of this fact to the District.

69.     The Provo invoice in the record is not clear about the amount paid by the Parents' health insurer.  The invoice also does not include months after April 2016. The District shall pay the Student's Provo tuition within 60 days after the Parents present the District with documents from Provo stating the amount of that tuition, and stating the amount paid by the Parents' health insurance.  The District shall reimburse the Parents for any Provo tuition they have already paid, and shall pay Provo for the remaining tuition (and any other related expenses) that the Parents owe to Provo.

70.     The award set forth in the paragraph immediately above shall be reduced *pro rata* by the tuition and expenses for one day of attendance at Provo, since the Parents provided nine business-days' notice of the Provo placement instead of 10 business-days' notice.

71.     The District shall reimburse the Parents $4,731.27 for the adolescent transport service used to transport the Student from his home to Provo on December 14, 2015.

*Prospective placement*

Findings of Fact, Conclusions of Law and Order
- OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 49

Office of Administrative Hearings
One Union Square, Suite 1500.
600 University Street   .
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

72.     The Student's prospective placement shall be at Provo through the end of August 2016, or through a later date to be determined by the Student's Provo treatment team if that team concludes he is not ready for discharge at the end of August 2016.  The District is responsible for paying Provo tuition and related expenses for this prospective placement.[33]

73.     Upon discharge from Provo, the Student's prospective placement shall be a placement jointly selected by his Provo treatment team and Dr. Cecchet, after they have consulted with the Student's IEP team.  The District shall pay for Dr. Cecchet's time on the activities described in this paragraph at her usual hourly rate for such consultation.  If the Student's Provo treatment team and Dr. Cecchet do not agree on the Student's next placement after Provo, the views of Dr. Cecchet shall prevail.

74.  .  The prospective placement provisions of this decision shall govern the Student's educational placement for one year following the date of the Order, except that any stay-put rights that arise under the IDEA shall continue to the extent provided by law

75.     All arguments made by the parties have been considered.  Arguments not specifically addressed herein have been considered, but are found not to be persuasive or not to substantially affect a party's rights.

## ORDER

1.     The District violated the IDEA by providing an inappropriate interim alternative educational setting (IAES) in that the District: (a) failed to provide prior written notice of the Student's change of placement to an IAES and a description of the IAES services; (b) failed to have the Student's IEP team determine his IAES services; and (c) failed to provide IAES services that would enable the Student to continue to participate in the general education curriculum and to progress toward meeting his IEP goals. The violations of the IDEA described in (b) and (c) in this paragraph denied the Student a FAPE.

2.     The District violated the IDEA and denied the Student a FAPE by failing to reevaluate him when a reevaluation was warranted:

   a. The District failed to obtain a psychological evaluation of the Student, and waited instead for the Parents to obtain a private psychological evaluation, despite the District behavior specialist suspecting the Student had an undiagnosed mental health disability, and despite subsequent changes in his behavior that indicated the same.

   b. After the Parents obtained a private psychological evaluation, the District failed to revise its own evaluation in light of the private evaluation, and changed the Student's educational placement without revising its evaluation.

---

[33] The Parents have not requested transportation costs for the Student to visit them, or for them to visit the Student, so no such costs are awarded.  Likewise, the Parents have not requested reimbursement for the cost of Dr. Cecchet's evaluation, so that cost is not awarded.

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 50

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

3.     The District violated the IDEA and denied the Student a FAPE by failing to convene an IEP meeting or amend his IEP before changing his educational placement to the part-time STEP program.

4.     The District violated the IDEA and denied the Student a FAPE by failing to offer him a residential placement.  The Parents' unilateral private residential placement of the Student at Provo Canyon School (Provo) was appropriate, and continues to be appropriate.  The District shall reimburse the Parents for Provo tuition, as well as for the adolescent transportation service that conveyed him to Provo.  The Parents' award of tuition is reduced by one day because they gave the District nine business days' notice of the placement instead of 10 business days' notice.

5.     The Student's prospective placement shall be at Provo through the end of August 2016, or through a later date to be determined by the Student's Provo treatment team if that team concludes he is not ready for discharge at the end of August 2016.

6.     The Student's prospective placement upon discharge from Provo shall be a placement jointly selected by his Provo treatment team and Dr. Stacy Cecchet, after they have consulted with the Student's IEP team.  The District shall pay for Dr. Cecchet's time on the activities described in this paragraph at her usual hourly rate for such consultation.  If the Student's Provo treatment team and Dr. Cecchet do not agree on the Student's next placement after Provo, the views of Dr. Cecchet shall prevail.

7.     The prospective placement provisions of this is Order (paragraphs 5 and 6, above) shall govern the Student's educational placement for one year following the date of the Order, except that any stay-put rights that arise under the IDEA shall continue to the extent provided by law.


Signed at Seattle, Washington on July 20, 2016.


Michelle C. Mentzer
Administrative Law Judge
Office of Administrative Hearings


## Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure.  A copy of the civil action must be provided to OSPI, Administrative Resource Services.


Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 51

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135

## CERTIFICATE OF SERVICE

I certify that I mailed a copy of this order to the within-named interested parties at their respective addresses postage prepaid on the date stated herein. *mcm*

Parents
4020 167th Place SW
Lynnwood, WA 98037

Charlotte Cassady, Attorney at Law
Cassady Law
113 Cherry Street # 99651
Seattle, WA 98104

Jean Mirabal, Student Services Executive Director
Edmonds School District
20420 - 68th Avenue West
Lynnwood, WA 98036

William A. Coats, Attorney at Law
Erin Sullivan-Byorick, Attorney at Law
Vandeberg Johnson & Gandara
PO Box 1315
Tacoma, WA 98401-3791

cc:   Administrative Resource Services, OSPI
      Matthew D. Wacker, Senior ALJ, OAH/OSPI Caseload Coordinator

Findings of Fact, Conclusions of Law and Order
OSPI Cause No. 2015-SE-0106X
OAH Docket No. 12-2015-OSPI-00227
Page 52

Office of Administrative Hearings
One Union Square, Suite 1500
600 University Street
Seattle, WA 98101-3126
(206) 389-3400  1-800-845-8830
FAX (206) 587-5135