The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| EDMONDS SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. C16-1500RSL |
| | ) | |
| v. | ) | PLAINTIFF EDMOND SCHOOL |
| | ) | DISTRICT'S MOTION FOR SUMMARY |
| A.T., a minor child, and R.T. and I.T, his | ) | JUDGMENT |
| parents, | ) | |
| | ) | Hearing date: June 2, 2017 |
| Defendants. | ) | Oral argument requested |
| | ) | |

## I.    INTRODUCTION

There are three reasons why the decision of the Administrative Law Judge should be overturned. First, under Ninth Circuit precedent, a school district is not responsible financially for a parent's placement of the student in a residential facility when that placement is in response to the medical problems of the student. Because the student's placement was necessitated by medical needs, and not educational needs, the ALJ erred in ordering the Edmonds School District to pay for the cost of the facility. For this reason, the decision of the ALJ should be reversed.

In addition, the residential facility at issue here failed to offer an appropriate education to A.T.[1] under the Individuals with Disabilities Education Act (IDEA), nor was the placement the least restrictive environment. Indeed, the locked facility, where the students wear uniforms and are not allowed to leave, is one of the most restrictive environments.

---

[1] To preserve privacy, the student will be indentified by his initials or by "the Student."

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 1
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1        Finally, the procedural errors by the District, if any, were rendered immaterial because

2   the Student failed to attend school for the vast majority of time at issue here. For these reasons,

3   the District requests that the decision of the ALJ be reversed.

## II.   STATEMENT OF FACTS

### 1.   A.T.'s early years in the District

6        Adopted at the age of 4, A.T. came to his new family with a long history of neglect and

7   abuse resulting in behavior problems and difficulty bonding with his Parents. Tr.[2] at 28:2-29:25.

8   His behavior difficulties continued following his adoption. Tr. at 28:24-29:8. A.T. became

9   eligible for special education services with the Edmonds School District in March 2004 under the

10  category of Developmentally Delayed. Administrative Record ("AR") at 1510.

11       A.T. received a formal diagnosis of Attention Deficit Hyperactivity Disorder (ADHD) by

12  second grade, which explained his impulsivity, difficulty with focus and sustained attention, and

13  maintaining appropriate behavior and peer interactions. AR at 1535, 1558. Despite the ADHD,

14  A.T. demonstrated a full scale IQ score of 118 during a February 2007 test. AR at 1562, Tr. at

15  33:5-9. Test scores showed that A.T. was in the 94th percentile of all students in the same grade

16  for reading, 97th percentile for writing, and 99th percentile for math. AR 1564.

17       A.T. began his elementary education in a classroom for students with social and

18  behavioral difficulties, but he eventually transitioned to a mainstream, general education

19  classroom by the fourth grade. AR at 1584, 1637. A.T. performed well in general education

20  classes with access to an Intensive Learning Support (ILS) classroom when he needed an

21  alternate setting to regulate his thoughts, feelings, or behaviors. AR at 1632.

### 2.   Ninth Grade (2013-2014 School Year)

23       A.T. entered his 9th grade year at Meadowdale High School (Meadowdale) in the fall of

24  2013, and by then he had also been diagnosed with Oppositional Defiant Disorder. AR at 1848,

25  2447, 2496; Tr. at 161:5-15. To alleviate his symptoms, his medication regimen included

26  

---

[2] "TR" refers to the hearing transcript, which is reprinted at pages 1-1103 of the administrative record.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 2
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1  Vyvanse for ADHD/ODD symptoms and Abilify to help control the side effects of the Vyvanse.

2  Tr. at 85:10-24. The Parents administered the medication. Tr. at 85:20.

3       A.T. continued to do well academically, although his grades did not reflect his full

4  potential due to missed or incomplete assignments. AR at 1794, Tr. at 430:5-17. His teacher, Lea

5  Un, believed him capable of performing the work, noting that he scored a "level 4" on the

6  statewide assessment, which was the highest level possible, and opined that he would be in the

7  top 10% of her class based on the assessment score. Tr. at 431:1-16, 432:17-25.

8       A.T. did have some disciplinary issues during his freshman year, typically for

9  noncompliance, being disruptive, or for leaving class without authorization. Tr. at 761:19-762:7;

10  AR at 1793. However, his Individualized Education Program (IEP) team noted in the January

11  2014 meeting that A.T. had not displayed overly concerning behaviors while at school. His

12  teachers stated that they typically did not have issues with his conduct, noting that his behavior

13  was consistent with other 9th grade boys. AR at 1792; Tr. at 433:6-18.

14       Nonetheless, A.T. required guidance and direction for his behavior. AR at 1793.

15  Therefore, the IEP team identified appropriate accommodations, including breaking projects into

16  smaller assignments, preferential seating, concise directions, and testing individually or in small

17  groups to reduce distractions. AR at 1798. A.T. also received a total of 75 minutes per week of

18  Special Education and related services to address behavior and learning strategies. AR at 1800.

19       In contrast, A.T.'s conduct *outside* of school had been progressively worsening since the

20  first semester. Tr. at 83:21-84:16, 85:5-9; 87:9-11. A.T. was more defiant, refusing to do his

21  chores or take care of himself. Tr. at 84:13-16. He began eloping, causing his parents to report

22  him missing to the police. Tr. at 84:17-85:1. He refused to take his medication, he was

23  experimenting with drugs, and he was stealing, both from strangers and his family to the point

24  his Parents installed locks on the interior doors. AR at 1835, Tr. at 290:3-9, 982:2-9. A.T. also

25  demonstrated more violent behaviors at home, such as punching holes in walls or slamming his

26  music stand into the wall so hard that it stuck. AR at 1823, Tr. at 66:4-13. And he was incurring

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 3
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1  criminal charges for trespassing at various apartment complexes and discharging a BB gun at

2  two strangers. AR at 1835; Tr. at 99:6-24.

3      On July 1, 2014, A.T.'s conduct had escalated to the point that his Parents sought an At

4  Risk Youth Petition (ARY) to obtain help via Court intervention. AR at 1821-37, Tr. 97:25-

5  98:11. In the ARY, his Parents reported that A.T. was "out of control" and would "place himself

6  in inappropriate situations." AR at 1823. The Court granted the Parents' ARY Petition, deeming

7  that A.T. was "beyond parental control such that the child's behavior endangers the health,

8  safety, or welfare of the child or any other person." AR at 1839; Tr. at 103:21-23. The Court

9  imposed restrictions such as residing in the parental home, participating in therapy, undergoing

10  drug testing, and abiding by household rules. AR at 1839-40.

11     However, A.T. violated the terms of the ARY order the next day, and for the remainder

12  of the summer, his elopement and delinquent behavior increased in frequency. AR at 1842-47;

13  Tr. at 104:9-13. Between July 21, 2014, when the ARY Petition was filed, and September 10,

14  2014, A.T. was missing for 31 days in violation of the ARY order. AR at 1842-47, 2454-57. In

15  addition, A.T. spent a total of 8 days in the Denney Juvenile Justice Center (Denney) for

16  violating the ARY order. AR at 2456.

17     Despite the frequency of A.T.'s elopement from home and the severity of his actions, the

18  District was unaware of A.T.'s conduct outside of school as the Parents did not disclose any of

19  A.T.'s conduct at home, Court involvement, or arrests. Tr. at 765:5-766:5. Christine Sutton,

20  A.T.'s school counselor, testified that although she had contact with Parents during the school

21  year, she had not been made aware of any major changes outside of school, in his environment,

22  or environmental factors. *Id.*

23      **3.    Tenth Grade (2014-2015 School Year)**

24     At the start of tenth grade, A.T. attended classes even when he was missing at home. His

25  Father testified although the family was having challenges at home, A.T. was attending school,

26  and *wanted* to go to school. Tr. at 172:20-173:2. And A.T.'s behavior at school was consistent

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 4
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief9.docx

1   with his previous year—minor infractions warranting minor discipline. AR at 2463. For instance,

2   he was placed on the no hall pass list because he was found in the girl's bathroom and lied about

3   why he was in there. AR at 2459;Tr. at 174:14-17.

4           In contrast, A.T. eloped from home with increasing frequency. AR at 2457, Tr. at 173:5-

5   11. From September through December 2014, A.T. spent more time at Denney for ARY

6   violations and an arrest for Malicious Mischief--Domestic Violence. AR at 1982-96, 2143-45,

7   2208-10, 2363-65, 2456-61.

8           On January 6, 2015, A.T. returned from the winter break, and again entered the girls'

9   bathroom. AR at 2461; Tr. at 176:4-8. He locked all of the stalls but for the one next to his,

10  stuffed toilet paper into the openings between the door and the frame, and put his feet on the

11  commode so that his feet were not visible. AR at 1881; Tr. at 351:8-19. He was emergency

12  expelled pending an investigation and a manifestation determination review. Tr. at 351:21-22.

13          A multi-disciplinary team consisting of his Father, Principal Joyce Scott, Christine Sutton

14  (School Psychologist) and other staff, attended the January 13, 2015 manifestation determination

15  review meeting to assess whether the January 6, 2015 incident was a manifestation of his

16  disability. AR at 1879, Tr. at 775:25-776:4. The team reviewed the nature of A.T.'s disability,

17  and determined that A.T.'s disability caused issues with impulsivity, but that the January 6, 2015

18  incident was not related to impulsive behavior. AR at 1882. Instead, it was well thought out, he

19  had over an hour to correct his behavior, and it was the third incident of the same nature during

20  the school year, indicating a pattern. AR at 1882; Tr. at 120:21-24. Therefore, the January 6th

21  incident was deemed not to be a manifestation of his disability. AR at 1879. A.T. received an

22  8-day short term suspension. AR at 1879, Tr. at 352:2-13. For his return, the team implemented a

23  safety plan, which included a paraeducator, or aide, to assist him and to ensure safety, removing

24  him from the class associated with the incident and to update his Behavioral Intervention Plan

25  (BIP) to reflect current behavior support needs. *Id.*

26

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 5
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1      During the meeting, Ms. Sutton's focus was on determining what A.T. needed in terms of

2  his program at school, and there was nothing about A.T.'s conduct at school that compelled her

3  to change his program or seek further information. Tr. at 782:4-20. The Parents, however advised

4  Ms. Sutton of A.T.'s questionable behavior outside of school. Tr. at 780:23-781:9. During the

5  meeting, the Parents indicated they were exploring a comprehensive mental health evaluation. *Id*.

6      A.T. returned to school from the short term suspension on January 20, 2015. On January

7  21, 2015, the paraeducator sought to ensure that A.T. had all of his assignments ready, but A.T.

8  refused to open his backpack. Tr. at 122:4-9, 352:20-353:3. At the Dean of Student's office, A.T.

9  continued to refuse to open his backpack. Tr. at 122:9-16, 353:3-5. A.T. attempted to get away

10  by climbing over a table in the office, and when the Dean attempted to stop him by taking a hold

11  of the backpack, A.T. head-butted the Dean, kicked the front of the desk, and continued to be

12  very aggressive. Tr. at 353:5-353:16. The school called law enforcement. *Id*. A search of A.T.'s

13  backpack produced a large metal wrist rocket, a slingshot that is worn like a sleeve on the arm,

14  and ammunition consisting of 30 large metal ball bearings approximately an inch in diameter. Tr.

15  at 353:18-354:15. He was emergency expelled. Tr. at 354:21-22.

16      Ms. Sutton oversaw the manifestation determination review meeting on January 27, 2015.

17  The multi-disciplinary team reviewed the available information and discussed his conduct. AR at

18  1949-52. The team evaluated the incident as two components: physical aggression and weapons

19  possession. Tr. at 784:9-19. The team determined that the January 21, 2015 incident was not a

20  manifestation of A.T.'s disability as A.T. did not have a documented disability in the area of

21  physical aggression. AR at 1951.

22      With regard to the weapons component, the team determined that because the slingshot

23  and ball bearings was extremely powerful and potentially dangerous, and that it constituted a

24  weapon. Tr. at 353:17-354:15. The team also determined that A.T. knew he was not to have

25  weapons at school AR at 1951. The principal noted during her testimony that she had a

26  discussion with A.T. following the incident, and that "it was clear that he understood that he was

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 6
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    not to have them at school." Tr. at 355:1-11. Additionally, bringing a weapon to school

2    constituted exceptional misconduct, and justified a long term suspension. Tr. at 784:18-785:2, 34

3    CFR 300.530(g)(1). The team determined that A.T.'s conduct was not a manifestation of his

4    disability. Tr. at 785:3-6.

5        The District converted the emergency expulsion to a 45-day long term suspension, a

6    penalty that was consistent with a weapons violation for any student. AR at 1951; Tr. at 355:17-

7    18. For A.T., the District allowed for a possible amendment to the penalty if A.T. successfully

8    completed Anger Management Counseling and showed academic progress through the PASS

9    program at Denney. AR at 1959; Tr. at 356:4-10. The PASS program allowed A.T. to receive

10    educational services while incarcerated. Tr. at 252:8-23. The detention facility provided teachers,

11    staffed by Everett Public Schools, including special education instruction. Tr. at 577:4-578:1.

12        Also on January 27, 2015, the IEP team met to discuss A.T.'s IEP and BIP. AR at 1896-

13    1942. The team noted that A.T. was bright and academically capable, and could be thoughtful

14    and attentive, but acknowledged that A.T. was having increased absences and missed

15    assignments. AR at 1907. Ms. Sutton recommended general education placement as A.T. did

16    better behaviorally because he *wanted* to be in that environment, and did better when he was

17    with general education peers. Tr. at 862:7-21. The team determined that A.T. needed to stay in a

18    general education classroom, but that he would receive 75 minutes per week with his special

19    education teacher for behavior and learning strategies support. AR at 1915. A.T.'s annual goals

20    continued to be focused on behavior and social interactions. AR at 1929.

21        A.T. spent the majority of his time in suspension either missing from home or

22    incarcerated. For example, he spent the first 11 days of his suspension at Denney as he had been

23    arrested for assault for head-butting the Dean. AR at 1966, 2208, 2463-64; Tr. at 123:5-7.

24    Shortly thereafter, he was again incarcerated after taking his Father's glasses during an argument

25    and breaking them. AR at 1999, 2208; Tr. at 136:11-137:11, 137:18-20. In addition, he was

26    arrested for violating the ARY order. AR at 2010; 2208; Tr. at 138:12-14, 138:20-139:10.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 7
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1    During his suspension, the District authorized 75 minutes per week of tutoring with Guy

2  Becker, consistent with the time allotted for services pursuant to A.T.'s IEP. Tr. at 578:24-

3  579:19, 580:13-19. The District selected Mr. Becker as A.T.'s tutor because of his particular

4  skills connecting with students and teaching behavior and social skills. Tr. at 579:6-14. Mr.

5  Becker was a full-time, certified teacher with a Bachelor's degree in Behavioral Science and

6  Master's degrees in Counseling and Teaching. Tr. at 464:14-465:3.

7    To prepare, Mr. Becker contacted A.T.'s IEP team members and reviewed documents.

8  Tr. at 466:7-467:22. Mr. Becker made several attempts to contact A.T. and his Parents, finally

9  connecting on February 25, 2015. AR at 2489; Tr. at 468:6-16. Mr. Becker and the Father agreed

10  for Mr. Becker to meet with A.T. the following week. AR at 2489;Tr. at 468:21-25.

11    On March 4, 2015, Mr. Becker and A.T. met so that Mr. Becker could connect with A.T.

12  and understand how to best serve him. Tr. at 469:10-14. During this meeting, A.T. expressed his

13  desire to attend Scriber Lake High School for a "fresh start." AR at 2489; Tr. at 469:15-470:4.

14  Because A.T. expressed an interest in e-learning, Mr. Becker arranged for A.T. to enroll. AR at

15  2490. A.T. and Mr. Becker agreed to meet every Wednesday. Tr. at 470:25-471:6.

16    But A.T. eloped later that afternoon, and was missing until March 10, 2015. Tr. at 139:4-

17  13. For the remainder of his suspension, A.T. either eloped or violated probation, resulting in

18  incarceration. AR 2467-68; Tr. at 139:17-140:8.

19    In March 2015, Stacy Cecchet, Ph.D. evaluated A.T. AR at 2179.

20    On April 11, 2015, Ms. Sutton contacted the Mother regarding a re-entry meeting for

21  A.T.'s return to school. AR at 2049; Tr. at 799:2-800:7. However, his Mother requested that a re-

22  entry meeting be postponed pending the psychological evaluation by Dr. Cecchet. *Id.*

23    **4.    Dr. Checchet's report and diagnosis of Prodromal Schizophrenia**

24    Ms. Sutton received a copy of Dr. Cecchet's report on April 22, 2015. Tr. at 800:10-15.

25  The report provided a medical context for A.T.'s progressively worsening behavior: prodromal

26  schizophrenia. AR at 2075-77.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 8
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    Dr. Cecchet explained that prodromal schizophrenia was a rare diagnosis, but explained
2    the progressively worsening symptoms and behavior described by both A.T. and his Parents. AR
3    at 2194-95; Tr. at 934:4-935:2. As Dr. Cecchet explained it, prodromal schizophrenia was like a
4    flickering light switch, with various influences causing it to flicker on or off. Tr. at 930:14-931:4.
5    If the light switch stayed on, then A.T. would have fully expressed schizophrenia, but in the
6    prodromal phase, A.T.'s symptoms would only manifest for short periods, which would
7    progressively become longer. *Id.* For Dr. Cecchet and A.T.'s family, the diagnosis explained the
8    progressive worsening of his behavior.

9    Dr. Cecchet opined that A.T.'s symptoms likely manifested sometime in spring 2014,
10   which was consistent with the Parents' observations. Tr. at 1007:2-13. Although the District
11   could not have known at the time, Dr. Cecchet explained that some of A.T.'s behavior at school
12   could have stemmed from the prodromal schizophrenia. Tr. at 1006:21-1007:8.

13   Dr. Cecchet's recommendations included clinical services with a licensed psychologist
14   with specialized training in adolescent psychiatry/or psychotic disorders, assumption of care by a
15   board-certified adolescent psychiatrist for medication management, therapeutic services, parental
16   involvement, monitoring and reevaluation, and record tracking. She also recommended
17   administration of antipsychotic medication, avoiding the use of illegal drugs, maintaining the
18   IEP, self-monitoring exercises, and family techniques to increase communication and warmth.
19   AR at 2077-80.

20   Dr. Cecchet also stated that hospitalization might be an option. AR at 2079. Dr. Cecchet
21   "strongly suggested" that A.T. enroll in the Children's Long Term In-Patient Program (CLIP),
22   which she described as "the most intensive inpatient psychiatric treatment available to
23   Washington State residents, ages 5-18 year of age." AR at 2079-80.

24   Dr. Cecchet explained during her testimony that because a CLIP placement was a
25   medically based treatment approach, providing 24 hours of psychiatric care, that A.T. needed to
26   demonstrate medical necessity for placement. Tr. at 1015:15-1016:5. She opined that there was

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 9
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    medical necessity, due to his mental health diagnoses. Tr. at 1016:6-8. Further, she testified that

2    "without residential care, he would not be able to function in a school setting." Tr. at 1016:9-12.

3         **5.    The District's attempts at re-engagement**

4         Upon reviewing Dr. Cecchet's report, Ms. Sutton notified the District multidisciplinary

5    team members and reached out to A.T.'s Parents to discuss what next steps needed to be taken.

6    AR at 2082; Tr. at 800:24-801:16. The Parents, at this time, expressed an interest in Scriber Lake

7    High School and the Intensive Learning Support (ILS) program. AR at 2093. During the April

8    29, 2015 meeting, the team, which included the Mother, discussed several options for

9    transitioning A.T. back into school. Tr. at 582:11-583:6. The Mother reported that A.T. did not

10   want to attend Meadowdale because he was embarrassed, and felt like he would be targeted for

11   his actions. Tr. at 148:3-13. Therefore, the team discussed what would be needed to successfully

12   return A.T. to the school setting via Scriber Lake. Tr. at 582:19-583:6. In addition to a tutor, the

13   team discussed hiring a Behavior Specialist through Hopeful Hands, a behavior support program

14   which provides staff with master-level degrees to support students. Tr. at 584:22-585:14.

15        The next day, on April 30, 2015, Andrea Hillman, the principal at Scriber Lake, joined

16   the multidisciplinary team, and she in turn included school psychologist Beverly Cartwright. AR

17   at 2098. Dr. Cartwright reviewed Dr. Cecchet's evaluation report. Tr. at 538:3-539:2. To initiate

18   her evaluation of A.T., Dr. Cartwright spoke with the Mother on May 1, 2015. Tr. at 537:18. She

19   discussed the Mother's struggles with implementing the recommendations as outlined by Dr.

20   Cecchet, such as securing a CLIP bed, contacting a medical professional to work with A.T., and

21   securing support from adoption services. Tr. at 538:3-539:2. Dr. Cartwright also learned that

22   A.T. had significant conflict at home, including eloping, unwillingness to take medication, and

23   hygiene. Tr. at 539:3-540:25. Dr. Cartwright had also talked with the Mother about Scriber Lake,

24   the smaller class sizes, and provision of intensive learning support as appropriate. Tr. at 540:24-

25   541:22. She also expressed her hope that A.T. would be located in her wing of the building so

26   that she could engage with him on a daily basis on behavioral and emotional issues. *Id.*

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 10
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief.docx

1        Dr. Cartwright and other District team members sought to meet with Parents on May 7,

2    2015 to discuss A.T.'s enrollment at Scriber Lake. AR at 2104. The purpose of the meeting was

3    to discuss A.T., Dr. Cecchet's report, and what impact the new diagnosis would have on A.T.'s

4    transition to Scriber Lake. Tr. at 545:2-25. The District sent a Prior Written Notice, attempted to

5    contact the Parents on May 4, 2015 and again on May 6, 2015. AR at 2104-05. However, neither

6    the Mother nor the Father attended the meeting. Tr. at 544:19-545:1. On May 7, 2015, the multi-

7    disciplinary team met again to discuss A.T.'s transition back into school. Tr. at 489:2-4. Dr.

8    Cartwright, in particular, wanted to learn whether any of the behaviors discussed in Dr.

9    Cecchet's report had been observed in the school setting. Tr. at 545:4-14.

10       The team did not implement or revise A.T.'s IEP or BIP at that time because they had

11   recently reviewed new information and needed to observe A.T. to assess how best to provide

12   services. Tr. at 555:25-558:4. The team determined that the most urgent goal was to provide a

13   safe environment for A.T. to return, then evaluate A.T. during the transition period to acquire

14   more information to determine how best to serve A.T. TR at 557:4-23. They decided that once

15   A.T. physically returned to the school, they could then observe and evaluate him and the effects

16   of his prodromal schizophrenia to assist in making any placement recommendations or decisions.

17   Dr. Cartwright anticipated the observation period to take approximately one week, and planned

18   to reconvene the IEP team immediately thereafter. Tr. at 558:24-559:5.

19       A.T. attended Scriber Lake on May 18, 2015. AR at 2103; Tr. at 493:12-18. Dr.

20   Cartwright took the opportunity to meet with A.T., and they talked for approximately 20

21   minutes. Tr. at 547:16-550:23. He also admitted he did not want to take his medication, and that

22   the only reason he did take it was to cease the arguing with his mother. Tr. at 550:2-7. A.T.

23   assured Dr. Cartwright that he would return to school the next day. Tr. at 550:10-19. A.T.,

24   however, did not return to school. Tr. at 550:20.

25       Dr. Cartwright contacted the Parents and spoke with his Mother on May 21, 2015. Tr. at

26   552:9-17. Dr. Cartwright discussed the Mother's struggles with getting A.T. to go to school,

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 11
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1   which usually led to arguments between her and A.T. Tr. at 553:1-554:13. Dr. Cartwright

2   inquired about how to get in touch with A.T., whether he had a cell phone or a friend, or what

3   could be done to encourage A.T. to return to school. *Id.* Principal Hillman, along with other staff

4   members, also attempted to contact A.T. and his Parents in an attempt to get him back to school.

5   Tr. at 494:4-:25, Tr. at 152:11-18. She eventually heard from his Mother, who requested that the

6   District not contact the Parents anymore regarding her son's absence. Tr. at 494:24-:25.

7        For the remainder of the school year, A.T. was again either missing or incarcerated. AR

8   at 2108, 2110; 2145, 2208-10, 2471-73; Tr. at 113:3-9. He continued to engage in risky behavior

9   outside of school, including trying illegal drugs such as marijuana and methamphetamine. AR at

10   2113, 2132. He was also violent toward his Parents and his Mother reported assaultive behavior,

11   property destruction, and verbal threats. AR at 2114. She also revealed that A.T. threatened to

12   choke her, refused to leave her office, and stated that she did not feel safe around him. *Id.*

13       **6.**    **11th Grade (2015-2016 School Year)**

14        A.T. did not attend any days of the 2015-2016 school year with the District. Tr. at 154:4-

15   154:7. He continued to elope, get arrested, and be incarcerated. AR at 2145,2156-57, 2476-80;

16   Tr. at 152:24-153:21, 307:5-11. During one incarceration, the police took him directly to Seattle

17   Children's Hospital, where A.T.'s urinalysis tested positive for benzodiazepines,

18   methamphetamine, and opiates. AR at 2156, Tr. at 152:24-153:21, 307:8-14. Seattle Children's

19   Hospital discharged him on October 3, 2015. AR at 2157. Recommendations at discharge

20   included scheduling an appointment with individual/family therapy, medication management,

21   and "residential treatment—mental health, substance use, or dual diagnosis—is indicated." *Id.*

22   Between November 13, 2015 and December 5, 2015, A.T. was either missing or incarcerated at

23   Denney. Tr. at 157:1-18.

24       **7.**    **Residential placement at the Provo Canyon School**

25        As Dr. Cecchet recommended residential placement, the Parents began looking

26   immediately. Tr. at 246:1-246:7. The Parents looked at several facilities, which were either too

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 12
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1   expensive or too short a placement. AR at 2155; Tr. at 273:25-277:5. Parents then selected Provo

2   Canyon School ("Provo") in Provo, Utah. Tr. at 246:14-17.

3           On September 8, 2015, the Mother completed an application for CLIP placement. AR at

4   2140-55. In the application, she outlined A.T.'s past psychiatric hospitalizations, attempts at

5   outpatient mental health treatment, incarceration, challenges leading to the request for long-term

6   in-patient psychiatric treatment, and A.T.'s failure in a past program due to his unavailability. *Id*.

7   The Parents, however, did not complete the CLIP process because the waiting list would take too

8   long for placement. Tr. at 192:11-19.

9           The Parents filed their notification of A.T.'s unilateral placement at Provo, and intent to

10  request reimbursement for all expenses associated with placement on December 1, 2015. A.T.

11  entered Provo on December 14, 2015. Tr. at 157:2-4.

12          Provo is a secure residential facility, meaning that students are locked in the facility and

13  are not free to leave. Tr. at 283:5-7; 1019:17-25. The facility includes a "stabilization" unit,

14  which is a separate wing of the building where students who have just entered the program, or

15  students with safety issues, are placed. Tr. at 223:6-224:3, 1022:9-1023:25. In stabilization,

16  students are locked in, have even less privacy, more direct supervision, and wear uniforms. *Id*,

17  Tr. at 1047:3-1047:5. Although A.T. did not have any incidences of violence, A.T. was in

18  stabilization from December 14, 2015 to January 21, 2016, and again on February 3, 2016. AR

19  2243-82; Tr. at 649:13-649:24. 658:19-659:16,

20          Provo also provides medication management. Tr. at 1054:8-24. Students are expected to

21  line up in two lines in front of the medication windows, where they received their medications.

22  *Id*. If a student refused, Student Life Mentors would engage the student. *Id*. Most students would

23  then take their medication. *Id*.

24          Provo does provide students with limited instruction. Tr. at 1049:16-1054:8. Instruction is

25  given via lecture with students completing worksheets. *Id*. Only three of the instructors have

26  special education endorsements. Additionally, although A.T. had an IEP and BIP, Provo was not

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 13
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brieft.docx

1   using or implementing either, and was not collecting any data to verify that A.T. was in fact

2   learning, or that his class placement was appropriate. *Id.*

3       Although exit goals are identified, the duration of a student's stay may be dependent on

4   who is paying. Tr. at 1055:9-25. When asked about the duration of a stay, the Provo Medical

5   Director responded that typically, "if it's private pay, it's six to nine months. If it's school district

6   pay, it's 12 months or more." Tr. at 1055:14-25.

7       Since December 15, 2015 until at least the time of the hearing, the Parents did not visit

8   A.T. at Provo. Tr. at 283:22-25. When asked about his stay at Provo, the Mother indicated her

9   intent to keep A.T. at Provo for an uncertain time. AR at 2397.

10       **8.**    **The administrative hearing and decision**

11       The Parents filed a request for a due process hearing on December 17, 2015. The issues

12   for the hearing were set by the fourth pre-hearing order, dated March 8, 2016. AR at 1380-85.

13   The hearing was held before Administrative Law Judge Michelle Mentzer in March & May,

14   2016. The ALJ issued her decision on July 20, 2016. AR at 1105-56.

15       In her decision, the ALJ held that the District violated the IDEA by failing to offer a free

16   appropriate public education to the student. AR at 1154-55. The ALJ also held that Provo was an

17   appropriate placement and the ALJ ordered the District to reimburse the parents for the Provo

18   tuition. AR at 1155. On September 22, 2016, the District appealed the decision to this Court.

19           **III.**    **ISSUES PRESENTED**

20       1.    Did the ALJ err when she held that the District must reimburse the Parents for the

21   A.T.'s placement at Provo, where Ninth Circuit precedent dictates that a school district is not

22   required to reimburse parents when placement at the residential facility treats medical, not

23   educational, problems?

24       2.    Did the ALJ err when she held that procedural violations by the District denied

25   the Student a FAPE, where the procedural violations of the District, if any, were rendered

26   immaterial because the Student failed to attend school?

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 14
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1

## IV.   LEGAL ARGUMENT

### A.   The Legal Standards for Appeals of Administrative Orders Under the IDEA

In an administrative hearing, the U.S. Supreme Court has held that the burden of proof lies with the party requesting the due process hearing. *Schaffer v. Weast*, 546 U.S. 49 (2005). There is a split among the Circuit Courts over which party has the burden of proof in a civil action arising under the IDEA. The majority of courts place the burden on the party that challenges the findings of administrative hearing. *See e.g. Ridley Sch. Dist. v. M.R. and J.R.*, 680 F.3d 260 (3d Cir. 2012).

This Court, citing 20 U.S.C. § 1415(i)(2)(C), has stated that a "modified *de novo* standard" governs review of the administrative decision:

> When reviewing an administrative decision in an IDEA case, the Court . . . applies a modified *de novo* standard. [citation omitted] The Court gives due weight to the administrative proceedings, particularly where—as here—the administrative decision was careful, impartial, and sensitive to the complexities present. . . . The Court must consider the findings carefully and address the hearing officer's resolution of each material issue. . . . After such consideration, the Court may accept or reject the hearing officer's findings in part or as a whole.

*Miller v. Monroe Sch. Dist.*, 131 F. Supp. 3d 1107, 1112 (W.D. Wash. 2015). The appropriate deference to afford the administrative decision lies within the discretion of the court. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010). A court, however, is free to deviate from the administrative decision "when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts." *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).

### B.   The IDEA and Residential Placement

Federal and state law require that school districts offer special education students the opportunity for a "free appropriate public education," or FAPE, at public expense. 20 U.S.C. § 1412(a)(1)(A) of the IDEA; RCW 28A.155.010; *see also Kutasi v. Las Virgenes Unified Sch. Dist.*, 494 F.3d 1162 (9th Cir. 2007) (IDEA is a "comprehensive educational scheme that confers

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 15
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

on students with disabilities a substantive right to public education.")

To achieve the goal of offering a FAPE, the IDEA requires that school districts develop an individualized education program ("IEP") for each child with a disability covered by IDEA. 20 U.S.C. § 1401(9)(D). Along with teachers and school staff, parents serve as members of the team that creates the IEP. 20 U.S.C. § 1414(d)(1)(B); WAC 392-172A-03095.

A parent has the right to complain about "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Either individually or on behalf of a disabled child, a parent challenging "any matter" relating to the education of a disabled child has the right to an impartial due process hearing before an administrative law judge. 20 U.S.C. § 1415(f)(1).

When parents challenge the appropriateness of a program or placement offered to their disabled child under the IDEA, a reviewing court or administrative law judge must undertake a twofold inquiry. *Rowley*, 458 U.S. at 206-07. First, the court or ALJ must consider whether the school district has complied with the procedures set forth in the IDEA. *Rowley*, 458 U.S. at 206. Only procedural flaws that result in the loss of educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process, will result in a denial of FAPE. *W.G. v. Bd of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479, 1484 (9th Cir. 1992).

Second, under *Rowley,* the court determines whether the IEP is reasonably calculated to enable the child to receive educational benefits. 458 U.S. at 206-07. To meet this requirement, a district's IEP does not have to be the best education. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) (quoting *Rowley,* at 197 n.2). Rather, the IEP is appropriate if it confers *some* educational benefit; it does not have to be superior to alternatives. *Rowley*, 458 U.S. at 198-200.[3]

---

[3] A case currently pending before the U.S. Supreme Court, *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist.*, 798 F.3d 1329 (10th Cir. 2015), *cert. granted,* 137 S. Ct. 29 (2016), addresses the level of benefit a school must confer on students to provide them with a FAPE under the IDEA.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 16
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

**C.     Tuition Reimbursement for Private Placement in a Residential Facility Requires that the Placement Be for Educational , and Not Medical or Psychiatric, Reasons**

A parent who unilaterally places a child in a private placement is "'entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the Act.'" *Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1188 (9th Cir. 2016) (quoting *Cty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996). If both criteria are met, the court must use its discretion and weigh equitable factors to determine whether, and how much, reimbursement is warranted. *Id.*

If a parent unilaterally places the child in a residential facility, then the placement is appropriate only if it is "necessary to provide special education and related services." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009) (internal quotations omitted) (hereinafter "*R.J.*"); 34 C.F.R. § 300.104. For the residential placement to be appropriate the student must be "'incapable of deriving educational benefit outside of a residential placement.'" *Id.* If the placement is for medical reasons, then parents are not entitled under the IDEA to be reimbursed for the costs of the private placement. *R.J.* at 1010.

As the *R.J.* court held, a court in the Ninth Circuit must focus on whether the residential placement is for an educational purpose and not for medical, social, or emotional problems:

> As we explained in *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir.1990), "our analysis must focus on whether [the residential] placement may be considered necessary for *educational* purposes." *Id.* at 643 (emphasis added). If "the placement is a response to medical, social, or emotional problems ... quite apart from the learning process," then it cannot be considered necessary under the IDEA. *Id.*

*R.J.*, 588 F.3d at 1010.

In *R.J.*, the district court rejected the hearing officer's determination that private placement was appropriate because the placement was for noneducational reasons that "manifested themselves away from school grounds." *Id.* at 1008. In *R.J.*, the student exhibited

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 17
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1   behavior difficulties in school, but nonetheless demonstrated the ability to comprehend the

2   materials and perform. *Id.* at 1010. When not in school, however, the student engaged in "risky

3   behaviors" that prompted her parents to enroll her in a residential placement. *Id.* For instance, the

4   parents identified sneaking outside of the house, and dishonesty about her relationships, all of

5   which were outside of school. *Id.* Although the parents argued that the student was "incapable of

6   succeeding academically outside of the residential facility," the Ninth Circuit affirmed the

7   District Court's ruling that the student's "primary problems were not educationally related." *Id.*

8   Thus, the Ninth Circuit affirmed the denial of the parents' request for tuition reimbursement. *Id.*

9       In another case involving the Ashland School District, *Ashland Sch. Dist. v. Parents of*

10  *Student E.H.*, 587 F.3d 1175 (9th Cir. 2009) ("*E.H.*"), the parents appealed the district court's

11  ruling that the student's residential placement was necessitated by medical, rather than

12  educational, concerns. *Id.* at 1185. In *E.H.*, the child began exhibiting symptoms of emotional

13  problems in third grade, which manifested into migraine headaches that were so severe he

14  required hospitalization. *Id* at 1178. The child performed well in school, and was very gifted

15  intellectually, but suffered from severe depression to the point of having suicidal ideation. *Id* at

16  1179. In the summer before high school, E.H. was hospitalized twice following two attempted

17  suicides. *Id.* A few months later, E.H. was again hospitalized for suicidal tendencies and for

18  threatening to injure family members. *Id.*

19      The parents then enrolled E.H. in a residential treatment program providing

20  psychological care, intensive counseling, and educational support sessions. *Id* at 1180. The

21  parents requested a due process hearing, seeking to be reimbursed for the costs of residential

22  treatment. *Id.* The hearing officer determined that because E.H.'s educational and medical

23  problems were intertwined, the district was obligated to pay for residential treatment. *Id.* at 1180-

24  81. The school district appealed the hearing officer's decision to federal court. *Id.* at 1181

25      Following the school district's appeal, the district court conducted "an independent

26  review of the record" and reversed the award of tuition reimbursement. *Id.* The district court

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 18
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    concluded that the parents decision to place E.H. in a private facility "was motivated primarily

2    by their worries about E.H.'s medical condition" and not for educational reasons. *Id.* at 1183.

3          On appeal, the Ninth Circuit affirmed the district court because: "The record contains

4    ample evidence supporting the district court's conclusion that Parents placed E.H. in residential

5    care to treat medical, not educational, problems." *E.H.*, 587 F.3d at 1185.

6          Citing both *E.H.* and *R.J.*, a federal district court in Oregon held that the parents were not

7    entitled to be reimbursed for tuition after placing their son at the Provo Canyon School (the same

8    school at issue in the case at hand.) *G.R. ex rel. Russell v. Dallas Sch. Dist. No. 2*,

9    823 F. Supp.2d 1120, 1141–42 (D. Or. 2011). Finding that the placement was not for educational

10   reasons, the district court affirmed the denial of tuition reimbursement: "I conclude that

11   placement at Provo Canyon School was not necessary to provide special education and related

12   services. Thus, the private-school placement was not appropriate . . . ." *Id.* at 1142.

13         The *G.R.* court also recognized that placement at Provo would not be consistent with

14   IDEA's preference for placing students in the least restrictive environment. While

15   acknowledging that a private placement need not satisfy the technical requirements of the IDEA,

16   the court noted that the private placement "must offer the child 'an education otherwise proper

17   under [the] IDEA'" *Id.* at 1138 (citation omitted). The *G.R.* court noted that the district's

18   program was "less restrictive than Provo Canyon School, an important consideration for a high

19   school student who would be leaving the classroom environment in a few years and must learn to

20   get along with peers." *G.R.*, 823 F. Supp. 2d at 1142. For these reasons, the court denied the

21   parents' request for tuition reimbursement for placement at Provo.

22         Like the courts in *R.F., E.H.,* and *G.R.*, this Court should deny the parents' request for

23   tuition reimbursement.

24   **D.**      **The ALJ Failed To Follow Ninth Circuit Precedent in Assessing Provo**

25         Here, the ALJ failed to cite the Ninth Circuit's opinion in *R.J.* The ALJ also attempted to

26   distinguish the holding of *E.H.* Decision at 34-35 (AR 1138-39) The ALJ claimed that *E.H.* is

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 19
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1     distinguishable because the student in that case performed well academically prior to being
2     hospitalized and residentially placed for depression. Decision at 34 (AR 1138). What the ALJ
3     fails to point out, however, is that the hearing officer in *E.H.* held that reimbursement was
4     appropriate because the student's educational and medical problems were intertwined. *E.H.*, 587
5     F.3d at 1180-81. The district court reversed that decision because the placement was intended to
6     treat medical problems, and the Ninth Circuit affirmed the reversal. *Id.* at 1185.

7           The ALJ's attempt at distinguishing *E.H.* fails, however, because the student here, like
8     the student in *E.H.,* performed well academically prior to the onset of his prodromal
9     schizophrenia. Like the parents *E.H* who chose a residential facility primarily because of E.H.'s
10    medical condition, the residential facility here was chosen to address A.T.'s medical and
11    psychiatric needs.

12          In addition, the ALJ's decision ignores *R.J.* In *R.J.*, the court recognized that the student
13    had some problems at school, but that it was her "'risky behaviors' outside of school that
14    prompted her parents" to seek a residential facility. *R.J.*, 588 F. at 1010. Like the behavior of
15    A.T. here, it was the "defiant behavior" of R.J. at home, and her continuing to sneak "out of the
16    house to see friends" that triggered the decision to place her in a residential facility. *Id.* Like the
17    Parents here, the parents in *R.J.* also claimed that the student "was incapable of succeeding
18    academically outside of the residential facility." *Id.* The district court in *R.J.* rejected that
19    argument, holding that reimbursement was not appropriate because R.J.'s "primary problems
20    were not educationally related." *Id.* The Ninth Circuit then affirmed the district court.

21          Instead of applying *R.J.*, the ALJ cites a district court opinion in New York to support her
22    decision to award tuition reimbursement. Decision at 35 (AR 1139) (citing *M.M. v. New York*
23    *City Dep't of Educ.*, 26 F. Supp. 3d 249 (S.D.N.Y. 2014). In *M.M.*, the court upheld
24    reimbursement merely because the "psychiatric treatment" the student received at the residential
25    facility "appeared to facilitate her education." 26 F. Supp. 3d at 258. The ALJ's decision, left
26

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 20
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    unchallenged, would require school district to pay for a residential placement whenever that

2    placement is necessary to facilitate the education of a student.

3         Such a lenient standard is not the standard in this Circuit. Because the ALJ erred in

4    ignoring *R.J.* and in attempting to distinguish *E.H.*, the decision should be reversed. In addition,

5    the medical basis for A.T.'s placement at Provo is discussed more fully in the next section.

6    **E.    Because A.T.'s Placement at Provo Was for Medical Reasons, the Request for
          Tuition Reimbursement Should Be Denied**

7

8         The Parents of A.T. were motivated by medical reasons to seek residential placement for

9    their son. A.T.'s behavior deteriorated in the summer of 2014, likely due to the initial onset of

10   his prodromal schizophrenia. Tr. at 1007:2-13. During the spring and summer of 2014, A.T.'s

11   symptoms fluctuated, sometimes he was quite functional and other times completely erratic. Tr.

12   at 1007:2-1007:13. A.T. began to make irrational choices, such as eloping from home and

13   making "friends" with transients. He was also becoming more aggressive and getting into trouble

14   with the law. *Id.*

15        At the hearing, the evidence established that the Provo placement was for medical and

16   not educational reasons.

17        **1.    The testimony of Dr. Cecchet underscores the medical basis for the
              placement at Provo.**

18        During her testimony, Dr. Cecchet stated that the natural course of schizophrenia was to

19   get worse. AR at 2435; Tr. at 938:18-940:4. The worsening symptoms may require

20   hospitalization. *Id.*

21        And as Dr. Cecchet described, A.T.'s symptoms and behavior did get worse. Tr. at

22   1013:14-1014:25. As an example, Dr. Cecchet referred to A.T.'s elopement from home, noting

23   that initially he left because of impulsivity, but eventually he stayed away because he was too

24   cognitively disorganized to be able to go home. *Id.* As Dr. Cecchet explained in her testimony,

25   while his behavior may have initially been impulsive, it became "more congruent with the other

26   mental health symptoms of the schizophrenia." *Id.*

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 21
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    Like the physician in *E.H.*, Dr. Cecchet also recommended a residential placement for

2    A.T, specifically the Children's Long-Term In-Patient Program (CLIP). Tr. at 908:4-5, 966:4-7.

3    In explaining CLIP, Dr. Cecchet stated that CLIP was "the most intensive inpatient psychiatric

4    treatment available to Washington State residents, ages 5-18 years of age." AR at 2199, Tr. at

5    1015:15-1016:8. To qualify for CLIP, a showing of medical necessity is required. *Id.* And Dr.

6    Cecchet recommended that A.T. apply "due to his mental health diagnosis." Tr. at 1016:3-

7    1016:8. She explained that his symptoms were getting worse, and would progressively worsen

8    unless his mental health condition was treated. Tr. at 1032:9-1033:11.

9    Dr. Cecchet was not the only mental health professional to opine that A.T. needed

10   residential placement for his medical symptoms. On September 30, 2015, A.T. had been

11   admitted to Seattle Children's Hospital Children's Behavioral Unit. AR at 2156. Daniel J.

12   Crawford, M.D. recommended residential treatment for mental health, substance abuse, or for

13   dual diagnosis. *Id.*

14   There is no dispute that A.T. needs medical treatment, or that he needed medication

15   management to address his prodromal schizophrenia. Similar to the circumstances in *E.H.*,

16   however, the primary need for residential placement is not to address A.T.'s education, but to

17   treat his medical condition. As the *E.H.* Court stated public funding for private placement in such

18   cases is inappropriate.

19      **2.    A.T.'s behavior outside of school was the primary motivation for his**
        **placement at Provo**

20      Residential placement is also not necessary for educational purposes when the placement

21   is in response to social or emotional problems quite apart from the learning process. *R.J.*, 588

22   F.3d at 1010. Under such circumstances, a school district is not financially responsible for the

23   residential placement, and resources other than the IDEA must be identified. *Gonzales v. Puerto*

24   *Rico Dept. of Educ.*, 254 F.3d 350, 353 (1st Cir. 2001). Furthermore, public funding for any

25   services to address social maladjustment is prohibited. 34 CFR 300.8(c)(4).

26

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 22
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1    Even if a student has difficulty with some school tasks, such as turning assignments in on
2    time, such difficulties do not rise to such a level as to require residential placement. *R.J.* at 1010.
3    In *R.J.*, the student did have behavior difficulties in school, but nonetheless demonstrated the
4    ability to comprehend the materials and perform. *Id.* However, outside of school, the student
5    engaged in "risky behaviors" that prompted her parents to enroll her in residential placement. *Id.*
6    For instance, the parents identified sneaking outside of the house, and dishonesty about her
7    relationships, all of which were outside of school. *Id.* Because the parent's primary motivation
8    was to address their daughter's behavior rather than her education, reimbursement for residential
9    placement was denied. *Id.*

10    Similarly, A.T.'s high level of intelligence and capability allowed him to attend all
11    general education classes for his academic subjects, requiring him only to spend a total of 75
12    minutes per week out of 1,800 in a special education setting to address his behavior and social
13    disabilities. AR at 2115. And similar to *R.J.*, A.T. performed well when he attended classes, and
14    demonstrated comprehension and a high level of skill. AR at 1793, Tr. at 430:5-430:17. A.T. was
15    even estimated to be in the top 10% of his math class based on his statewide assessment score.
16    Tr. at 431:1-431:16, 432:17-432:25.

17    As in *R.J.*, it was not A.T.'s incomplete assignments, tardiness, or other school-related
18    issue that prompted his Parents to seek Court supervision when they filed the At Risk Youth
19    Petition or to seek CLIP placement. His Parents sought the ARY in the summer of 2014 because
20    A.T. was eloping from home, sometimes for days at a time, and becoming involved with law
21    enforcement due to criminal behavior and his behavior was simply out of their control. AR at
22    1823; Tr. 97:25-98:11.

23    Similar to *R.J.*, A.T.'s placement at Provo stemmed from issues separate from the
24    learning process, as his behavior was most troublesome away from school grounds. He
25    threatened to choke his mother, put bleach in his father's water, put a hole in the wall from
26

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 23
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1   slamming his door, and threw his music stand at the wall hard enough to make it stick. AR at

2   1823, 2114. He was violent, and his Mother no longer felt safe around him. AR at 2114.

3         In placing A.T. in residential placement, his Parents were seeking a method of controlling

4   his behavior and ensuring his and their safety. The behaviors they identified in their ARY and

5   CLIP applications were behaviors that were limited primarily to the home environment, further

6   evidence that their motivations are not educational. Consequently, residential placement at public

7   expense to address behavior is inappropriate.

8   **F.     Provo did not offer an appropriate education in the least restrictive environment**

9         While a private placement need not satisfy the technical requirements of the IDEA, the

10  private placement "must offer the child 'an education otherwise proper under [the] IDEA'" *G.R.*,

11  823 F.Supp.2d at 1138 (quoting *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 522 (6th Cir.

12  2003)). Similarly, a "parental placement need not be the least restrictive environment." *N.T. v.

13  D.C.*, 839 F. Supp. 2d 29, 35 (D.D.C. 2012). Nevertheless, a hearing officer should consider

14  whether the private placement "was the least restrictive environment in evaluating whether

15  private placement was the proper remedy." *Id.; See also J.S. v. Shoreline Sch. Dist.*, 220 F. Supp.

16  2d 1175, 1182 (W.D. Wash. 2002) ("Residential placements (or reimbursement therefor) may

17  sometimes be required in remarkable circumstances, but generally courts have found that FAPE

18  is available in a less restrictive, local environment.")

19        Here, the evidence at the hearing established that the Provo placement was neither

20  appropriate under the IDEA nor was it the least restrictive environment. This is especially

21  apparent when Provo is compared to the placement offered by the District.

22        **1.     Provo did not offer an appropriate education for A.T.**

23        Until the onset of the prodromal schizophrenia, A.T. was successful in school with the

24  District, progressing from grade to grade, and performing well overall. The District also offered

25  services to support A.T.'s needs, such as intensive learning support, paraeducator assignments,

26  and assistance with masters-level behavioral support. Tr. at 571:3-572:25, 582:12-583:6.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 24
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1        In addition, at the District, A.T.'s IEP reflected placement in all general education classes as A.T. needed the peer interaction and demonstrated the ability to perform well in all academic subjects at his grade level. AR at 1912. Provo, conversely, made no efforts to implement the most recent IEP, and the assignment of classes did not reflect A.T.'s capabilities, even by Provo's own placement testing methods. AR at 2307-08; Tr. at 220:19-221:1, 698:13-698:14.

        For example, Provo assigned A.T. to a 10th grade English class even though its testing showed that A.T. was reading at the 12.9 grade level and Provo even recommended that A.T. be served with 11th grade instructional materials. Nevertheless, A.T. was placed in a 10th grade class, which was a year behind his chronological grade, a year behind the recommendations made by Provo's own testing, and significantly behind his capabilities. AR at 2306, Tr. 343:16-344: 15. Similarly, in math, A.T. tested at the 84th percentile nationally with a 12.9 grade equivalent score. *Id*. Even though testing results suggested that A.T. advance to Algebra 2; A.T. was again enrolled in Geometry, which he had taken previously. *Id*, AR at 2380.

        Additionally, the primary purpose of Provo is to provide medical and psychological treatment, not to provide an education. As history teacher Ben Francis explained:

> Most of the students are here for behavior problems, you know, addictions, drug addictions, pornography addictions, you know. It could be depression or suicidal issues. They're usually here for more of the emotional concerns.

Tr. at 342:20-342:24.

        Additionally, when the treatment team (which does not include the Parents) does determine that a resident is capable of discharge from Provo, they do not release the resident to the school district to continue academic services. Instead, they release the resident to Intensive Outpatient or Partial Hospital Program to continue on-going medical and clinical services. AR at 2311; Tr. at 230:20-231:7. Thus the very purpose of Provo, and the lack of educational services it provides, is further evidence that the primary motivating factor in A.T.'s enrollment was for reasons other than for educational purposes.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 25
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1          **2.      Provo contradicts IDEA's preference for the least restrictive environment.**

2          In addition to a FAPE, the district must provide education and related services in the

3    "least restrictive environment" (LRE) possible. 20 U.S.C. § 1412(a)(5) Regarding LRE, the

4    IDEA stresses that disabled children should be educated in the regular education classroom "to

5    the maximum extent appropriate." § 1412(a)(5)(A). Removal of a student from a "regular

6    educational environment occurs only when the nature or severity of the disability of a child is

7    such that education in regular classes with the use of supplementary aids and services cannot be

8    achieved satisfactorily." § 1412(a)(5)(A).

9          Residential placement at public expense is therefore only appropriate "'when the nature

10   or severity of the disability of a child is such that education in regular classes with the use of

11   supplementary aids and services cannot be achieved satisfactorily.'" *R.J.*, 588 F.3d at 1009

12   (citation omitted). The *R.J.* court explained that the LRE requirement: "furthers the IDEA's

13   purposes of assuring that 'separate schooling ... occurs only when the nature or severity of the

14   disability of a child is such that education in regular classes with the use of supplementary aids

15   and services cannot be achieved satisfactorily.'" *R.J.*, 588 F.3d at 1009 (quoting 20 U.S.C. §

16   1412(a)(5)(A)). Thus, residential placement is necessary under the IDEA only when the

17   "'student is incapable of deriving educational benefit outside of a residential placement.'" *Id.*

18         As a secured facility, Provo is the most restrictive educational environment available. The

19   facility is secured by swipe locks and traditional key locks, which prohibit students from leaving.

20   Tr. at 283:5-283:7; 1019:17-1019:25. To enter the facility, one must go through two locked

21   doors. Tr. at 1046:2-14. The only doors that were not locked were classrooms. *Id.*

22         Provo also has a stabilization unit where students with "acute" behavior issues and

23   students entering Provo for the first time, regardless of behavior issues, are placed. Tr. at 223:12-

24   223:25. The children in stabilization are required to wear uniforms. Tr. at 1047:3-1047:5. The

25   purpose of the stabilization unit is to address behavior issues, and any educational benefit

26   granted the student is a secondary consideration, as students do not receive regular instruction.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 26
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    Tr. at 345:2-345:24. Instead, the instructor merely provides instruction on what needs to be

2    completed by the student. Tr. at 345:5-346:5. In other words, stabilization is similar to a student

3    being placed on suspension. *Id.*

4          A.T. has not and does not need the severely restrictive environment created at Provo to

5    benefit from his education. His progress from year to year and his high academic capability when

6    he is mentally stable demonstrates that when medical issues are not a factor, he can and does

7    benefit from the educational services and the general education setting at the District. The only

8    purpose for effectively incarcerating him in such a facility is to provide round-the-clock

9    supervision for non-educational reasons.

10   **G.     The District Provided the Student with a Free Appropriate Public Education in
           Compliance with the IDEA Following his Long Term Suspension.**

11

12         Only those issues identified in a due process complaint are subject to consideration in an

13   administrative hearing. In the Fourth Prehearing Order, dated March 8, 206, the administrative

14   law judge indentified three procedural errors claimed by the parents. AR at 1381. Specifically,

15   the Parents asserted that: 1) the District failed to provide an interim alternative educational

16   setting (IAES); 2) failed to provide an evaluative placement for A.T. after his long term

17   suspension from the District; and 3) significantly excluded the Parents from the educational

18   process by failing to reconvene A.T.'s individualized education program (IEP) team in light of

19   Dr. Cecchet's evaluation, long term suspension, chronic absences, and deterioration at the end of

20   the 2014-2015 school year and inability to attend school during the 2015-2016 school year. 4th

21   Prehearing Order, AR at 1381. *See also* ALJ's Decision at ¶¶ 22-24 (AR at 1141-42).

22         In her decision, the ALJ concluded that the District committed procedural violations that

23   denied the Student a FAPE. ALJ's Decision at 50-51 (AR at 1154-55). There are two reasons

24   why this ruling should be reversed: (1) procedural violations by the District, if any, were

25   rendered immaterial by the unavailability of A.T. and (2) the ALJ's findings of procedural

26   violations were not supported by the record.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 27
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief.docx

1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26

    **1.**    **Any Procedural Errors by the District did Not Materially Prohibit A.T. from Accessing a Free Appropriate Public Education.**

A procedural violation will result in a denial of FAPE only when the procedural violation impedes the child's right to a FAPE, significantly impedes the parents' opportunity to participate in the decision-making process, or causes a deprivation of educational benefit. 20 USC § 1415(f)(3)E(ii); *R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007) ("A child is denied a FAPE only when the procedural violation 'result[s] in the loss of educational opportunity or seriously infringe[s] the parents' opportunity to participate in the IEP formation process.'") (citation omitted).

In addition, a district's failure to offer FAPE may be rendered immaterial by a student's failure to take advantage of educational opportunities because of the student's truancy. *See Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1126 (10th Cir. 2008) ("[T]he district court held that, in light of Myisha's truancy and behavioral problems, . . . , the school district's failure to conduct an IEP for the Fall 2003 semester was immaterial.") As the *Garcia* court explained: "the limited resources devoted to providing education benefits for disabled children are not effectively allocated where schools expend resources on students who not only fail to use the educational opportunities provided them but also affirmatively avoid attending school altogether." *Id.* at 1130.

Here, any errors that may have been made regarding A.T.'s educational program from the time he was placed on suspension following the January 27, 2015 manifestation determination review to the end of the school year on June 17, 2015 were immaterial as A.T. was unavailable to benefit from any program the District had to offer. During his long-term suspension, January 21, 2015 until April 3, 2015, A.T. was incarcerated for assault, malicious mischief-domestic violence, and various probation violations, and spent a total of 30 out of the 45 days of the suspension incarcerated. AR 1966, 1999, 2208-10, 2463-70; Tr. at 123:5-123:7, 136:11-137:20. While incarcerated, A.T. received services through the Everett School District, who is not a party

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 28
Case No. C16-1500RSL

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1    to this proceeding. Tr. at 575:14-575:20, 577:10-578:1. In addition to his incarceration, A.T. was

2    also missing another 7 days. *Id*. Thus in total, A.T. was unavailable 37 out of 45 days.

3    Once his suspension had ended, A.T. did not return to school at his parent's direction

4    pending the outcome of Dr. Cecchet's evaluation. AR at 2049; Tr. at 184:17-185:25, 799:2-

5    799:7. Consequently, A.T. missed an additional 24 days of school. A.T. was again incarcerated

6    on May 27, 2015, for a probation violation, and from May 27, 2015 to the end of the school year

7    on June 17, 2015, A.T. was incarcerated or missing a total of 10 days.

8    A.T. did not return to the District for the 2015-2016 school year. Tr. at 154:4-7. Indeed,

9    he was missing for 28 days at the beginning of the school year, Tr. at 153:2-13, and he was found

10   only after being caught shoplifting by the police. *Id*. Because of a hospitalization at Seattle

11   Children's Hospital Behavioral Unit and incarceration at Denney AT was unavailable almost the

12   entirety of the first semester of his junior year.

13   By December 1, 2015, his Parents had already contacted an attorney, sent a letter to the

14   District demanding reimbursement, and planned to admit A.T. into Provo Canon on December

15   15, 2016. AR at 2167; Tr. at 154:15-154:25, 155:14-155:22, 157:2-157:7.   A.T.'s various

16   incarcerations and elopements for non-educational, non-school-related reasons prevented A.T.

17   from taking advantage of any educational opportunities offered by the District.

18   Thus, the alleged procedural violations committed by the District, even if true, were

19   rendered immaterial by the unavailability of A.T. For this reason, the ALJ's ruling that the

20   District denied A.T. a FAPE should be reversed.

21   In addition, as discussed in the following sections, the ALJ's findings of procedural

22   violations are not supported by the record.

23       **2.    The District Provided an Appropriate Interim Alternative Educational
             Setting (IAES) During A.T.'s Suspension.**
24

25   When a special education student's conduct results in disciplinary action, a school district

26   is required to hold a "manifestation meeting" to determine if the student's actions were a

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 29
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    manifestation of his or her disability. 20 U.S.C. § 1415(k)(1)(E). If the misconduct is a

2    manifestation of the student's disability, then the student may not be suspended or expelled for

3    more than 10 days. 34 C.F.R. § 300.530. If the conduct warranting discipline is not a

4    manifestation of the child's disability, then the child is subject to the same sanctions for

5    misconduct as a child without a disability, including long term suspensions and expulsions. 34

6    CFR 300.530(d)(i), WAC 392-172A-05145(3). During the suspension or expulsion, the District

7    is required to provide the necessary services to allow the student to progress toward meeting the

8    goals as set out in the IEP. 34 CFR 300.530(d)(i).

9        Here, a multi-disciplinary team, which included the Father and several staff members,

10   determined that A.T.'s physical aggression over his backpack and his decision to bring a weapon

11   to school was not a manifestation of the his disability. Tr. at 785:3-6. That decision was not

12   challenged by the parents.

13       A.T.'s goals as identified in his 2015 IEP included respectful communication with an

14   adult, following directions from an adult, utilizing positive strategies for peer social interactions,

15   and organizing assignments and school materials. AR at 1910-11. To accomplish these goals, the

16   District assigned 75 minutes a week in behavior and learning strategy services with the special

17   education teacher. AR at 1915.

18       To meet the IEP designated special instruction during the suspension, the District

19   assigned a tutor who was a full time, certified teacher with a Bachelor's degree in Behavioral

20   Science and Master's Degrees in Counseling and Teaching to further A.T.'s identified behavior

21   and social goals. Tr. at 579:6-579:14, 464- 465:3. The District initially authorized the tutor to

22   work with A.T. for the 75 minutes per week as allotted in the IEP, but would have authorized

23   more if necessary. Tr. at 579:15-580:8. Unfortunately, A.T. never used the tutor as he was

24   unavailable because he had elopement or had been incarcerated during the suspension. Tr. at

25   123:5-123:7, 136:11-137:20, 138:12-140:8.

26

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 30
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1         **3.**     **Any Inability by the District to Provide an Evaluative Placement for A.T.**
               **Following His Long-Term Suspension Occurred Because A.T. was**
2                   **Unavailable for Evaluation.**

3         School districts have an obligation to make efforts to have suspended or expelled students

4    return to an educational setting as soon as possible. WAC 392-400-420(1). To do so, districts

5    convene a meeting with the student and parents or guardians within twenty days of the student's

6    long-term suspension or expulsion, but no later than five days before the student's reentry or

7    enrollment, to discuss a plan to reengage the student in a school program. *Id.*

8         Complying with the Parents' request, a re-engagement meeting did not occur until April

9    29, 2015. Tr. at 581:13-23. Prior to the meeting, multiple District personnel considered Dr.

10   Cecchet's evaluation report. AR at 2179-2200. While Dr. Cecchet's report focused on A.T.'s

11   medical and clinical needs, such as a comprehensive treatment team, medication management,

12   and hospitalization, it did provide some academic recommendations. AR at 2198. Regarding

13   academics, the report identified general problems faced by children with schizophrenia, but also

14   made specific recommendations regarding support for A.T. *Id.* For instance, it recommended that

15   A.T.'s IEP be maintained, that he be provided preferential seating near the point of instruction,

16   break tasks into subtasks and provide frequent breaks, and teach self-monitoring exercises to

17   increase sustained attention and concentration. *Id.*

18        All of these recommendations, however, were already identified in A.T.'s IEP and BIP.

19   AR at 1899-90, 1912. The 2015 IEP specified preferential seating, breaking long projects into

20   smaller assignments, and providing concise directions. AR at 1912. Further, A.T. had access in

21   his Study Skills Class to the Zones of Regulation Curriculum to learn skills for emotional

22   regulation by assisting the student in identifying the zone of their emotion, the trigger, and what

23   to do to overcome negative emotions. Tr. at 887:6-887:23. In addition to meeting all of Dr.

24   Cecchet's recommendations, the District had the capability to provide additional services, for

25   example, a 1:1 paraeducator to ensure supervision at all times, such as when A.T. returned from

26   short term suspension. Tr. at 352:5-352:13, 573:16-573:25.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 31
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1    Also prior to the April 29, 2015 re-engagement meeting, the Parents informed Ms. Sutton

2    via communications between April 23, 2016 and April 27, 2016 that A.T. did not wish to return

3    to Meadowdale, and instead was interested in Scriber Lake and the Intensive Learning Support

4    (ILS) program. AR at 2093. A.T. had also expressed an interest in Scriber Lake to Mr. Becker

5    during their only tutoring session, and to his probation officer. AR at 2489, Tr. at 469:15-470:4.

6    Therefore, during the April 29, 2015 telephone conference, the Mother and the District

7    team discussed several options, including A.T.'s return to Meadowdale, his enrollment at Scriber

8    Lake, individual tutoring, adding a paraeducator trained for behavior support, and other

9    educational services and programs. Tr. at 581:13-585:17. However, because the Parents and A.T.

10   had expressed a particular interest in Scriber Lake, the team agreed at that time to evaluate what

11   was needed to allow A.T. to attend Scriber Lake, including tutoring and specialized behavior

12   support. AR at 2101; Tr. at 584:22-585:14.

13   The services offered at Scriber Lake included the STEP program, a transitional program

14   to reintroduce school to a student. Tr. at 489:17-490:1. A.T. was partnered with a special

15   education teacher and paraprofessional, and the program had the flexibility to allow A.T. to

16   transition back into an educational routine. Tr. at 494:4-494:9, 807:1-807:17. It was only a

17   temporary program, and program duration was dependent on A.T.'s needs. Tr. at 890:24-891:17.

18   Scriber Lake was also capable of providing a general education program, and typically

19   had smaller class sizes and a higher population of special education students. Tr. at 527:10-

20   527:18, 530:15-531:4. The school also had an Intensive Learning Support program, which would

21   have provided A.T. with a greater level of behavior support as necessary. Tr. at 527:24-528:10.

22   In addition, A.T. would have had the benefit of working with Dr. Cartwright, who has a Master's

23   degree in School Psychology and a Doctorate in Clinical Psychology. Tr. at 536:1-6.

24   A.T.'s enrollment at Scriber Lake would be, in effect, an evaluative placement. Given

25   that A.T. had been out of school for approximately 5 months, had received a new medical

26   diagnosis with cognitive implications, and his behavior was becoming increasingly violent and

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 32
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

1  more frequent, an updated evaluation was necessary to determine what services he needed. Tr. at

2  555:25-556:20.; Tr. at 557:24-558:4.

3       Therefore, in light of the new medical information from Dr. Cecchet, the team postponed

4  implementation of A.T.'s IEP or BIP to provide an opportunity to observe and evaluate A.T. Tr.

5  at 555:25-558:4. Such an evaluation period was necessary because the team determined that it

6  was unrealistic to simply implement even the same IEP for A.T. because they did not know how

7  the diagnosis of prodromal schizophrenia would, if at all, impact A.T.'s education. *Id*. Instead,

8  the plan was for Dr. Cartwright to evaluate A.T. during the transition period at Scriber to assess

9  the impact of the new diagnosis and determine how best to serve him educationally. *Id*.

10      However, the District could not complete its evaluation because A.T. only attended one

11 day at Scriber Lake and did not return to the District. AR at 2103, Tr. at 493:12-493:18.

12 Consequently, the District was unable to gather the necessary data, observations, and information

13 to determine whether Scriber Lake, or some other placement, was appropriate. In other words,

14 A.T.'s evaluative placement terminated because A.T. stopped attending school.

15      **4.      Parental participation was key to District's efforts to facilitate A.T.'s Return.**

16      Parental participation in the IEP and educational placement process is central to the

17 IDEA's goal of protecting disabled students' rights and providing each disabled student with a

18 FAPE. However, only those instances where a lack of parental participation results in the denial

19 of an educational opportunity, or seriously infringes upon the parent's opportunities to

20 participate in the IEP formulation process, results in a denial of a FAPE. *Shapiro v. Paradise*

21 *Valley Unified Sch. Dist. No. 69*, 317 F.3d 1072, 1079 (9th Cir., 2003).

22      A.T.'s Parents were essential members in developing a plan for A.T.'s return to the

23 District following his suspension. The District communicated with, and complied with, his

24 Parents' requests at each point in plan development. For example, the District advised the

25 Parents on January 29, 2015, that a meeting needed to take place prior to A.T.'s return to the

26 District. AR at 1959-60.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 33
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1    Despite receiving the notice and being instructed to contact the school to schedule the

2    meeting, Parents did not do so. Tr. at 179:14-179:24. The District again postponed the re-

3    engagement meeting at the Parents' request until April 29, 2015 because the Parents wanted a

4    psychological evaluation first. AR at 2049; Tr. at 180:5-180:8, 581:13-581: 23, 799:2-799:7.

5    After receiving Dr. Cecchet's report on April 22, 2015, the District contacted the Father

6    on the next day to discuss the report. AR at 2085. A meeting was scheduled at the Parents'

7    convenience, and was even rescheduled due to a conflict, and eventually occurred on April 29,

8    2015. Tr. at 581:13-581: 23. Participants in the meeting included the Mother, Ms. Sutton, District

9    Secondary Special Education Director Jan Beglau, Meadowdale Principal Joyce Scott, Counselor

10   Nathan Howden, and Dean of Students Brian Grijalva. Tr. at 582:1-582:10. In effect, the team

11   that participated in the phone conference on April 29, 2015 was A.T.'s IEP team.

12   Pursuant to the Parents' communication that A.T. did not wish to return to Meadowdale,

13   and instead was interested in Scriber Lake and the Intensive Learning Support (ILS) program,

14   the team discussed the various options and programs at Scriber Lake. AR at 2093, 2101; Tr. at

15   581:13-585:17. At no time during the meeting or afterward until filing their due process request

16   did the Parents voice concerns about Scriber Lake being an inappropriate placement. Tr. at

17   151:13-151:19.

18   The District again attempted to meet with the Parents on May 7, 2015 with Scriber

19   Lake's Assistant Principal Hillman, Dr. Cartwright, and special education teacher Greg Lange,

20   and issued a prior written notice of the meeting. AR at 2104. However, the Parents did not attend

21   the meeting[4]. Although the team that met on May 7, 2015 did discuss the program at Scriber

22   Lake, A.T.'s IEP and BIP were not revised or implemented because of the uncertainty of the

23   effect of his new diagnosis. Tr. at 555:25-558:4.

24   The Parents approved of A.T.'s enrollment at Scriber Lake. Tr. at 151:13-151:19. His

25   Mother spoke with Dr. Cartwright on May 1, 2015 to discuss the psychological report and A.T.'s

26

---

[4] Parents asserted during testimony that they never received the May 7, 2015 Meeting Notice. Tr. at 149:22-150:12.

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 34
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx

1   behavior. Tr. at 538:3-539:2. They also discussed what was offered at Scriber Lake. Tr. at
2   540:24-541:22. Additionally, the Father met with Ms. Hillman on May 14, 2015 to discuss the
3   STEP program and A.T.'s schedule. Tr. at 489:17-490:12, 152:4-152:10. Unfortunately, A.T.
4   only attended one day and did not return.

5           Dr. Cartwright contacted the Mother on May 21, 2015 to inquire when he would return.
6   Tr. at 552:9-554:17. A.T.'s Mother expressed her frustration and her attempts to get her son to
7   school. *Id.* Several staff members attempted to contact A.T. and his Parents to no avail. Tr. at
8   152:11-152:18, 494:4-25. After A.T. was missing for the fourth day, he was considered
9   withdrawn from the District. Tr. at 487:8-16. Nonetheless, Ms. Hillman kept trying to find ways
10  to get A.T. to return to school, and eventually heard from the Mother, who requested that the
11  District not contact the Parents anymore. Tr. at 494:24-:25

12          The Parents were invited and did participate in meetings with District to develop plans
13  for evaluation and potential changes in placement. The District directly responded to parental
14  input in enrolling A.T. at Scriber Lake, and accommodated the Parents' request for placement at
15  Scriber for the evaluative placement. The level of participation by Parents establishes that
16  Parents were an integral part of the plan formulation process in compliance with the IDEA.

17          Because the ALJ's ruling that the District's procedural violations denied A.T. a FAPE,
18  the decision of the ALJ should be reversed.

19                          **V.    CONCLUSION**

20          For the above reasons, the District requests an order reversing the decision of the ALJ,
21  denying the parents' request for reimbursement at public expense for the private placement of
22  A.T. at Provo, and declaring that declaring that the District provided A.T. with a FAPE.

23          DATED this 16th day of March, 2017.

24                                  VANDEBERG JOHNSON & GANDARA, LLP
25                          By
26                                  William A. Coats, WSBA # 4608
                                    Attorneys for Plaintiff

PLAINTIFF EDMOND SCHOOL DISTRICT'S MOTION
FOR SUMMARY JUDGMENT - 35
Case No. C16-1500RSL

VANDEBERG JOHNSON & GANDARA, LLP
ATTORNEYS AT LAW
1201 PACIFIC AVENUE, SUITE 1900
P.O. BOX 1315
TACOMA, WASHINGTON 98401-1315
(253) 383-3791 (TACOMA)
FACSIMILE (253) 383-6377

F:\19000-19999\19135\19135-42002\Pleadings-Federal District Court\DCMP ESD brief4.docx