1
2
3
4
5
6
7
8
9

The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

10
11
12
13
14
15
16

EDMONDS SCHOOL DISTRICT,

    Plaintiff/Appellant,

v.

A.T., a minor child, and R.T. and I.T.
his parents,

    Defendants/Appellees.

Case No.   2:16-cv-01500-RSL

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY
JUDGMENT

17

## I.  INTRODUCTION

18

    A.T. is a student with a rare psychological diagnosis, prodromal schizophrenia, whose

19

parents unilaterally placed him in a residential school in order for him to access an education.

20

Contrary to Plaintiff Edmonds School District's ("ESD") assertion that it offered A.T. an

21

appropriate program, A.T. could not receive an education in a non-residential placement, due

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 1

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

to his complete inability to self-regulate and organize thoughts, and to attend and stay in class, as well-established in the administrative record. The profound effects of prodromal schizophrenia on A.T.'s ability to function in a school environment and even attend a public school educational program, as detailed in the administrative record, cannot be overemphasized.

The placement of A.T. at a residential school, Provo Canyon (Provo), was necessary in order to provide him supportive services to allow him to receive educational benefit, and thus the ALJ's order reimbursing A.T.'s parents should be upheld.  In residential placement, Student has made gains in behavioral skills, participation in therapy and participation in academics.

Moreover, as the ALJ found, the Plaintiff offered Student extraordinarily deficient educational programming in light of the seriousness of the Student's disabilities, and the administrative record is replete with procedural violations of IDEA.  A.T. had been on IEPs since preschool for ADHD and deficits related to a pre-adoption history of severe abuse and neglect.  However, with the onset of prodromal schizophrenia in the ninth grade, his academic and functional performance plummeted until the Defendants enrolled him at Provo Canyon residential school in December of his eleventh grade year.   Despite two years of clearly deteriorating behavior including at least five months of disability related school refusal, a diagnosis of prodromal schizophrenia in April of the tenth grade, private school reimbursement notification by Defendants, and the filing of a due process hearing, ESD failed to conduct a reevaluation of the Student or amend A.T.'s IEP to offer more than seventy-five

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 2

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

minutes a week of special education and related services.

## II. STATEMENT OF FACTS

### A. A.T.'s Early Childhood Experiences of Abuse and Neglect Predisposed Him to Difficulties In School And Development Of Schizophrenia In Later Life.

Administrative Law Judge Michelle Mentzer succinctly and accurately summarized R.T.'s early childhood in the first paragraph of her Findings of Fact:

> The Student was born to a teenage mother who was killed during a drug deal when he was 18 months old. The identity of the Student's biological father is unknown. Child Protective Services (CPS) records indicate the Student was exposed to street drugs *in utero* and alcohol during breast-feeding. Before the mother's death, there were more than 24 CPS allegations of child neglect and abuse against her. The Student was removed from her custody before she died, when he was 15 months old, and placed with his maternal grandparents. . . throughout the years he lived with the maternal grandparents, there were CPS allegations of neglect and abuse against them. The Student was removed from their home when he was three and a half years old and placed in Washington State custody. He experienced a failed adoption when he was three years and eight months old, due to behavioral problems and the inability to form a loving parent-child bond. Approximately a month later, he went into foster care with the Parents, where he lived with them and the Mother's 10 year old biological daughter. The Parents adopted the Student when he was approximately four and a half years old.

AR 1107 ¶1 (citing to AR 2181-2182, 2272-2273).

R.T. and I.T., the Defendants in this case, are the Parents who adopted A.T. at four-and-a-half years of age (Parents). The record reflects that they provided a secure, loving and

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT– 3

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    stable home to A.T. until they were forced to enroll him at their own expense at Provo

2    Canyon, a therapeutic residential school in Utah, when A.T was sixteen years old.

3         Psychologist Stacy Cecchet[1] described the impact of childhood abuse and neglect on

4    A.T.'s development, school performance, and susceptibility to schizophrenia in later life.

5    Individuals have a window of opportunity from birth to six or seven to develop a stable

6    personality. Tr. 913: 7 - 925:15.[2]  If a child doesn't have a stable upbringing during this time

7    period, he cannot cope with stress as effectively in later life as others. *Id.*  Individuals with

8    stable personalities do not take challenges to their self-esteem to heart because they have a

9    baseline understanding of themselves as worthy; individuals with unstable personalities do

10   not have this, so challenges and threatening social situations are far more likely to make them

11   feel like an unworthy person at their core. *Id; Tr.* 919: 920 -925:15. Also, individuals from

12   abuse and neglect backgrounds do not have parents who model organized lives and

13   appropriate functioning in everyday life; so they literally do not know how to do it. *Id.*

14   

---

15   [1]      Dr. Stacy Cecchet testified for the Defendant at hearing.  She assessed the Student and generated her report before Parents' met with counsel in their education case. Tr. 154:25; AR 2179. No District witness, expert or otherwise, testified to disagreement with her report or her testimony. *See* AR 1-1103. Dr.

16   Cecchet received a PhD in clinical psychology from Seattle Pacific Lutheran University in 2012. AR 2210. As part of her graduate work she did an 18 month rotation at one of the Washington State Children's Long-term Inpatient Program (CLIP) residential facilities, the Child Study and Treatment Center (CSTC). AR

17   2201; Tr. 913:11-915:3 After receiving her PhD, she completed a postdoctoral fellowship in pediatric psychology at John Hopkins University, where she practiced at the Kennedy Krieger Institute's Behavioral

18   Management Clinic. *Id.* Dr. Cecchet has participated in a number of research projects and has published several articles in professional journals. AR 2220, 2202-2203. For the last three years, she has maintained a

19   clinical practice in Everett, Washington, working with children and adolescents with significant behavioral, mental health and academic issues. Tr. 913-915.
     [2]      "Tr." refers to the transcript of the administrative hearing and appears at pages 1 through 1103 of the

20   Administrative Record of OSPI Cause No. 2015-SE-0106X.

21   

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 4

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    Academic settings generate stressful situations: completing a big assignment, making
2    satisfactory grades, fitting into social environments, and connecting with academic officials.
3    A student with an unstable personality cannot regulate emotions when confronted with such
4    everyday stresses and is far more likely to act out with explosive behavior and aggression; to
5    experience deficits in social skills that may lead to desperate attempts to achieve closeness
6    and affection, including through acts of aggression; and to have cognitive disorganization that
7    makes linear thinking difficult and routine tasks like getting up in the morning, going to
8    school, remembering to turn in your homework assignment, etc., difficult. *Id.*

9    And tragically, A.T.'s history of childhood abuse and neglect increased his chances of
10   developing schizophrenia in later life. Tr. 927:15 - 929:24. Dr. Cecchet testified that, if you
11   think of a gene as a light switch, A.T. was born with a "wiggly light switch" for
12   schizophrenia.  Under the stress diathesis model of schizophrenia, stress accumulated -- from
13   severe abuse, severe neglect, exposure to drugs and alcohol, unstable living placements,
14   failed placement with grandparents --- until the light switch for schizophrenia flipped to the
15   "on" position.  Tr. 929: 15-24.

16   Youths with schizophrenia do not normally have the full hallucinations and delusions
17   typical of schizophrenia. They have, like the Student, atypical thoughts, nonlinear thoughts
18   that have some delusional elements, and some atypical sensory experiences; this is prodromal
19   schizophrenia. *Id*. Tr. 934:1-25, 936:22-25.  Using the analogy of the light switch, prodromal
20   schizophrenia is like a fluorescent light flickering before it comes on completely. Tr. 930:14-
21   25.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 5

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

**B. A.T. Exhibited Social, Emotional and Behavioral Issues Throughout Preschool, Elementary and Middle School**

A.T. exhibited difficulty bonding with his adoptive family and interacting with peers as a preschooler. Tr. 29:18-25.  Several preschools exited A.T. for aggressive behavior towards other students. *Id.*  The Mother testified that A.T. desired friends but had difficulty making and keeping them, because he did not understand how to relate to others socially. Tr. 37:12-38:9. Despite social and behavioral difficulties in preschool, A.T. loved to read and scored above average in intelligence testing. Tr. 33:5-9, 33:13-34:5; AR 1562.    Parents stated that A.T.'s education has been "extremely important" to them.  Tr. 33:16.

A.T. attended Edmonds School District (ESD) throughout his school career, from pre-school up until his enrollment in Provo in December of what should have been his tenth grade year, and he always had an Individualized Education Plan (IEP). Tr. 30:20-31:3. Early ESD evaluations referenced Attention Deficit Hyperactivity Disorder (ADHD) and described childhood abuse and neglect as sources of disability. AR 1640.    A.T.'s IEPs (including Behavior Intervention Plans, or "BIPs") addressed deficits in social skills, behavior, attention and executive function. Tr. 31:4-17.

Throughout elementary and middle school, A.T. received special education support for emotional and behavioral issues.  A.T. participated in a self-contained classroom designed for students with social/emotional deficits from first through third grades. Tr. 44:15-45:21, Tr. 72:11-21; AR 1637.  From fourth through sixth grades, A.T. attended a general education classroom with a behavior plan and some pull-out special education support for emotional

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT– 6

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1  regulation. AR at 1637; 1726.   During A.T.'s seventh and eighth grade years, A.T. attended

2  general education classes, but continued to receive special education support in an Intensive

3  Learning Support classroom ("ILS", a classroom for students with behavior disorders) when

4  he needed an alternate setting to regulate his thoughts, feelings or behaviors. AR 1726, 1729;

5  Tr. 47:1-19, 629:24-630:1.

6  **C. When A.T. Developed Prodromal Schizophrenia in His Ninth Grade Year, His**
   **Academic and Behavioral Functioning Declined Dramatically but ESD Did Not**
7  **Respond by Providing Appropriate Educational Programming**

8      **1. The Onset of Prodromal Schizophrenia**

9      Dr. Cecchet testified that A.T. experienced the onset of prodromal schizophrenia a

10  year to eighteen months prior to her evaluation dated April 7, 2015.  Tr. 1007:2-13, 2179.  In

11  other words, onset occurred sometime from the beginning to the middle of A.T.'s ninth grade

12  year.

13      **2. A.T.'s Decline in Academic and Functional Performance**

14      A.T.'s academic and functional performance declined drastically during his ninth

15  grade year (2013-2014) at Meadowdale High School ("MDHS").

16      A.T.'s grades declined in correlation to his behaviors. Tr. 52:18-25. A.T. finished the

17  second semester of eighth grade with a GPA of 2.871. AR at 1699, 2375.  By comparison, in

18  the first semester of A.T.'s ninth grade year, he earned a GPA of 1.667 with 3.0 credits

19  earned of 3.5 credits attempted, and in the second semester a GPA of 1.050 with 2.5 credits

20  earned of 3.5 credits attempted. AR at 2380.

21

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 7

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

Teachers frequently removed A.T. from classes due to behaviors. A.T.'s math teacher had to remove A.T. to the hallway because his disruptions annoyed other children who then refused to engage in group learning activities with A.T. Tr. 53:9-17.  In A.T.'s math class, A.T. stood out as *the* student with behavioral issues. Tr. 440:5-10.  A.T. was also put out of band class because of disruptive behaviors with his band teacher remarking that "[A.T.] seldom can stay in the clinic session without being removed by the para pro." Tr. 53:1-5; 53:18-54:6; AR at 1776.

In addition to missing class because of removals by teachers, A.T. eloped from classes and did not return, often expressing a need to go to the bathroom or the nurse's office. Tr. 280:19-281:2. Teachers described "continuous" requests to leave class. Tr. 435:7-16, 436-437:15; AR at 1769.  Per the Mother and teachers, A.T. would sometimes just wander around the school building. *Id;* AR at 1774.  The Parents frequently received automated telephone calls from the school in the evening indicating A.T. had missed specific class periods. Tr. 54:1-55:6; 280:21-24; 55:25-56:6.

Despite A.T.'s documented behavioral regression, teachers testified at hearing that they did not instruct A.T. any differently than other students in the class, and did not have access to his BIPs or his complete IEP. Tr. 452:7-21.  Teachers routinely received only "IEP-At-A-Glance" for students with IEPs, Tr. 456, which did not include behavior plans.  IEP-At-A-Glance is a "shorter, consolidated" piece of the larger IEP that is given to general education teachers, Tr. 589:14-17, and A.T.'s math teacher did not recall ever seeing a behavior plan for A.T or using a behavior plan to respond to his behaviors. Tr. 452:7-21.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 8

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

A.T. began to exhibit oppositional behavior at home in completing homework and keeping track of assignments. He refused to use the communication notebook between home and school that he had used in middle school to help his Parents keep track of assignments and school performance. Tr. 78:19-79:2.   In middle school, the Parents would work with A.T. on weekends and after school on past-due assignments, but in the ninth grade, there would always be "a big fight" when Parents attempted to work with A.T. on school assignments and he would sometime sit at the table for three hours without writing a single word.  Tr. 79:16-22, 55:12-17, 303:8-15.

 Despite A.T.'s significant drop in grades, assignment completion, and behavioral performance at school in the ninth grade, ESD did not significantly change A.T.'s IEP or behavior plan during the ninth grade, except to eliminate 1:1 behavioral instruction from School Psychologist and Behavior Interventionist Christine Sutton, Tr. 60:2-25; AR at 1758, 1800, as part of a school policy applied to all special education students. Tr. 838:18-842:2. Elimination of 1:1 behavioral instruction with Sutton in the January 29, 2014 IEP occurred despite the fact that A.T.'s evaluations, IEPs, FBAs and BIPs over many years stressed his need for close, personal relationships with staff and documented assessments indicating withdrawal and depression. Tr. 853:22- 858:1. In fact, the January 29, 2013 ESD reevaluation forming the basis for A.T.'s February 8, 2013 (8th grade) and January 29, 2014 (ninth grade) IEPs specifically states A.T. needs counseling services. AR 1727.

 School Psychologist Sutton testified that, although A.T.'s 1:1 behavior minutes with her were removed from the January 29, 2014 IEP, she attempted consultations with MDHS

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 9

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   staff to address and remediate A.T.'s behaviors, but staff were not receptive.  Tr. 818:6-9,

2   839:6-18, 842:12-843:15, 824:23-825:2-16; AR at 1800, 1812-181, 1807, 1818. Sutton's

3   relatively unsuccessful attempts to have other staff talk with A.T., to preserve A.T.'s self-

4   esteem around band, and to get other staff to recognize A.T.'s strengths, are consistent with

5   A.T.'s written IEPs and Behavior Intervention Plans ("BIPs").   *See* AR at 1788-1806, 1746-

6   1765.

### 3. A.T.'s Behaviors at Home and in The Community Declined During His Ninth Grade Year in Ways Impacting His School Performance

In the ninth grade, A.T. refused to stay after school to work on homework and began to follow other children who were walking home from school to their homes instead of his own. Tr. 99:6-100:7, 822:24-823:14.  Sutton encouraged MDHS staff to investigate the reasons for A.T's refusal to stay at school, but staff dismissed her recommendations. AR 1807-1811.  Parents and MDHS staff knew A.T. was following other children home to their houses, and Sutton found this odd social behavior typical for A.T, who just wanted friends and desperately sought reactions from others. AR at 1818; Tr. 822:24-823:14.

A.T.'s behavior at school had escalated significantly by the end of the ninth grade, right before the summer of 2014. MDHS staff recognized that his behaviors were starting to "ramp up," including repeatedly asking for money, following girls home, not leaving them alone, and engaging in fights. AR at 1818. On May 23, 2014, MDHS's Dean of Students Brian Grijalva emailed MDHS staff, "Might need to develop a plan on how to reign this kiddo in if he's going to make it to the end of the school year in one piece." *Id.*  Yet the school

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 10

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   did not convene an IEP meeting to increase special education, change A.T.'s behavior plan,

2   or initiate a reevaluation to investigate the reasons for the behaviors or how to address them.

3   Tr. 63:17-64:1.

4           Unfortunately, A.T.'s desperate attempts to connect with other students contributed to

5   his first juvenile offenses and his developing disregard of home curfews.  Following students

6   home after school resulted in trespassing charges and, on one occasion, in A.T. obtaining and

7   using a BB gun at another child's house. Tr. 99:6 -100:7. Moreover, A.T.'s initial failures to

8   come home from school at the end of the school day during the second half of the ninth grade

9   year escalated over time to staying away from home overnight and for entire weekends Tr.

10  84:19-85:2; 166:5-9, 281:8-10.

11  **D.  Summer Between Ninth and Tenth Grades**

12          A.T.'s behavior in the summer of 2014 grew increasingly bizarre. He reported to his

13  Mother that he was sleeping on the street with homeless people and that he felt a kinship with

14  them. Tr. 65:14-19. He was defiant and destroyed property when at home. Tr. 66:4-13.

15          Parents filed an At-Risk Youth Petition ("ARY")[3] on July 1, 2014, "because of the

16  experience [A.T.] was having both at home and at school." Tr. 97:11-14 (Mother) (emphasis

17  added). A.T.'s mother testified that she thought once the ARY set structures for school

18  ───────────────

19  [3]        ARY Petitions, when granted, authorize a court to impose penalties on youth for committing non-
    criminal offenses, such as being truant at school, not completing homework, not abiding by home curfews,
    etc.  Such petitions ideally provide an authority figure outside the home to impose rules and consequences
20  on students who are no longer or insufficiently responsive to parental rule-setting and discipline. *See* RCW
    13.32A.191 *et.seq.*.

21

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 11

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

attendance and assignments, and a curfew, then his schoolwork would fall into place. Tr. 85:3-15.  Parents cited school issues to the Court as part of the grounds for their ARY petition, noting A.T.'s work refusal and failing grades. AR at 1832,1836,1840.

**E.  A.T.'s Academic and Functional Skills Continued to Deteriorate in the Tenth Grade, Yet ESD Did Not Offer Meaningful Intervention**

    **1. School Performance Declined Steadily from The Beginning of Tenth Grade Through A.T.'s Long Term Suspension on January 25, 2015**

During the first few days of A.T.'s tenth grade school year, the Father told MDHS counselor Nathan Howden about A.T.'s continuing behavioral issues over the summer, such as staying out all night and sleeping on park benches, and also about the ARY Petition.  Tr. 171:1-8, 883:1-3.

Unfortunately, A.T.'s behaviors continued to deteriorate in tenth grade, with a correlating drop in academic performance. A.T. earned first semester grades of F in English, F in Int. Engineering Design, F in World History and a D in Geometry, for a semester GPA of .5 and a total of .5 credits earned out of 2.0 credits attempted. AR at 2380.

A.T. continued to elope at school.  A.T. frequently absented himself from class, even when he went to school in the morning.  Tr. 116:18-117, 442:12-443:2.  He would not complete homework. Tr. 260:17-25.   He disrupted classes when he was in school, to the point that ESD staff made comments about changing educational programming, albeit without following up.  For example, A.T. was given a suspension for "continually messing with computers in lab, turning computers on and off, whipping headphone cables around," and continually touching other student's computers and bothering them. AR at 1864; 1871.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 12

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1  Dean of Students Grijalva wrote that he was "at a loss," when it came to changing A.T.'s

2  behaviors, that "discipline is ineffectual," and that he was considering a shortened day, A.T.'s

3  removal from certain classes, and increased supervision. AR at 1859.

4       ESD staff continued to fail to implement behavior interventions prescribed in A.T.'s

5  IEPs and BIPs, and school staff continued to obstruct MDHS School Psychologist and

6  Behavior Interventionist Sutton's attempts to implement A.T.'s BIP. Tr. 826:17- 827:8; AR at

7  1868. As had been the case in the ninth grade, tenth grade teaching staff did not recall receipt

8  of A.T.'s BIP or complete IEP, receiving instead the very abbreviated and incomplete "IEP-

9  At-A-Glance." Tr. 419:12-18, 420:7-8; 425:12-426:4-25.

10      Disciplinary incidents accumulated in A.T.'s tenth grade year, culminating in a

11  suspension in mid-January.   On January 6, 2015, MDHS suspended A.T. for hiding in a stall

12  of the girls' bathroom for the third time that school year after leaving class. AR at 1881; Tr.

13  350:1-22.  MDHS held a manifestation meeting on January 13, 2015, and determined the

14  behavior was not a manifestation of A.T.'s disability, AR at 1879-1885, 1889, though the

15  School Psychologist in charge of the manifestation review, Ms. Sutton, testified repeatedly

16  that she did not know why A.T. went into the girl's bathroom and acknowledged that social

17  issues were the root of his behavioral difficulties. Tr. 875:5-19.  No one asked A.T. at the

18  time why he had hidden in the girl's restroom, but he reported to Dr. Cecchet long after the

19  incident that a person wearing a hoodie with the <u>hood zipped up in the front and completely</u>

20  <u>covering the person's neck and face</u> instructed him to go into the restroom.   Tr. 1003:14-

21  1006:8.  Dr. Cecchet cited this as a hallucination related to his prodromal schizophrenia,

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 13

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   along with seeing dogs in rooms that were not there, owls swooping down that other students

2   did not see, etc. AR 2077.

3       A.T. returned to school from his suspension for being in the girl's restroom on

4   January 21, 2015, and the very next day incurred an even longer, 45-day suspension. AR at

5   1950-1951. This time, A.T. refused to take his binder out of his backpack and headbutted

6   Dean Grijalva when he grabbed the backpack to investigate. *Id.*  The backpack contained a

7   wrist rocket slingshot, thirty large ball bearings and a lighter. *Id.*   MDHS then held a

8   manifestation meeting and again found the behavior not a manifestation of A.T.'s disability.

9   *Id.*.  However, School Psychologist Sutton, who was in charge of the manifestation review,

10  testified to uncertainty about A.T.'s disability and its relationship to his behavior. Tr. 881:11-

11  17, 878:11-15, 878:20-879:13. She also testified she had always suspected A.T. was on the

12  autism spectrum. Tr. 853:12-21.  Significantly, A.T. was not diagnosed with autism spectrum

13  disorder and this disability had therefore not been considered in educational planning.  *See*

14  AR 1557, 1637, 1727.

15      ESD generated a new BIP and IEP on the same date as the manifestation meeting, on

16  January 27, 2015. AR at 1896-1901, 1902-1942.  However, Father testified the meeting,

17  which lasted thirty minutes, only involved a manifestation review concerning the disciplinary

18  infraction and suspension, with no discussion of an IEP or IEP services. AR at 1924; Tr.

19  123:9-10,130:20-25. Sutton did not remember it being at an IEP meeting, Tr. 787:7-11, and

20  no other ESD employee testified to an IEP meeting occurring or to discussion of an IEP at the

21  January 27, 2015 meeting.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 14

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

Despite A.T.s deteriorating school performance, ESD did not significantly change the educational programming in A.T.'s new IEP, dated January 27, 2015.   The "Special Education and Related Services" pages in the new IEP and in the former January 29, 2014 IEP are identical except for the dates the services are to be delivered. AR at 1800, 1934. Despite an earlier statement in the January 13, 2015 PWN (documenting the manifestation review arising out of the girls bathroom episode) that A.T. would receive 1:1 aide support and access to a behavior interventionist (ie, Ms. Sutton), AR 1950, the January 27, 2015 IEP did not include these services. Id. The behavior goals were changed slightly to purportedly improve disruptive and prosocial behavior, but no additional services were offered to help A.T. achieve these goals. Tr. 127:6-128:23; AR at 1796-1797,1929-1930.

Dr. Stacy Cecchet, reviewed A.T.'s January 27, 2015 IEP, and testified that it was "wildly inappropriate" for A.T given the level of his need at the time the IEP was offered. TR. 975-978:11. She testified to insufficient specialized instruction and accommodations, and that no day placement (as opposed to residential placement) would have been appropriate when the IEP was created. *Id.*

2. **Disability-Related School Refusal and Elopement from Home and School After Student's January 2016 Long-Term Suspension**

After A.T.'s outburst with Dean Grijalva on January 22, 2015, ESD called the police. TR. 135:8-13, 122:24-25.  A.T. was charged with Assault in the 4th Degree and was detained in Denny Youth Center ("Denny") until February 2, 2015. *Id.;* Tr. 356:14-16.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 15

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    For the period of the forty-five day suspension, ESD did not provide a Prior Written

2    Notice (PWN), IEP, or other written document describing any Interim Alternative

3    Educational Setting (IAES) or educational services A.T. would receive while suspended. Tr.

4    603:12; 607:1-608:2. ESD administrators subsequently assigned a tutor to instruct A.T. for

5    the minimal amount of special education minutes specified in his IEP (one hour and fifteen

6    minutes per week), albeit outside the IEP process.  AR at 2488, Tr. 471:2-4; 484:20-24.

7    However, A.T. eloped from home after the first meeting with the tutor, and tutoring was

8    discontinued.   AR at 2489; Tr. 474:14-15, 471:5-18, 472:11-14, 183:4-11.   ESD staff

9    believed they were not obligated to provide instruction during suspension beyond the special

10   education minutes provided in the IEP, though many clearly believed A.T. needed more. AR

11   at 1997, 2007-2008.  However, on March 9, 2016, ESD administrators, again outside the IEP

12   process, authorized ELearning for A.T. (independent study on a computer), despite A.T.'s

13   dismal behaviors and performance in past computer labs and difficulties with independent

14   study. A.T. never received ELearning. AR at 2014; 482:11-18.

15   After A.T.'s long-term suspension, A.T. spent a large amount of time at home with

16   nothing to do and minimal to no educational services from ESD. Tr. 318:10-17. The Parents,

17   probation office Leah Price, and MDHS school psychologist Sutton expressed concern that

18   unstructured time without educational services would ultimately exacerbate A.T.'s behavioral

19   issues.  AR at 2002.

20   This is precisely what happened.  As the Father explained, the terms of the ARY

21   Order --- which included obeying home curfews, attending school, completing homework and

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 16

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    chores --- were incorporated as terms of A.T.'s probation once A.T. became involved with the

2    juvenile justice system. Tr. 109:1-112:23. After A.T.'s expulsion, A.T.'s behaviors at home

3    grew increasingly impulsive and aggressive, and he reacted with rage to Parents and ran away

4    from home, violating terms of his probation.  This in turn resulted in detention at Denny

5    Juvenile Detention Center (Denny) from February 6-19, 2015 and February 25-March 3,

6    2015. D1-27; Tr. 127:22-139:3. A.T. again ran away from home from March 4-10, 2015, and

7    returned to Denny. Tr.139:4-140:1.

8       Between February 6-26, 2015, Probation Officer Leah Price repeatedly asked MDHS

9    psychologist Sutton to help the Parents in seeking a psychological evaluation for A.T, to no

10    avail. AR at 1998-1999.  Therefore, Parents retained Dr. Stacy Cecchet themselves to assess

11    A.T. AR at 2029-2030.   At a meeting between Parents and Dr. Cecchet on April 22, 2015,

12    she explained that A.T. needed residential placement.  She told the Parents that if AT were

13    accepted at Children's Study and Treatment Center (CSTC), A Washington State in-patient

14    residential treatment center (CLIP), insurance and Medicaid might pay for the placement. Tr.

15    272:20 - 273:13-16.  Dr. Cecchet's report became available to the Plaintiff and the Parents on

16    April 21, 2015.  Tr. 144:18-25, Tr. 185:1-4.

17       Dr. Cecchet's report confirmed many preexisting diagnoses but added a new one:

18    prodromal schizophrenia. AR at 2077.  Recommendations included special education, school

19    accommodations, and extensive related services (including clinical services from a licensed

20    clinical psychologist, a treatment team to create a treatment plan with a licensed psychologist,

21    medication management services, individual and family therapies, and behavioral training for

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 17

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

the Parents). AR at 2077- 2079.  Cecchet recommended residential placement for the delivery of these services, *Id.*, testifying at hearing that "without residential care, A.T. would not be able to function in a school setting." Tr. 1016:9-12. In a section called, "Hospitalization and Residential Treatment," Cecchet noted "it may be necessary to hospitalize a young person if they are experiencing a crisis or their safety is at risk," distinguishing this from her recommendation for residential placement through application to the Washington State CLIP program. AR 2079 *Id.*[4]

Dr. Cecchet testified that she recommended CSTC in her report and not a private residential school because finances were a limiting factor for the parents and CSTC accepts insurance and social benefits.  RP 972:5- 972:16 (Cecchet). [5]

On April 29, 2016, ESD staff met to discuss various educational options for A.T.'s return to school, with Parents participating by phone.  Despite divergent testimony, no one testified that a decision about the Student's educational programming and placement was made at this meeting, or that an IEP or other formal written educational plan was submitted, discussed or generated, in draft or final form. Tr. 582:12-583:6; 587:1-20, 606:16; 299:20-

---

[4]      A first episode of schizophrenia does not mean that schizophrenia is episodic with periods where psychosis disappears completely, as is the case with a manic episode in a person with bipolar disorder.  Tr. 937:2- 939:22 (Cecchet).  With schizophrenia, a person never returns to baseline functioning after the first episode, even though there may be periods of exacerbation when hospitalization is required.  *Id.*

[5]      Dr. Cecchet is familiar with CSTC because she has worked there in the past. Tr. 927:5-927:16, 1016:9-12. At CSTC students live in cottages on the campus and attend a full time school program run by the Clover Park School District, also within the campus. Id. Because CSTC's program is a residential treatment center, the program is infused with behavior modification, medication management, and various therapies. Id. Therapies at CSTC include individual therapy, group therapy, family therapy, and milieu therapy. Id.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 18

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

300:4; 265:5-16; 803:18-23;358:1-13; 301:11-23. Mother mentioned that A.T. wanted to attend Scriber Lake High School ("Scriber"), an ESD alternative school, not MDHS, because he was embarrassed about what had happened there and had a friend at Scriber. *Id.;* Tr. 1077:22-1079:17; AR at 2093.

ESD conducted a May 7, 2015 meeting, without Parents present, at which ESD staff decided that A.T. would attend Scriber's Student Transitional Education Program ("STEP"). Tr. 489:3-13, 585:20-23, 555:3-7, 806:8-15; 489:19-22.   No witness testified that Dr. Cecchet's evaluation was discussed at this meeting. A.R. 1-1103.  ESD did not generate an IEP for the Student at the May 7, 2015 meeting, but did generate a PWN stating A.T. would attend the District's alternative high school because of the need for more intensive instruction and rejecting return to a comprehensive high school with a larger student population due to Student's very problematic activities. AR at 2104. The PWN did not mention residential placement as an option considered. *Id.*  While Plaintiff contends that Parents were invited to the May 7th meeting, ALJ Mentzer found as a matter of (well-supported) fact that the Parents did not receive a May 7, 2015 meeting invitation or PWN.  Tr. 149:2-19; AR 1124-1125 at ¶58.

ESD did not initiate a reevaluation of A.T. after receipt of Dr. Cecchet's report, or before issuing the May 7, 2015 PWN placing A.T. at Scriber's STEP.  AR 2104.   ESD staff explained at hearing that they did not initiate a reevaluation immediately because they needed an opportunity to observe A.T. first in the Scriber environment. Tr. 632:2-12, 808:1-14.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 19

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1        Although ESD did not change A.T.'s January 27, 2015 IEP before assigning A.T. to

2    Scriber's STEP program, the assignment to Scriber changed A.T.s educational program in a

3    number of ways.   MDHS is A.T.'s neighborhood school and a mainstream high school,

4    whereas Scriber's STEP program is a transitional program for kids who struggle to attend

5    school or make progress at school, Tr. 495:13-15.   At Scriber STEP, all students attend a

6    partial school day, *Id.*, whereas the January 27, 2015 IEP and placement at MDHS called for

7    A.T. to attend a full school day. AR 1934. The STEP program consists of two staff

8    members—a special education teacher instructing students in one classroom, and a

9    paraeducator working with the same students doing individual study work in another

10   classroom. Tr. 512:20-2; A.T.'s January 27, 2015 IEP calls for general education classrooms

11   with typical peers the vast majority of the school day. AR 1924, 1934, 1935.  Scriber is a

12   much smaller school: it has 275 students but only a 64 percent attendance rate so there are

13   about 170-180 students on campus each day.  Tr. 519:20-24.  A.T. was to have a 1:1 aide at

14   Scriber (or at least this was discussed by the group on May 7, 2015; it was not committed in

15   an IEP, PWN, or any other written document), whereas his January 27, 2015 IEP did not

16   provide one. Tr. 508: 15-20; AR 1931, 1935.

17       Dr. Cecchet found Scriber's STEP program inappropriate, as A.T. needs school

18   interventions in concert with medication management and therapeutic services. Tr. 987:16-

19   998:5. With respect to the part-time nature of the STEP program, Cecchet testified that even a

20   full-day school program would struggle to meet A.T.'s needs with the number of

21   interventions he needs and his need for opportunities to practice those interventions. *Id*.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 20

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1  Moreover, Cecchet was concerned with the amount of unstructured time A.T. would have in

2  the program, and the socialization he would receive with students with delinquent and

3  criminal behavior, or transient students, given his qualitatively different disability-related

4  needs. *Id.* Moreover, ESD staff expressed ambivalence, uncertainty, and non- commitment

5  when it came to Scriber STEP for A.T.. Christine Sutton equivocated about the

6  appropriateness of Scriber for A.T, at best.  Tr. 866:5-866:25. The remainder of ESD staff

7  described Scriber STEP as a place where school staff could "get to know" and observe A.T.

8  before creating specific educational programming for him.  Tr. 586:11-24, 503-5-9; 556:1-

9  557:23.

10  On May 18, 2015, the Father took A.T. to Scriber for his first day of school since his

11  long-term suspension on January 22, 2015. A.T. attended Scriber that day, but refused to

12  return to Scriber, or to any ESD school, after that date.  Tr. 552:9, 547:17, 151:20-152:18,

13  186:7-12, 186:17-24; AT 1084:5-13.   The Parents talked to MDHS staff about their

14  unsuccessful attempts to get A.T. to attend school.  Tr. 1081:12-17; 552:11-24, 533:14-534:6;

15  AR at 2103-2104. Parents testified that they wanted help and never discouraged ESD staff

16  from contacting them (despite ESD's argument to the contrary). Tr. 1093:3-12, 1081:12-17.

17  **F.  A.T. Would Not Attend School After the End of Ninth Grade, Until His Parents**
   **Enrolled Him at Provo Canyon Residential School**

18

19  Over the summer of 2015, A.T. continued to run away from home for longer and

20  longer time periods. Tr. 187:12-18. There was only one other criminal offense committed

21  after February of 2015, a shoplifting incident in September of 2015. Tr.142:23-13, 187:19-24.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 21

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    Police took A.T. to Children's Hospital after apprehending him because there were orders to

2    take him there for a psychological evaluation if he was picked up.  *Id.*.  Children's Hospital

3    staff recommended, "Residential treatment, mental health, substance use or dual diagnosis."

4    Tr. 187:25-188:25; AR 2156-2157.

5          A.T. would not attend school in the fall of his tenth-grade year (2015-2016), despite

6    Parents' efforts to get him to go. Tr. 154:8-14. No ESD staff testified to efforts to contact

7    A.T. or the family in the fall of 2015. *Id.* Scriber withdrew A.T. automatically on the fourth

8    day of the 2015-2016 school year as a matter of routine procedure. Tr. 14:1-8. The Mother

9    did not call ESD to discuss school refusal in the fall of 2015 because she had no new

10   information from the school district, and understood this to mean the ESD had done

11   everything they could. Tr. 1083:4-8.

12         The Parents understood that it takes a student about a year and a half to get into a

13   CLIP program, if he or she is accepted into one at all. Tr. 267: 3-5.  The Parents submitted the

14   application to CLIP.  Tr. 269:7-14 (Mother); P 134-7.  Given the usual wait time, however,

15   the Mother began in August of 2015 making calls to investigate different residential treatment

16   centers, Tr. 267: 5-8, 292:24-25 (Mother). Provo accepted the Student but the Parents'

17   insurance would not cover the placement, stating that it was <u>not for medical reasons</u>; the

18   Parents nonetheless enrolled him there at their own expense. Tr. 277: 3-9.

19         Parents met with education counsel for the first time on November 30, 2015.  Tr.

20   154:25.   Subsequently, Parents gave written notice to ESD of their intent to place A.T. in a

21   residential school and seek reimbursement for all expenses related to the placement, on

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 22

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

December 1, 2015. Tr. 155:6-23; AR at 2168, 2333-2334.  A.R. entered Provo on December 14, 2015. Tr.277:19.

**G. The Administrative Law Judge Correctly Found Provo Canyon an Appropriate Placement for A.T.**

Provo is a therapeutic residential school in Utah that provides a comprehensive and integrated educational, medication management, behavior intervention, and therapeutic program.  Provo provides individual therapy, group therapy, recreational therapy, medication management, staff trained in behavioral medication techniques and a full time school staffed largely by special education teachers.

All of Provo Canyon School's students have individual treatment teams that meet at least once a month to review the student's progress for periods of time that may vary but tend to be 15-20 minutes per student. AR 234.  The treatment team consists of a representative from the Medical department, the Student Life department, the Clinical department and the Education department. *Id.*

At the treatment team meeting, staff from each department discuss how the student is doing in his or her department, discuss his progress and needs, and brainstorm about any needed changes in approaches and programming for the student. *Id.*  When the meeting is over, each representative takes recommendations and important information from other departments back to staff in the respective department he or she comes from so services are interdisciplinary and coordinated. *Id.*

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 23

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    Provo provides a fully endorsed, full time, year-round school on a trimester system,

2    serving middle and high school boys. AR at 2339.  The school is an accredited special

3    education school by Northwest Accreditation.  Tr. 720.  All of the teachers are either

4    certificated in special education or in the process of taking courses to become certificated in

5    special education (there are 16 teachers total, with 3 working on their certification). Tr. 703:

6    5-9, 721:19-23.  Students attend school from 8:45 am to 3:20 pm with eight periods. AR

7    2340.  Class sizes are not bigger than 15, and A.T.'s classes range from 8-10 students. In

8    order to carefully monitor student progress in school and address any deficits in school

9    performance quickly, Provo Canyon provides constant grade checks and grades over

10   graduated levels every two weeks. AR at 2340.

11   Many of Provo School's students have behavior issues. AR at 2340, 2327, 2329.

12   Classrooms are small and very structured to encourage appropriate behaviors. *Id.* If a

13   student exhibits behaviors in class, they are first prompted within the classroom itself. *Id.*

14   If prompting does not stop the behavior, then the student may be asked to leave the

15   classroom. *Id.* There are at least three Student Life staff present in the school building at

16   all times so they are always available to process behavioral issues with a student who has

17   been removed from class until the student is ready to rejoin the class. *Id.* There are

18   additional Student Life staff present a phone call away on campus so educational staff can

19   summon as many as five additional Student Life staff to the school building if needed. *Id.*

20

21

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

Even the more intensive therapeutic aspect of the program supports A.T. in his education. If intervention outside the classroom by Student Life staff proves insufficient to permit the student to reenter the classroom, the student goes to the Stabilization and Assessment area where behavior is reviewed and the student is able to process behavioral and emotional issues with a psychiatrist and therapist and work their way back to the school area. AR at 2340-2341, 2327-2328 ¶6. While in the Stabilization and Assessment area, students receive educational instruction from teachers who leave the school to go to the Stabilization and Assessment area to teach their particular class that the student is missing by not being at school. This keeps students from falling behind academically while they are in the Stabilization and Assessment area. Instruction involves a high teacher: student ratio in the Stabilization and Assessment area, often 1:1. *Id.*

A.T. participates in group and individual therapy.   Students participate in therapy groups from 3:20 pm to 4:00 pm, after school is over.  AR 2340.  Alex also participates in one individual therapy session per week and one family session per week, with his parents participating by phone.  AR 2345.  A.T.'s family and individual therapist is a masters level clinician in Marriage and Family therapy.   *Id.*   AT's therapist testified to improvement in group therapy, in the sense that A.T. had become more polite, more attentive and more cooperative in groups. AR 2346.  AT's Provo therapist testified that he was moving through the emotional growth program at Provo, called the "Five Stages of

Change" curriculum, having reached completed Level 1 and most of Level 2 on a 5 level program at the time of hearing, roughly five months after entry. *Id.*

At hearing, numerous witnesses testified about A.T.'s progress at Provo. A.T.'s grades and school participation improved tremendously at Provo Canyon. In his first semester he earned a B in Art Foundation 2, an A in Geometry, a B- in English, a B in U.S. History, an A- in PE, and an A- in Physical Science. AR at 2427-2432. As noted, clinical staff testified to emotional and behavioral improvement. A.T. reports to his Mother that he enjoys school; writes to the Parents and sends copies of his report card and is excited to calculate his GPA; and reports studying all night. In family counseling sessions, he states that he plays sports with other students at the school, and is working on his social skills so he can have more friends. Tr. 278:2-9 (Mother).

Dr. Cecchet is familiar with Provo Canyon School, and testified to its appropriateness for A.T. Tr. 970:22 - 974:21. Dr. Cecchet visited the school on April 18, 2016, meeting with the Director, touring the facility, meeting with the treatment team, and observing the Student. Id. Dr. Cecchet compared Provo Canyon to CSTC. *Id*. Provo Canyon has a stronger academic program and is preferable to CSTC in this respect. *Id.* At CSTC, the students work in one classroom but at Provo Canyon there are multiple classrooms with more subjects taught and extracurricular type activities. *Id*. Both programs have integrated individual therapy, group therapy, family therapy, milieu therapy, behavior intervention, and psychiatric services. *Id.*

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 26

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1

**H. Cecchet's Testimony Regarding the Educational Implications of A.T.'s Disabilities and Educational Need for Residential Placement**

2

3

Psychologist Stacy Cecchet explained at hearing how A.T.'s educational needs are

4

interwoven with his social, emotional, medical and behavioral needs such that he needs

residential placement, <u>and Plaintiff presented no testimony to the contrary</u>. AR 1-1131.

5

6

According to Dr. Cecchet A.T.'s combination of ADHD, schizophrenia and

attachment issues created a "perfect storm" for his truancy and other school issues. Tr.

7

940:22-944:23.

8

9

Schizophrenia impacts cognitive organization. Tr. 934:1-25, 936:22-25. *Id.* If you

are seeing things other people aren't seeing, hearing things other people aren't hearing, and

10

thinking highly unusual thoughts, it is going to be very difficult to maintain an age

11

appropriate focus on an academic setting, class participation, social participation, homework

12

completion, etc. *Id.* If you are already cognitively disorganized from an unstable personality

13

from early abuse and neglect, experiencing unusual sensory experiences and thoughts will

14

only make the situation worse. *Id.* Student also has ADHD. *Id.* So essentially, he acts

15

impulsively. *Id.*

16

Cecchet described how these conditions affect A.T.'s though processes with respect to

17

truancy and school elopement. Impulsivity from ADHD limits A.T.'s ability to inhibit poor

18

choices like leaving home because he's mad or to engage in preferred activities. Tr. 942:7-

19

944:23. Then, A.T. is on the street with transient individuals. Even if Student thinks, "it's

20

getting late, I should go home," he may immediately think something else and lose focus on

21

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 27

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

getting home. *Id.* Or he may be so cognitively disorganized [from schizophrenia, childhood abuse and neglect] that he really doesn't know how to get himself home. Neurotypical individuals take for granted how easy it is to formulate and follow the sequential steps to get home, but A.T. cannot do this. *Id*. And all these issues, and A.T.'s social issues, put him at risk for not being able to make friends easily, and therefore "falling in with the wrong crowd." Tr. 945: 5-21, 946:24 - 948:24. Dr. Cecchet opined that this very clearly happened in the Student's case. He turned to spending time with a transient population living in parks and on the streets. *Id.*

Dr. Cecchet recommended residential placement in her report due to "significantly worsening dangerous behavior and elopement." Tr. 969:14-970. Cecchet testified to a relationship between this and Student's educational needs. Id. The Student cannot participate appropriately in the educational environment, complete homework, and attend class, nor can he learn the social skills necessary to participate in a classroom environment, if he is struggling so much with cognitive disorganization that he's truant and eloping for longer and longer periods of time. *Id.* Dangerous behavior was also impacting Student's school participation as the level of his aggressive behavior at school increased over time and ultimately led to long term suspension. *Id.*

### III.  ARGUMENT

**A.  Standard of Review**

In an appeal of a due process administrative decision brought under 20 USC §1415(i)(2), the court must receive the record of the administrative proceedings, hear

1    additional evidence at the request of a party, and base its decision on the preponderance of the

2    evidence. 20 USC §1415(i)(2)(B). The Supreme Court has held that "due weight" must be

3    given to the administrative proceedings. *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982).

4    The court should afford deference where the ALJ's findings are "thorough and careful," *L.M.*

5    *v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009), and the ALJ demonstrates

6    "careful, impartial consideration of all the evidence and demonstrates his sensitivity to the

7    complexity of the issues presented." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office,*

8    93 F.3d 1458, 1466-67 (9th Cir. 1996).

9    **B.  Statutory Framework of IDEA**

10        The Individuals with Disabilities Education Improvement Act ("IDEA") provides

11    disabled students a right to a free and appropriate public education ("FAPE").  20 USC §1400

12    et seq., 34 CFR 300 *et. seq.*. The statute mandates, through a series of procedural regulations,

13    an educational process designed to assure that a student received an appropriate education. 20

14    USC §1414 - §1415.  First, a statutorily prescribed "IEP team" conducts an evaluation that

15    determines the educational needs of the child. 20 USC §1414 (a)-(c).  The evaluation results

16    form the basis for the IEP team's development of a written educational plan for the student,

17    called an Individualized Education Plan ("IEP"). Id, 1414(a)(1)(C)(I). The statute sets out

18    precise educational processes for development of an IEP.  20 USC §1414(d).  The IEP is the

19    "primary vehicle" for implementing the underlying goals of the statute. *Honig v. Doe*, 484

20    U.S. 305, 311, 108 S. Ct. 592, 597 (1988). It is the IEP that sets forth the student's current

21    educational performance, articulates a set of annual goals and short-term objectives in

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 29

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

furtherance of those goals, and identifies the special education and other services necessary to help the student achieve those goals. *Honig*, 484 U.S. at 311, 108 S. Ct. at 597-98, 20 USC §1414(d)(1)(A)(i).

IDEA also provides parents of disabled students a right to participate in the educational process the statute mandates. 20 USC §1415(f)(3)(E)(ii)(II).   In addition to procedural regulations designed to assure an appropriate education to students with disabilities, IDEA includes procedural regulations intended to assure parental participation in the educational process, including for example that parents be part of the evaluation team, the IEP team, and that they receive Prior Written Notice when a school district acts or fails to act with respect to the delivery of FAPE to a student. 20 USC 1414, 1415 (e.g. § 1415(b)(1) and (3), (d)(1)(A), (f) and §1414(a)(1)(D), (b)(1), (b)(4)(A) and (B), (c)(3), (d)(1)(B)(i).

A school district violates IDEA if it fails to provide a substantive free and appropriate public education to a student.  To meet its substantive obligation under the IDEA, a school must offer an IEP "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist.,* 580 U.S. ___ (2017).

A school district also violates IDEA if it fails to follow one or more procedural regulations and that failure has a substantive impact.  There is a substantive impact if the procedural violation impedes the student's receipt of a free and appropriate public education, results in a deprivation of educational benefit to the student, or significantly excludes the parents from the educational process. §1415(f)(3)(E)(ii)(I) - (III).

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT– 30

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

The Supreme Court set forth a two-pronged test for reimbursement for a unilateral private placement in *Florence County School District Four v. Carter*, 510 U.S. 7 (1993). First, a federal court must conclude that the public school placement violated the IDEA, essentially determining that a substantive denial of FAPE occurred.  Second, the court must determine that the private placement Parents seek as a remedy is proper under the IDEA. *Id.*

## C. A.T.'s Placement at Provo Canyon Served Educational Needs Indivisible from and Intertwined with Behavioral, Social and Medical Needs

### 1.  The Legal Standard for Residential Placement

The Ninth Circuit standard for school district placement of a disabled child in a residential school focuses on whether the placement is necessary in order to meet the student's educational needs, or whether the placement is a response to medical, social, or emotional problems "quite apart from the learning process." *Ashland School Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir. 2009), *citing Clovis Unified Sch. Dist. v. California Office of Administrative Hearings*, 903 F.2d 635, 643 (9th Cir. 1990). *See also* 34 CFR §300.104.

Requiring residential placement for some students is consistent with IDEA's statutory requirement that special education students receive "related services… as may be required to assist a child with a disability to benefit from special education." 20 USC §1401(26)(a). *See*

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 31

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

*also* 34 CFR § 330.17 ("free appropriate public education means special education and related services …). The term "related services" includes a wide array of supportive services.[6] A residential placement consists essentially of special education supported by an extensive and integrated package of related services, typically including individual counseling, group counseling, recreational therapy, room and board, and 24/7 behavioral counseling.

In assessing whether a placement, including a residential placement, is necessary to meet a student's educational needs under the IDEA, it should be noted that the IDEA does not solely consider a student's academic achievement; indeed, the definition of "educational needs" under IDEA includes "academic" *and* "functional" needs.    34 CFR §300.320(a)(1) and (6)(i); 300.324(a)(4). *See also E.R.K. v. State Dep't of Education*, 728 F.3d 982, 990 (9th Cir. 2013); In *Seattle Sch. Dist.v. B.S.*, 82 F.3d 1493, 1500 (1996)("term 'unique educational needs' shall be broadly construed to include the handicapped child's academic, social, health, emotional, communicative, physical and vocational needs.").

---

[6]    Related services include [T]ransportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children. *Id.*

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 32

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

**2.    The Administrative Court Followed Ninth Circuit Precedent in Awarding Residential Placement**

Plaintiff relies on the Ninth Circuit's decisions in *Ashland School District v. Parents of Student E.H.,* and *Ashland School District v. Parents of Student R.J.* ("*E.H.*" and "*R.J.*") for the proposition that A.T.'s issues manifested off school grounds, were medical in nature, and thus were separate and apart from the educational process.    Both cases are distinguishable from the case at bar, and thus the ALJ did not err in her application of them.

Plaintiff, on the other hand, implicitly urges this Court to adopt an incorrect legal standard, namely that a medical diagnosis requiring mental health treatment *ipso facto* renders a residential placement non-educational.   Plaintiff argues that A.T. needed Provo Canyon solely for medical reasons because (1) psychologist Stacy Cecchet testified that while Student's behavior may have been impulsive at first it became more congruent with the other mental health symptoms of schizophrenia; (2) a doctor at Children's Hospital in Seattle also recommended residential treatment for mental health reasons; (3) Dr. Cecchet initially recommended a residential placement (CSTC) providing intensive inpatient treatment. *Plaintiff Edmonds School District's Motion for Summary Judgment* (Pff. Motion) at 21-22. In urging this Court to reverse the administrative court on these grounds the Plaintiff disregards entirely IDEA's fundamental requirement that school districts provide educational services to address mental health and medical needs that have a detrimental impact on a student's education. *See* 34 CFR §300.8.

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 33

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1      Far from placing A.T. outside the realm of IDEA's protection, schizophrenia is

2    explicitly included within the definition of Emotional Disturbance, one of the eligibility

3    categories of IDEA.   34 CFR § 300.8(c)(4)(ii).   While a student's schizophrenia must also

4    detrimentally impact him educationally to trigger IDEA eligibility, the District repeatedly

5    concedes that A.T.'s schizophrenia did exactly this.     ("the student performed well

6    academically prior to the onset of his prodromal schizophrenia", *Pff. Motion* at *20:8*; "the

7    Student's progress from year to year and his high academic capability when he is mentally

8    stable demonstrates what when medical issues are not a factor, he can and does benefit from

9    the educational services and the general education setting at the District." *Id.* at 27:4-9)

10      Cutting to crux of the matter, the administrative court correctly observed:

11          The District cannot insulate itself from the medical problems of its
          students.   If those medical problems prevent the students from
12          benefitting from an education without certain services in the
          educational setting, then the District must provide those services.
13          The District's argument… is akin to a district arguing that it should
          not have to fund a nurse to serve a medically fragile student who
14          needs a nurse in class in order to attend school.   If medical issues
          were not a factor, that student could easily benefit from the
15          educational services the District offers…. Similarly, if psychiatric
          issues were not a factor, the Student here easily has the intellectual
16          ability to benefit from the District's placement.   Sadly, students
          cannot be separate from their disabilities.   The District must take
17          students as it finds them, and provide the related service of nursing
          (for the medically fragile student) and the environment of a
18          residential placement (for the Student here).   Because if these
          services are not provided, neither of these students will receive any
19          benefit from their education.

20    AR 1138 at ¶9.

21

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    The fact that Dr. Cecchet initially recommended placement at a CLIP facility, CSTC,

2  likewise does not render Provo a non-educational, medical placement for two reasons: (1)

3  Provo is not a medical placement under the standards set forth in *Clovis,* the Ninth Circuit

4  seminal case distinguishing medical and non-medical placements; and (2) Dr. Cecchet's

5  testimony clearly identifies features associated with a non-medical placement under *Clovis* as

6  features needed by the Student, specifically distinguishing in her report the recommendation

7  for periodic hospitalization to address an acute crisis from A.T.'s longer term need for

8  residential treatment.

9    In *Clovis*, the parents placed the student in an "acute care psychiatric hospital" called

10  Kings View Hospital and sought reimbursement from their school district for the costs of the

11  placement, characterizing it as a residential placement under IDEA.  903 F.2d at 639.  The

12  school district "agree[d] that a residential placement of some kind [was] necessary" and

13  agreed that "a highly structured and integrated program of regularly scheduled psychological

14  services, including psychotherapy, [was] needed for [the student] to benefit from any

15  educational program."  *Id. at 641.*  However, the school district asserted that it was not

16  required to pay for a "psychiatric hospitalization because that type of placement is a response

17  to a medical rather than an educational need and is not the type of residential program

18  contemplated under the Act."  *Id.*

19    The Ninth Circuit agreed, and in doing so set forth criteria distinguishing a medical

20  from an educational placement: (1) whether the hospitalization occurs because of an "acute"

21  psychiatric crisis *Id. at 645*; (2) receipt of minimal hours of classroom instruction a day (two

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 35

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1    hours per day in *Clovis) Id at 646.;* (3) whether the amount of time spent in the classroom is

2    determined by hospital staff and is dependent upon non-academic treatment needs, *Id.at* 645*;*

3    (4) whether the student's overall program is designed by a medical team, *Id.;* (5) whether a

4    student receives high amounts of psychotherapy, suggesting services are "medical" insofar as

5    they address a "medical crisis" (six hours per day of intensive psychotherapy in *Clovis), Id.*;

6    (6) whether the placement is under the jurisdiction of a government body concerned with

7    health services (the hospital in *Clovis* was under the State Department of Health Services) *Id.*

8    at 646; (7) whether the placement in included as an educational option for handicapped

9    students by the state (the hospital in *Clovis* was not). *Id.;* (8) whether educational services are

10   provided by the institution itself or the local school district. *Id.* at 646.

11          Under *Clovis,* Provo is an educational, not a medical, placement.  Provo is accredited

12   as a school.  Parents' insurance refused to pay for Provo because it did not meet the medical

13   necessity standard. A.T. was not placed there for a temporary, acute medical crisis, but based

14   upon two years of constant regression in academic and functional performance. A.T. attends

15   school at Provo for a standard school day, five days a week.  He attends a moderate amount

16   of group therapy in the afternoons when school is over, with an additional session of

17   individual therapy and family therapy a week. A.T.'s program at Provo is designed by an

18   interdisciplinary treatment team consisting of medical staff, counselors, teachers, and

19   dormitory ("student life") staff.

20          Moreover, Dr. Cecchet's recommendation of CSTC did not imply a belief that A.T.'s

21   medical needs were separable from his educational needs.  In her report recommendations,

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 36

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

Dr. Cecchet distinguished the need for "hospitalizations" should A.T. be experiencing a "crisis" from enrollment at CLIP/CSTC due to "significant worsening behavior and elopement."  She testified to the interwoven relationship between Student's "significant worsening behavior and elopement" and his disabilities and educational needs.  Dr. Cecchet testified that she recommended CSTC instead of a private residential school not because it was "medical" in nature but because finances were a limiting factor for the Parents and CSTC accepted insurance and social benefits.  Dr. Cecchet's testimony emphasized the similarities between CSTC and Provo in non-medical services: both programs have full time school services; students live together in dorms at Provo and cottages at CSTC; both programs provide individual therapy, group therapy, family therapy, milieu therapy, behavior intervention services and psychiatric services.  Ultimately, Dr. Cecchet expressed a preference for Provo because of its stronger academic program.

The sole Ninth Circuit case Plaintiff cites to suggest Provo serves exclusively medical purposes is *E.H,* but *E.H.* bears little factual resemblance to our own case.  587 F.3d 1175 (9th Cir. 2009).  In *E.H.*, the student maintained good grades, and there is no reference to pronounced behavioral problems at school.  *Id. at* 1179. However, the student suffered from depression and repeatedly attempted or imagined suicide, resulting in short term hospitalizations. *Id.* After a hospitalization in December of ninth grade for suicidal tendencies and threatening to hurt family members, the parents enrolled the student in Youthcare, a residential facility. *Id.*  The parents did not provide reimbursement notification or even oppose the student's IEPs before enrolling the student at Youthcare, leaving school personnel

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 37

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

with the impression that the student would be entering residential school to address emotional and not scholastic issues. *Id* at 1179, 1185. Moreover, the parents' caseworker testified that parents reported they were seeking residential placement because of issues at home, not school. *Id.* at 1185. Once at Youthcare, the student was unable to complete much schoolwork for the first six months because of emotional issues. *E.H. Id.* at 1185.

*A.T.* on the other hand exhibited behavioral difficulties from preschool and --- beginning with the onset of prodromal schizophrenia in the ninth grade --- failed classes, disrupted classes, refused to do school work, left classes without permission, wandered the halls, did bizarre things such as hiding in the girl's restroom, and ultimately was suspended for 45 days for bring a wrist rocket and ball bearings to class, after which he refused to attend school at all.

A Ninth Circuit residential placement case far closer factually to our own is *Seattle Sch. Dist. v. B.S.*, 82 F.3d 1493 (9th Cir. 1996), in which the court affirmed residential placement at Intermountain for a student adopted from an abuse and neglect background whose behaviors disrupted and impeded her ability to function at school, despite her ability to perform well on standardized tests because of high intelligence. In *Seattle Sch. Dist. v. B.S.*, the Ninth Circuit noted:

> Finally, the School District asserts that it should not be responsible for the costs of Intermountain because Intermountain is essentially a "medical" rather than an "educational" program. To the contrary, Intermountain is an accredited educational institution under state law. Witnesses testified that it is not a psychiatric hospital and is not based on a "medical model." That A.S.'s disability, like most disabilities under the IDEA, stems from medical or psychiatric

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT– 38

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1

2

> disorders, and that Intermountain's program addresses these disorders in an attempt to ensure that A.S. is able to benefit from her education, does not render the program invalid or remove the District's financial responsibility.

3

*Id. at 1402.*

4

5

Plaintiff's assertion that behaviors and adaptive functioning at home, and not

academic and functional performance at school, necessitated residential placement at Provo is

6

likewise not supported by the record in this case.  AR 1-1103.

7

8

Plaintiff cites one Ninth Circuit case in support of this position, *R.J,* but the facts of

*R.J.* are easily distinguished from our own case.  *R.J.* involved a student with ADHD who had

9

10

also been diagnosed with adjustment disorder because of the anger she felt about her parent's

divorce and conflicts with her boyfriend. 588 F.3d at 1006.  She began self-harming and

11

parents decided to keep her at home.  *Id.* When she was back at school, she began sneaking

12

13

out to see males and had a relationship with an adult male.  *Id.* She had begun to make

progress at school and with her work completion, and earned good grades. *Id.* at 1006-1007.

14

She was not disruptive in school, only at home.  *Id.* at 1010.  However, her parents expressed

15

16

concerns at an IEP meeting about *R.J.'s* defiant behavior at home and her relationships with

men, and then enrolled her in a residential school without providing reimbursement

17

notification to the school district.  *Id.* at 1007.

18

19

Unlike the student in *R.J.*, A.T. is not a student who was acting out and defiant solely

at home but otherwise a passable student—he had long-standing issues at school. His parents

20

did not seek out residential treatment solely to prevent him from having inappropriate

21

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 39

1   relationships. In addition, at school, A.T.'s IEPs and BIPs always reflected a need for

2   behavioral and social intervention at school, not just at home.

3        In relying exclusively on *R.J.* and *E.H.,* the Plaintiff disregards other Ninth Circuit

4   cases that are factually similar to A.T.'s, where reimbursement for residential placement was

5   found appropriate and where the student's academic, behavioral, social, functional and

6   medical needs were similarly intertwined: *Seattle Sch. Dist. v. B.S.,* 82 F.3d 1493 (9th Cir.

7   1996) (Student with pre-adoption history of neglect, physical and sexual abuse, and

8   abandonment; diagnosed with attachment disorder, conduct disorder, ODD and histrionic

9   personality; high intelligence and high scores on achievement tests; significant behavioral

10  issues at school, unsuccessful special education placement and expulsion); *Taylor v. Honig*,

11  910 F.2d 627 (9th Cir. 1990) (affirming lower court award of residential placement based in

12  part on need to address truancy, where school district failed to offer an appropriate program

13  and student repeated periods of juvenile detention); *Capistrano Unified Sch. Dist.*, 59 F..3d

14  884 (9th Cir. 1995) (Student with history of febrile seizures causing hyperactivity, learning

15  and behavioral difficulties, hospitalized based on aggression in the home; doctors

16  recommended a highly structured day placement or residential placement; student failed in

17  various special education placements at school; immediately prior to parents' unilateral

18  placement in a residential program the school reduced special education services).

19       Moreover, only one current formal evaluation of A.T. existed in this case at the time

20  of hearing, and the evaluator, Dr. Cecchet, testified extensively about the combined effects of

21  schizophrenia, ADHD, and childhood abuse and neglect on A.T.'s ability to self-regulate and

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 40

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   organize behavior, make choices, seek out relationships, attend school and complete work.

2   She carefully explained why A.T. needed residential placement to address those needs.

3   Despite ample notice that A.T.'s needs changed in January of 2015, the ESD last evaluated

4   this student in 2013. No current evaluation or evaluator for ESD made any different

5   recommendations for placement than Cecchet, during the educational process or at the

6   administrative hearing. In fact, ESD witnesses testified to uncertainty about the nature of

7   A.T.'s needs at hearing. None took issue with Cecchet's evaluation, and in fact staff referred

8   to the evaluation as illuminating, and Dr. Cartwright testified that she agreed with it.  As

9   such, Cecchet's recommendations for residential placement to address educational needs, her

10  opinion that Provo Canyon is an appropriate educational placement, as well as her diagnoses

11  and testimony concerning the relationship between the student's disability and educational

12  needs are entitled to some deference.

13  **D.  The Placement at Provo Canyon is Proper under the IDEA**

14      The U.S. Supreme Court set forth a two-pronged test for reimbursement for a

15  unilateral private placement in *Florence County School District Four v. Carter*, 510 U.S. 7

16  (1993). Under the second prong, the *Carter* court held that a private school placement could

17  be found proper under the IDEA even if it did not provide the student with all of the

18  necessary educational benefits. *Id.* at 15-16.

19      Plaintiff argues that the placement at Provo Canyon is not proper under the IDEA

20  because it did not implement A.T.'s last IEP (which is not a requirement), and did not place

21  him in advanced classes. However, under the Ninth Circuit standard, the private placement

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 41

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

need not furnish every service necessary to maximize the student's potential. There need only be a showing that the placement provides educational instruction specially designed to meet the unique needs of a disabled student, supported by such services as are necessary to permit the student to benefit from instruction. *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.* 635 F.3d 1155, 1159 (9th Cir. 2011); *Union Sch. Dist. v. Smith*, 15 F. 3d, 1519 1526 (9th Cir. 1994) (parents' unilateral residential placement need not satisfy state educational standards for reimbursement to be ordered).

Plaintiff also argues that the parental placement at Provo is not proper because it is not the least restrictive environment. This is not a requirement for unilateral private placement in the Ninth Circuit. *Seattle v. B.S., 82 F.3d at 1501-1502.*   In any event, the record demonstrates that A.T. was not and could not have been appropriately educated in less restrictive ESD placements.

**E.  ESD's Proposed Program is Not Appropriate and Did Not Constitute FAPE in The Least Restrictive Environment**

Plaintiff relies on a case from an Oregon district court rejecting a placement at Provo, which is factually distinguishable from ours yet helps to frame the issue and highlight the differences between the inappropriate placements ESD proposed for A.T. and the appropriate placement at Provo.

In *G.R. ex rel. Russell v. Dallas Sch. Dist. No. 2,* 823 F. Supp.2d 1120 (D. Or. 2011), the court contemplated a residential placement for a student with a learning disability who brought a knife to school and was convicted of sexual assault. In that case, the school district

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 42

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   provided a program, "New Options," for the student that was highly structured with a small

2   class size, close supervision, daily tracking, behavioral supports, and individual and group

3   therapy. *Id. at* 1142.  New Options would have given that student the ability to practice

4   needed appropriate social behavior with girls his own age, addressing his behavioral issue

5   directly (which Provo Canyon could not provide as an all-boys school). *Id.* The student's

6   juvenile probation officer testified that he could have successfully attended the school

7   district's program and gone to outpatient treatment. *Id*. at 1139.  Since the court found that

8   the student could have received a FAPE while attending New Options at the district, then the

9   placement at Provo Canyon was found not necessary to provide special education and related

10  services. *Id.*

11      Scriber's STEP program is inappropriate at a number of different levels.  First, the

12  "offering" of Scriber is replete with procedural errors that denied FAPE by excluding the

13  Parents from the educational process; hence regardless of the substantive appropriateness of

14  Scriber STEP, the first prong of the two part test the Parents must meet to obtain the relief

15  they seek is met.  These procedural errors included ESD's failure to include the Parents at the

16  May 7, 2015 IEP meeting where the team decided to place A.T. at Scriber, and its failure to

17  generate an IEP (as opposed to a PWN) describing educational programming the Student

18  would receive.  When a school district excludes parents from an IEP meeting in which an IEP

19  is generated, it denies FAPE by excluding the parents from the educational process, and a

20  court must resolve the first prong in favor of the parent regardless of the appropriateness of

21  the IEP designed.  *W.G. v. Target Range Sch. Dist.*, 960 F.2d 1479, 1484, 1485 (9th Cir 1992),

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 43

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1  superseded by statute on other grounds, as recognized in *R.B. v. Napa Valley Sch. Dist.,* 496

2  F.3d 932 (9th Cir. 2007) (failing to include Parents in IEP meeting significantly excluded

3  them from educational process, denying FAPE, and thus there was no need to determine if

4  IEP was reasonably calculated to provide educational benefit before awarding private school).

5  Similarly, when a school district determines a school placement (like Scriber) without first

6  determining the educational programming needed in an IEP, it excludes the parents from the

7  educational process by predetermining placement.  *W.G.* 960 F.2d at 1484; *Spielberg v.*

8  *Henrico Cnty. Pub. Schs.,* 853 F.2[nd] 256, 258-59 (4th Cir. 1988).

9         However, quite apart from the exclusion of the Parents from the educational process,

10  ESD denied FAPE because Scriber STEP was not appropriate for the Student.  Dr. Cecchet

11  testified to its inappropriateness, and even ESD testified they wanted to take more time to

12  investigate whether Scriber would work for A.T. before offering a more specific program for

13  him. There is no indication that A.T. could have successfully attended Scriber STEP, and in

14  fact he refused to attend after just one day spent there.  This is consistent with expert

15  testimony that A.T. could not have been successfully instructed in less restrictive placements,

16  such as public school with outpatient treatment, or a day placement.

17  **F.  ESD's Failure to Provide a FAPE to A.T. Was Not Cured by A.T.'s Disability-**
     **Related Elopement and Detentions**

18

19         Plaintiff relies on a Tenth Circuit decision to support its argument that any violations

    of the IDEA that ESD may have committed would be ameliorated by A.T.'s truancy. *Garcia*

20  *v. Bd. of Educ. of Albuquerque Pub. Sch.,* 520 F.3d 1116, 1126 (10th Cir. 2008). However, the

21

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 44

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

Ninth Circuit decision in *Taylor v. Honig* has precedential effect and has direct bearing on the case at hand. 910 F.2d 627 (9th Cir. 1990). *Taylor* also presented an adolescent with serious emotional disturbance, who was arrested for assaulting a family member, and also spent periods in both detention facilities and children's psychiatric hospitals. At no time did the court find, as in *Garcia,* that the periods of absence from school absolved the school from its responsibility to develop an IEP and appropriate placement for the student. The court upheld the hearing officer's order of a 24-hour residential facility that would provide, *inter alia,* "an on-site school program to forestall truancy." *Taylor v. Honig*, 910 F.2d at 630.

The Administrative Law Judge, who heard the testimony at hearing, found that "Dr. Cecchet persuasively explained why the Student's truancy was causally related to his disabilities" and "the District offered no evidence to the contrary." A.R. 1139. IDEA only excludes social maladjustment from disability eligibility if the social maladjustment is not related to emotional disturbance otherwise covered by the Act. 34 CFR §300.8(c)(4)(ii). School districts cannot shirk their duty to provide appropriate programming and placement to students who manifest disability-related truancy, including residential placement. *See Taylor v. Honig, supra; M.M. v. New York City Dept. of Educ.,* 26 F. Supp. 3d 249 (SDNY 2014); *Lexington County Sch. Dist. One. V. Frazier*, 2011 US Dist. LEXIS 107813, 111 LRP 62693 (DSC 2011).

Moreover, the record is well-developed that while A.T. was attending school in the ninth and tenth grades, ESD did not consistently implement his IEPs or BIPs, removed behavioral intervention services, and did not change or add services as A.T.'s school

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 45

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

functioning deteriorated. A.T.'s truancy issues were profoundly exacerbated by ESD's failure to provide the structured environment, behavior, counseling, executive functioning and social support that his evaluations, IEPs and BIPs all identified he needed.  Plaintiff should not be permitted to excuse its failure to deliver FAPE on the Student's absence from school when the Student's absence from school was in large part caused by Plaintiff's failure to deliver FAPE at an earlier point when the Student was in school.

**G.  The ALJ's Findings of Procedural Violations by the ESD are Well-Supported by the Record**

**1. ESD Denied A.T. a FAPE by Failing to Provide an Appropriate IAES Following his Long-Term Suspension**

The federal regulations implementing the IDEA require that when a disciplinary removal of a student with a disability from his or her current placement occurs, that student must continue to receive educational services, "so as to enable the child to <u>continue to participate in the general education curriculum</u>, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 34 CFR §300.350(d)(1).(emphasis added) The student must also receive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur. *Id.*

Assuming *arguendo* that A.T.'s conduct was not a manifestation of his disability, the ESD was still required to provide A.T. with an Interim Alternative Educational Setting (IAES), and 75 minutes per week instruction on IEP goals was woefully inadequate to enable A.T. to participate in the general education curriculum ---- according not only to the Parents'

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT– 46

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

witness, psychologist Stacy Cecchet, but also according to the school psychologist intimately involved with the Student's education, Christine Sutton (as evidenced in her emails in evidence).

As correctly noted by ALJ Mentzer, a student's IEP team must decide both the setting and the services for the IAES:   the interim alternative educational setting….shall be determined by the IEP team." *See* WAC 392-172A-05150; 34 CFR §300.531; *Admin. Order* at ¶27-28.   The ALJ correctly found these decisions were made unilaterally by ESD administrators, not by the IEP team, thus excluding the Parents from the educational process.

**2. The Plaintiff's Failure to Evaluate A.T. Denied Him FAPE**

School district are required to reevaluate students whenever "the educational or related service needs… of the child warrant a reevaluation."   34 CFR 300.303(a). A.T.'s most recent reevaluation by ESD at the time of hearing occurred in February of 2013, during his eighth grade year.   During A.T.'s ninth, tenth and eleventh grades, his behaviors precipitously increased and his academic performance plummeted.    This triggered the obligation to reevaluate:  a reevaluation is a formal process under IDEA to determine the nature of a student's educational needs so that appropriate educational programming and placement can be offered.

Moreover, ESD staff should have initiated a reevaluation based on their suspicion that A.T. experienced Autism Spectrum Disorder.   School districts "shall ensure that … the child is assessed in all areas of suspected disability."   20 USC § 1414(b)(3)(B).   This obligation to evaluate includes "medical services…   for diagnostic and evaluation

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 47

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

purposes." 20 USC §1401(26)(A); 34 CFR§ 300.34.

School Psychologist Christine Sutton suspected A.T. experienced autism, but did not tell the Parents this or initiate a reevaluation. School districts are responsible for initiating evaluations, including medical evaluations, when they suspect an undiagnosed disabling condition. *See also N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1209 (9th Cir. 2008) (school district denied FAPE in telling parents who disclosed a medical diagnosis of autism that they should obtain a general evaluation from a child development center); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir. 1994) (parents failure to secure an evaluation, even if the parents agreed to obtain it, does not excuse the school district's obligation under the IDEA to secure such an evaluation); *Dept. of Educ. State of Hawaii v. Cari Rae S,* 158 F. Supp.2d at 1198 (DC Hi 2001) (school district must reimburse parents for costs of a hospitalization necessary for proper evaluation of the student's disability); *MJC By Martin v. Special Sch. Dist. No. 1,* 58 IDELR 288 (DC Minn 2012) (district must secure a medical evaluation by a licensed physician if such an evaluation is necessary to determine student's IDEA eligibility); *Letter to Anonymous*, 34 IDELR 35 (OSEP 2000)(where physician's examination necessary to establish ADHD to determine IDEA eligibility, must be at no cost to parents).

The District cannot excuse its failure to evaluate on the fact that A.T. exhibited school refusal and was therefore "unavailable" to evaluate. As part of any reevaluation under IDEA, a district must initially determine the data available and the data needed. 34 CFR 300.305(a). School districts are permitted to evaluate a student by review of existing

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 48

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   information alone without additional testing or observation of the Student, 34 CFR §

2   300.305(d), and in this case the ALJ found, correctly, that the District had "extensive and

3   recent assessments, both formal and informal from which to conduct its reevaluation." AR

4   1148 at ¶ 49.    Plaintiff had at its disposal the comprehensive formal evaluation of Dr.

5   Cecchet as well as available information about A.T. from school psychologist Christine

6   Sutton and MDHS teacher observations and reports. *Id.*  Second, a student may be evaluated

7   in-patient at a hospital, mitigating the risk of elopement.  *Cari Rae S,* 158 F. Supp.2d 1190,

8   1198 (DC Hi 2001).

9        The District was obligated to reevaluate the Student after receipt of Dr. Cecchet's

10  report diagnosing A.T. with prodromal schizophrenia.  The requirement to reevaluate may

11  be triggered by the report of outside experts.  *See N.B. v. Hellgate Elementary School*

12  *District,* 541 F.3d 1202, 1209 (9th Cir. 2008) (school district failed to evaluate student after

13  speech and language pathologist report provided by the parents identified an "autistic

14  component" interfering with child's education).  Yet no one at ESD initiated a reevaluation

15  under IDEA, which would have triggered a formal process for focusing on, assimilating, and

16  responding to this new information and determining its implications for educational

17  planning.

18       The District should have evaluated the Student before changing his placement.

19  School districts violate IDEA by materially changing a student's educational program and

20  placement without conducting a reevaluation first. *Oak Harbor School District 201,* 46

21  IDELR 52 (OCR 2005).  A school district changes a student's placement whenever a change

DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR
SUMMARY JUDGMENT– 49

**Cassady Law** PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   is "likely to affect in some significant way the child's learning experience." *See DeLeon v.*

2   *Susquehanna Community School Dist.*, 747 F.2d 149, 153 (3rd Cir.1984).   The record

3   clearly supports that such a change occurred when ESD transferred A.T. to Scriber STEP.

4        After a careful application of the law to the facts in the case, The ALJ correctly

5   concluded that the Plaintiff's failure to reevaluate the Student, to offer an appropriate IAES,

6   and to convene an IEP meeting to design an IEP had a substantive impact, thereby

7   constituting a denial of FAPE. AR 1144, 1146-1147, 1149,1150.  These findings are well-

8   supported by the record at hearing.

9   ### III.  CONCLUSION

10        Based on the foregoing, Defendants respectfully request an order affirming the ALJ's

11   decision in its entirety, including awarding the Parents' reimbursement at public expense for

12   the placement of A.T. at Provo Canyon, prospective placement at Provo Canyon, and

13   declaration that ESD denied A.T. a FAPE.

14        Respectfully submitted this 17th day of April, 2017.

15        By:  s/Charlotte Cassady
          Charlotte Cassady, WSBA #19848

16        Cassady Law PLLC
          Attorney for Defendants

17

18        s/Nicholle Mineiro
          Nicholle Mineiro, WSBA #4475

19        Cassady Law PLLC
          Attorney For Defendants

20

21

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960