The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| EDMONDS SCHOOL DISTRICT,<br><br>    Plaintiff/Appellant,<br><br>v.<br><br>A.T., a minor child, and R.T. and I.T.<br>his parents,<br><br>    Defendants/Appellees. | Case No.   2:16-cv-01500-RSL<br><br>DEFENDANTS' REPLY |

## I. INTRODUCTION

Plaintiff Edmonds School District ("ESD") extrapolates from *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings* a more stringent standard for evaluating residential placements than is warranted by *Clovis,* the statutory language of IDEA, or IDEA jurisprudence in general. *Clovis* at 903 F.2d 635 (9th Cir. 1990).  Were this Court to adopt the

DEFENDANTS' REPLY– 1

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1   medical placement definition promoted by ESD, then virtually no residential placement for a
2   disabled student would ever be funded by a school district. The ESD likens any residential
3   school that provides behavioral, social and academic instruction in a therapeutic milieu to a
4   psychiatric hospital. This approach frustrates the intent of Congress and the Washington state
5   legislature to enable students with profound disabilities to receive a free appropriate public
6   education in residential treatment centers. 34 C.F.R. §300.104; WAC 392-172A-02055.

7   The Court's decision in this case affects not only the education of A.T., but also the
8   education of disabled students throughout Washington state who require therapeutic
9   residential treatment placements in order to be educated.

## II.  ARGUMENT

### A. The *Clovis* Decision Differentiates Residential Treatment Centers from Psychiatric Hospitals

ESD relies heavily on *Clovis* to argue that residential placements that provide even minimal psychiatric treatment should not be reimbursable as a "supportive service" or "related service" under the IDEA. However, the facts of *Clovis* are inapposite.

The *Clovis* Court considered a psychiatric hospital placement, Kings View Hospital, for a student with severe emotional disturbance, and carefully analyzed the differences between a psychiatric hospital and a traditional residential school placement. *Clovis v. California Office of Administrative Hearings,* 903 F.2d 635, p. 642, (9th Cir. 1990).  First, the school district itself in *Clovis* attempted to place the student in a residential placement, offering the parents both a state diagnostic school and another residential center. The parents instead wanted to

DEFENDANTS' REPLY– 2

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1 keep the student in a psychiatric hospital and have the school district fund the hospital. *Clovis*
2 at 639.

3     Here, the program ESD offered to A.T. was described in expert testimony at hearing to be
4 "wildly inappropriate." TR. 975-978:11. Unlike in *Clovis*, where the school district offered
5 alternatives that provided appropriate level of services in a residential environment for a
6 profoundly disabled student such as A.T., the ESD only offered A.T. 75 minutes a week of
7 special education instruction in a public school setting under his last implemented IEP.

8     Next, a central issue in *Clovis* concerned whether the psychiatric hospital at issue was the
9 type of residential placement contemplated by the IDEA. *Clovis* at 642.  The Court
10 recognized that a psychiatric hospital provides therapeutic services as does a traditional
11 residential placement, and did opine that "some psychological services are explicitly included
12 within the definition of related services under the Act when pupils need such services to
13 benefit from their special instruction." *Clovis* at 646.  The Court determined that King's View
14 Hospital provided the student with six hours per day of intensive psychotherapy to treat her
15 condition, but hardly provided the student with any educational services. Thus, the court
16 found "[b]ecause King's View does not provide its patients with educational services, it
17 differs substantially from facilities found by other circuits to be residential placements within
18 the ambit of 34 C.F.R. §300.302 for which school districts are financially responsible."

19     In contrast, Provo Canyon School does not solely treat A.T.'s schizophrenia. The record
20 amply demonstrates that Provo provides a full-time school program with certificated teachers,
21 behavioral support, and therapeutic intervention so that students can make progress on

DEFENDANTS' REPLY– 3

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1 educational, social, behavioral, and adaptive life skills. AR 234, 2327, 2329, 2339-2340, 2345-2346; Tr. 703: 5-9, 720- 721:19-23, 970:22-974:21.

The *Clovis* court's discussion of the Eleventh Circuit's opinion in *Jefferson County Board of Education v. Breen*, 853 F.2d 853 (11th Cir. 1988), is also instructive. The Eleventh Circuit refused to place a student in a psychiatric hospital, instead requiring the school district to fund a placement at The Ranch, a school with facilities to provide the child with an integrated program of educational and supporting services. *Clovis* at 646, citing *Jefferson Cty. v. Breen,* 857. Most tellingly, the Eleventh Circuit found that the psychiatric hospital lacked the facilities to provide the student with an appropriate education. *Clovis* at 647, citing *Jefferson Cty. v. Breen,* 857.

As established in the record, Provo Canyon <u>does</u> have the facilities to provide a comprehensive therapeutic educational program. AR 2329, 2340; Tr. 720, 703:5-9, 721:19-23.

The *Clovis* court also distinguished the Sixth Circuit decision in *Clevenger v. Oak Ridge School Board*, 744 F.2d 514, 516 (6th Cir. 1984), placing a student with emotional disturbance at a residential school that could provide for the student's educational and related service needs. *Clovis* at 647. *Clovis* applied this test to the psychiatric hospital at issue, and found that the complete absence of educational services suggested that the room and board were medically and not educationally related. *Clovis* at 647, citing *Clevenger v. Oak Ridge*, 516.

DEFENDANTS' REPLY– 4

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

### B. *McKenzie v. Jefferson* Does Not Compel the Same Result Simply Because the Student Has Schizophrenia

ESD also urges this Court to apply *McKenzie v. Jefferson*, 566 F.Supp. 404, 413 (D.D.C. 1983), as cited in *Clovis*, 903 F.2d at 643. While the student in *McKenzie* also had schizophrenia, the case presented a different scenario. In *McKenzie*, the issue presented was whether the district should fund separate inpatient and outpatient hospitalization expenses while the student attended a therapeutic day program. *McKenzie* at 407. In contrast, the Provo Canyon school cannot be carved out into separate programs, as the students require the therapeutic milieu in order to receive academic, behavioral, social and adaptive instruction. There is ample evidence in the record that Provo Canyon School does not simply provide inpatient hospitalization. AR 234, 2327, 2329, 2339-2340, 2345-2346; Tr. 703: 5-9, 720-721:19-23, 970:22-974:21.

If the ESD wishes to rely on *McKenzie* to refuse to fund Provo Canyon, then a more thorough exploration of *McKenzie* is appropriate. The *McKenzie* Court discussed two cases that are quite relevant to the current analysis. It distinguished these cases, involving the state refusing to fund a residential placement, from the issue of funding psychiatric hospitalization as a related service. These cases help illuminate why the case at bar falls into the former category and not the latter.

First, the Court considered *Papacoda v. Connecticut,* 528 F.Supp. 68 (D.Conn. 1981), involving the placement of an emotionally disturbed student with self-destructive behavior. *McKenzie* 566 F.Supp. at 410. The school board approved her special education placement at

DEFENDANTS' REPLY– 5

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

a residential facility, but argued it should not pay for the "noneducational" cost of the placement—room, board and therapy—where the primary reason she was placed there was for emotional factors rather than education. *McKenzie* at 410, citing *Papacoda* 528 F.Supp. 68. The *Papacoda* Court found that the student could not be educated outside of residential placement as the education program needed to be coordinated with the therapeutic program. McKenzie at 410, citing *Papacoda* 528 F.Supp. at 71. Notably, the McKenzie court remarked on this case:

> The issue in *Papacoda* was one of residential placement, and it seems that if the argument made by the state had been accepted, there would be little if any chance, of ever requiring the state to fund a residential placement or find that a residential placement represented an appropriate program and placement under the EAHCA. Yet it is clear that under the appropriate circumstances, the State, the hearing officer or the court may order a residential placement for special education purposes. See 34 C.F.R. § 300.302. The issue in the instant case however is not whether DCPS can be required to place the child in a residential placement…rather, it is whether, under the circumstances of this case, where a child is placed in a hospital for medical reasons, such placement constitutes a related service as defined in the EAHCA and the regulations promulgated thereunder. That issue was not addressed in *Papacoda* and thus the cases are distinguishable. *McKenzie* 566 F.Supp. at 410

The *McKenzie* court went on to discuss *North v. District of Columbia Board of Education,* 471 F.Supp. 136 (D.D.C. 1979), where a district "attempted to avoid its responsibility under the EAHCA" to argue that if a student needed a residential placement for his or her emotional well-being, it was not the district's responsibility to fund it. *McKenzie* 566 F.Supp. at 410, citing *North* 471 F.Supp. 136. In discussing this case, the *McKenzie* Court noted that the student's educational and emotional needs were "interwoven," and highlighted the difficulty

DEFENDANTS' REPLY– 6

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

in differentiating the need for residential placement for educational purposes or due to the student's emotional state. *McKenzie* at 410. This is the very discussion that the ESD attempts to foreclose before this current Court.

Ultimately, it does not appear that the *McKenzie* court intended to render a broad holding transforming all residential treatment centers that provide psychiatric and therapeutic services as part of their programs into psychiatric hospitals.

**C. The Student's "Uncontrollable Condition" Is Not a Bar to Funding Residential Placement**

ESD argues that *Clovis* created a factor to determine whether a placement is for medical or educational reasons-- the student's "uncontrollable condition." A close reading of *Clovis* does not reveal such a required element. The Court discussed the student's condition but then focused its analysis on the services provided by the hospital and compared them to a residential placement, as the deciding factor. *Clovis,* 903 F.2d at 645. It stands to reason that all students with emotional and behavioral disabilities have behaviors that are uncontrollable. If taken to its logical conclusion, all students with disabilities have a condition they cannot control. To use this argument as a bar to funding A.T.'s placement is absurd.

Furthermore, ESD *itself* goes on to argue that A.T. is socially maladjusted and is in control of his behaviors (a rather unusual argument concerning a student with schizophrenia, but Defendants digress), in order to deny responsibility for funding his placement. ESD is essentially arguing against itself in its own brief.

DEFENDANTS' REPLY– 7

**D. The Residential Placement's Implementation of the IEP is Not a Determining Factor**

The *Clovis* Court did note that the psychiatric hospital did not implement an IEP developed by the public school district. *Clovis* 903 F.2d at 645. However, the more relevant factor for the Court was that in *Clovis* the local school district provided the (very minimal) educational services for the student, and the supervising physician and medical team provided the hospital services. Id. The *Clovis* program was not an integrated program like Provo Canyon School, with the same entity providing mental health and educational services, so the IEP developed for the student by the local school district in *Clovis* was not implemented by the hospital staff at King's View Hospital. Id. In this case, Provo Canyon School is not a public school required to develop an IEP under IDEA, and since ESD did not place the student there, ESD did not develop an IEP for A.T. in conjunction with Provo Canyon School staff.

Furthermore, to require a residential placement to implement the student's very IEP that is the subject of a FAPE dispute would compel an illogical result. As the Court held in *School Committee of the Town of Burlington v. Dept. of Educ.,* 105 S.Ct. 1996; 471 U.S. 359 (1985), the very purpose of the private placement reimbursement remedy is to remediate an inadequate IEP:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably

DEFENDANTS' REPLY– 8

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

> confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete. Because Congress undoubtedly did not intend this result, we are confident that by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case. *Burlington* at 2003.

*Burlington* sets forth the test for the reimbursement of a unilateral private placement, and it does not require that the private placement implement the student's IEP.

**E.   The Fact that Provo Canyon Offers Medical Services is Not Dispositive**

Provo Canyon, like virtually all residential treatment centers, is costly because of the provision of therapeutic services, student-staff ratios and level of supervision. However, residential treatment centers are specifically authorized by Congress as a special education placement, regardless of cost. 34 CFR § 300.104. The *Clovis* decision that ESD relies on takes great pains to elaborate the factors distinguishing a residential treatment center from a hospital, not centering on cost or the inclusion of medical services in the residential program:

> We note that there is nothing magical about the appellation 'hospital' in our analysis. There are many public institutions around the nation which are called "state hospitals" that are in fact primary residential treatment facilities where the educational, social, and developmental training needs of severely handicapped individuals are met. For example, in California the legislature has established eight "State Hospitals for the Developmentally Disabled." *See* Cal. Wel. & Inst.Code §7500. These institutions are not primarily medical hospitals, but are more like residential treatment centers where an individual's multiple and intertwined needs can be met. The object of these "hospitals" is the "care, treatment, habilitation, training, and education" of the person committed thereto, Cal. Wel. & Inst. Code §7503, and may well qualify, under state

DEFENDANTS' REPLY– 9

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

law, as residential placements with which school districts may contract under the Act." *Clovis* 903 F.2d 635 at 646, n.4.

At the state level, Washington state law authorizes child long-term inpatient treatment facilities, WAC 388-865-0580, which Dr. Cecchet recommended as A.T.'s placement. ESD argues that it was Dr. Cecchet's recommendation of the "CLIP" program that demonstrates that A.T.'s placement is solely for medical reasons. However, as the 9th circuit noted above in *Clovis*, the name of the treatment center is not controlling. CLIP facilities in Washington are required to not only have psychological and medical staff, but also an educational/vocational assessment of each resident with appropriate educational/vocational programs developed and implemented or assured on the basis of that assessment. *Id.* CLIP facilities are also required to have an occupational therapist, recreational therapist, and social worker available so that these functions may be integrated with the residents' program. *Id.* To the extent that ESD analogizes Provo Canyon to a CLIP placement in Washington, ESD's conclusion that both are solely medical placements is incorrect. Dr. Cecchet's testimony also supports the non-medical nature of CLIP. Tr 963:22-967:25, 970:22-974:21, 978:11-985:9;1016:9-12.

**F. Social and Emotional Needs, In Addition to Academics, Are Expressly Covered Under the IDEA**

ESD argues that A.T.'s program at Provo Canyon providing behavioral, social and emotional instruction and support does not provide an appropriate education. However, the IDEA mandates that a student's academic, developmental and functional needs must be considered as part of the student's special education program. 20 U.S.C. §1414(d); 34 C.F.R.

DEFENDANTS' REPLY– 10

§300.324. Behavior that "impedes the child's learning and that of others" is also expressly addressed in the IDEA, as a special factor to consider as part of the student's special education program. *Id.* In fact, Emotional Disturbance is one of the eligibility categories qualifying student for special education and related services under IDEA. 34 CFR §300.8(c)(4)(ii). Moreover, while the District complains A.T. had no academic goals on his treatment plan at Provo Canyon School, A.T. had no academic goals on his IEPs from ESD either—his goals were social and behavioral, because his needs in this area negatively impacted his academic performance. AR 1754-1755, AR 1796-1797, AR 1929-1930.

**G. The Record is Well-Developed that A.T.'s Behavior Stems from His Disability and Not Social Maladjustment**

ESD argues that A.T.'s behavior due to schizophrenia is uncontrollable and thus needs hospitalization for medical reasons, while at the same time arguing that he meets criteria for social maladjustment for being able to control his behavior and manipulate the situation. This position is logically inconsistent.

It is well established in the record that A.T.'s behaviors stemming from prodromal schizophrenia, as well as his other disabilities, rendered him virtually incapable of regulating impulsive behavior, interacting with peers and adults in a socially appropriate way, or organizing his thoughts and responses to his environment. Tr. 934:1-25, 936:22-25.

Furthermore, even if a student is displaying socially aberrant behavior, that does not render the student ineligible for special education services if there is emotional impairment at the root of the student's behavior. 34 C.F.R. §300.8. Case law from other circuits and districts

DEFENDANTS' REPLY– 11

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

helps illuminate the interplay between emotional disturbance and conduct disorder: *See Independent Sch. Dist. No. 284 v. A.C.,* 258 F.3d 769 (8th Cir. 2001) (student's truancy resulted from emotional disturbance rather than moral failing); *Eschenasy v. New York City Dept of Educ.,* 604 F.Supp. 2d 639 (S.D.N.Y. 2009) (student cut classes, used drugs and stole due to a conduct disorder and emotional disturbance, and committed self-harm making her IDEA-eligible).

**H. ESD's Procedural Failures to Provide a FAPE to A.T. are Not Absolved**

   **1.   There Is No Ninth Circuit or Statutory Authority Relieving ESD of the Responsibility to Evaluate and Develop an Appropriate IEP for A.T.**

ESD argues that its procedural violations of the IDEA did not amount to a FAPE violation due to A.T.'s disability-related periods of vagrancy, truancy and periods of psychiatric hospitalization and detention. With the exception of *Taylor v. Honig*, 910 F.2d 627 (9th Cir. 1990), the Ninth Circuit has not addressed the issue of disability-related truancy. However, Congress did not create any exceptions of this nature to school districts' responsibilities to locate, evaluate and serve children with disabilities in need of special education under Child Find. 34 C.F.R. § 300.111(a). The Ninth Circuit has also held that school districts have the duty to affirmatively seek out and serve students eligible under the IDEA, and not wait for other agencies or people to do so. *Compton Unified Sch. Dist. v. Addison,* (9th Cir. 2010).

DEFENDANTS' REPLY– 12

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

**2.  A.T.'s Inability to Attend School for an Evaluation and to Receive Educational Services Does Not Relieve the District of its Duty to Evaluate and Serve A.T.**

It is well established that school districts have to evaluate and provide special education to IDEA-eligible students who are not able to attend school, and are confined to hospitals and institutions. 33 U.S.C. §1401; 34 C.F.R. § 300.39. School districts must also use multiple measures to evaluate students, and have the authority to use diagnostic placements as a method of evaluation. 20 U.S.C. §1402; 34 C.F.R. §300.34.  Based on the foregoing, Congress did not intend for the school district's responsibility to evaluate and serve an IDEA-eligible student to be cut off at the point the student is unable to attend school.

Furthermore, if the student's truancy is impeding the student's ability to make progress on the IEP, the school district is mandated to consider the use of positive behavioral interventions and supports, and strategies, to address the student's behavior. 34 C.F.R. 300.324(a)(2)(i).

Therefore, A.T.'s absences from school due to psychiatric hospitalization and school refusal behaviors did not relieve the ESD from its obligations under the IDEA.

**3.  U.S. Agency Guidelines Illuminate School Districts' Responsibilities Towards Highly Mobile Children**

A.T. was chronically absent, suffering from periods of vagrancy, involuntary commitment, and high mental instability, placing him in a similar category of "at-risk" children who have difficulty attending school on a regular and consistent basis. There is no indication that Congress intended to exclude children with these challenges from the IDEA's

DEFENDANTS' REPLY– 13

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

procedural protections. 42 U.S.C. §11431-32. Similarly, the U.S. Office of Special Education and Rehabilitative Services and Office of Special Education Programs issued a Dear Colleague letter to state directors of special education, highlighting the needs of students in foster care, migrant children, and homeless children, under the category of "highly mobile children." OSERS/OSEP, *Dear Colleague Letter*, (July 19, 2013), *reprinted at* https://www2.ed.gov/policy/speced/guid/idea/memosdcltrs/12-0392dclhighlymobile.pdf. In this guidance letter, both agencies emphasized that highly mobile children should receive expedited evaluations and eligibility determinations, due to the greater degree that such students experience educational disruption and impact. *Id.*

### 4. Congress Has Not Released Districts from IDEA's Requirements When Students Are Hard to Locate

The IDEA encompasses homeless students and wards of the state. 34 C.F.R. §300.111(a)(1)(i). While it might be said that homeless children are highly difficult to locate and serve, Congress through the McKinney-Vento Act mandated that state and local educational agencies and school districts take exhaustive steps to ensure that homeless students with disabilities receive a FAPE. 42 U.S.C. §11431-32.

The fact that A.T. eloped from home and was vagrant for periods does not excuse the ESD from all obligations under the IDEA. Congressional intent in protecting homeless children belies the proposition that runaway students with disabilities are no longer a school district's problem. The issue certainly is not simple for school districts, but the McKinney-Vento statutory scheme implies at minimum that school districts as institutions must make

DEFENDANTS' REPLY– 14

**Cassady Law PLLC**
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

1  meaningful efforts to coordinate with state agencies and to serve special education students
2  who go missing, rather than simply doing nothing.  In this case, ESD dropped the ball
3  altogether at the end of the 2014-2015 school year and the beginning of the 2015-2016 school
4  year, when A.T. did not attend school, leaving his parents no choice but to seek an
5  appropriate education for him on their own.  Tr. 552:9; 151:20-152:18, 186:7-12, 186:17-14,
6  1084:5-13, 1081:12-17, 552:11-24, 533:14-554:13, 1093:3-12, 1081:12-17, 892:1-7, 154:8-
7  14, 14:1-8.

**I. The Practice of Administrative Law Judges Limiting or Restating Parents' Issues in the Due Process Complaint Does Not Prevent the Court from Reviewing FAPE De Novo in IDEA Judicial Review**

The Ninth Circuit addressed the issue of review of issues outside of the due process complaint in *M.C. v. Antelope Valley Union High Sch. Dist.*, 852 F.3d 840 (9th Cir. 2017). The Ninth Circuit confronted a situation where the ALJ restated the issues in the complaint and omitted one of the claims that emerged, and the reviewing District Court found that the parent waived the issue by failing to object to its omission or amend the complaint. *Id.* at 846. The Ninth Circuit opined that "we generally treat issues as if they were raised in the complaint if they were tried by consent." *Id.,* citing Rule 15 of the Federal Rules of Civil Procedure. The Court found that the presentation of evidence by the District on the issue overrode the argument that the parents waived the issue. *Id.* Therefore, to the extent that this Court reviews the ESD's offer of FAPE to the student, including portions of the record outside the scope of the ALJ's restatement of the parents' issues in their due process

DEFENDANTS' REPLY– 15

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

1  complaint, it would not be improper given that both parties presented evidence and testimony
2  on these issues.

3  Moreover, the portion of the ALJ's opinion of which the ESD complains are
4  comments by the ALJ on District witness testimony that were not used as a basis for her
5  decision. The ALJ based her decision to award residential placement "solely on the Student's
6  need for residential placement and the District's failure to offer him residential placement by
7  the time he enrolled there." (FFAC 37-38) The ALJ did criticize the District for legally
8  incorrect assertions about the IDEA that the District witnesses themselves testified to at
9  hearing; however, she explicitly stated that since these issues were not raised in the
10 complaint, they played no part in the remedy awarded. (FFAC pp 46-48) The ALJ's decision
11 should not be overturned on this basis.

12 Furthermore, while the ALJ did rule on procedural violations that occurred after A.T.'s
13 suspension in January 2015, those were not the _only_ issues before the administrative court.
14 The ALJ set the issues under the required framework: whether the District procedurally and
15 substantively violated the IDEA (*Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v.*
16 *Rowley,* 458 U.S. 176 (1982) (FFAC ¶ 2); and whether the District offered appropriate special
17 education services (*Rowley* at 188-189) (FFAC ¶3). Under this framework, the first issue
18 before the ALJ was whether the District failed to offer a FAPE to A.T. by failing to offer
19 residential placement; in other words, she considered whether the District's program was
20 appropriate. (FFAC ¶¶6-14) To that end, evidence and testimony regarding the needs and
21 functioning of A.T., and the appropriateness of the IEP and placement offered by ESD to

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

A.T. before his suspension in 2015 were properly considered by the ALJ, and within the scope of review of this Court.

### J. The Balance of Equities Should Not Favor the District

**1. The ALJ's Order of Expert Supervision in Managing A.T.'s Placement and Transition from a Residential Placement Is Not Unfair to the District Where the District Admitted It Could Not Serve A.T.**

The ESD itself admitted at hearing that A.T. could not be educated without being in a residential placement. (District Closing Brief 40-41) Before this Court, ESD argues that it should not be held responsible for providing a FAPE to A.T. because he was difficult to educate and locate. Expert testimony at hearing established that A.T. needed a level of therapeutic support that the District was unable or unwilling to provide. It is also difficult to conclude the ALJ denied the District meaningful input into A.T.'s placement where she required Provo staff and Dr. Cecchet to consult with the ESD IEP team. Therefore, the ALJ's order that the parties most able and qualified to understand and meet A.T.'s needs, Provo staff and Dr. Cecchet, monitor A.T.'s readiness for placement and transition is reasonable.

**2. ESD's Argument that Provo Canyon Would Not Be Allowed to Operate in Washington is Not Persuasive Where the Only Appropriate Residential Program in Washington is Not Available to A.T.**

As argued previously, Washington's CLIP program would meet the standards of a residential treatment center. Dr. Cecchet testified at hearing that CLIP would have been an appropriate placement for A.T. TR 963:22-967:25. However, the record established that there was no space available in CLIP for A.T. TR 968:2-969:13, 267:3-5, 267:3-8.

DEFENDANTS' REPLY– 17

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

Therefore, the ESD's argument is unavailing where it did not and cannot offer an appropriate program within the state for A.T. in lieu of Provo Canyon.

### 3. A Review of the Conduct of the Parties Reveals that the ESD Acted Unreasonably and the Defendants Did Not Act Unreasonably

The Ninth Circuit in *Forest Grove Sch. Dist. v. T.A.,* 523 F.3d 1078 (9th Cir. 2008) ("Forest Grove I") held that the right to reimbursement where a district has failed to provide FAPE is an equitable one, and that "the conduct of both parties must be reviewed to determine whether relief is appropriate." *Id., citation omitted.* The ESD wishes to apply the holding in *Forest Grove Sch. Dist. v. T.A.,* 638 F.3d 1234 (9th Cir. 2011) ("Forest Grove II") where the court found the balance of equities on the facts of that case did not warrant reimbursement of a private school.

The Forest Grove II court considered the conduct of the parents in its weighing of equitable factors, including the parents' decision not to seek reevaluation until after that student was already in the private school, and their failure to list academic difficulties and disability on the private school application. *Id.* at 1239-1240. It upheld the lower court's decision that none of the student's behavior problems stemmed from any disabilities under the IDEA. *Id.* at 1238.

ESD's reliance on *Forest Grove II* depends on ESD's assumption that A.T.'s behaviors did not result from his disability, and there is ample evidence in the record to establish that A.T.'s behaviors did result from his disability. Acting on the assumption that A.T's behaviors were "medical" and therefore not disability related, ESD insisted throughout the

DEFENDANTS' REPLY– 18

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960

time periods at issue in the administrative hearing, and indeed during the hearing itself, that it did not have the responsibility to evaluate A.T (ironically, a necessary prerequisite under IDEA to determining behaviors are unrelated to disability), amend his IEP, or develop strategies to address his behavior (including school refusal).

Moreover, there is no evidence in the record that the Defendants acted <u>unreasonably</u>: they were forced to seek a private evaluation of A.T. only because the ESD would not conduct one; they shared information regarding A.T.'s condition and whereabouts with ESD staff; they considered the ESD's proposals and did not reject them out of hand; they participated with the IEP team to the extent they were included; they substantially complied with the IDEA notice requirements for unilaterally placing a student in a private school with intent to seek reimbursement. *See Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross- Motion for Summary Judgment*. It was only when all efforts failed and Defendants understood based on ESD's own actions that there was nothing more ESD could do, that the Defendants placed A.T. in a residential treatment center.

### III. CONCLUSION

A.T. is a low-incidence special education student, meaning that he, unlike the vast majority of higher-incidence special education students, experiences a highly unusual and profoundly disabling condition that renders him incapable of being educated without the therapeutic and behavioral supports offered in a therapeutic residential treatment center. A.T. does not, like many special education students, need only a special class for a subject area in which he is deficient, like remedial mathematics or reading, nor does he need only a

DEFENDANTS' REPLY– 19

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone:  206-452-5665
Fax:  206-299-9960

social skills class to address difficulties with peers. A.T. is definitely a more expensive student to serve than the usual special education student, but that is because he experiences a rare disabling condition: prodromal schizophrenia likely induced by a pre-adoption early childhood of severe abuse and neglect.

At the same time, schizophrenia does not automatically mean a student stays in a state of perpetual acute psychosis warranting continuous inpatient treatment in a psychiatric hospital. IDEA contemplates as much, specifically stating that the statute's "Emotional Disturbance" eligibility category does not exclude schizophrenia.

A.T. is precisely the type of admittedly uncommon student who is in need of school district placement in a therapeutic residential treatment center in order to be educated. Therefore, Defendants respectfully request that this Court affirm the order of the administrative court.

Respectfully submitted this 1st day of June, 2017.

By: s/Charlotte Cassady
Charlotte Cassady, WSBA #19848
Cassady Law PLLC
Attorney for Defendants

s/Nicholle Mineiro
Nicholle Mineiro, WSBA #4475
Cassady Law PLLC
Attorney For Defendants

DEFENDANTS' REPLY– 20

Cassady Law PLLC
506 Second Avenue, Suite 1400
Seattle, Washington 98104
Phone: 206-452-5665
Fax: 206-299-9960