UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
EDMONDS SCHOOL DISTRICT,            )
                                                          )
                  Plaintiff,     )
     v.                              )
                                                   )
A.T., a minor child, *et al.*,      )
                                                   )
                  Defendants.   )
_____)

Cause No. C16-1500RSL

ORDER AFFIRMING ADMINISTRATIVE DECISION AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on "Plaintiff Edmond School District's Motion for Summary Judgment" (Dkt. # 13) and defendants' cross-motion (Dkt. # 14). The school district appeals an administrative decision that it is financially responsible under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, for the costs associated with A.T.'s placement in a residential facility. The district maintains that the placement was necessitated by A.T.'s medical condition, not his educational needs, and is therefore not covered by the IDEA. A.T., on the other hand, argues that a residential placement was necessary for him to be able to benefit from the specially designed instruction set forth in his individualized education program ("IEP").

Through the IDEA, Congress offered states federal funds to assist in educating children with disabilities, but imposed a number of substantive and procedural conditions in exchange for the funds. Substantively, the state must provide a free appropriate public education ("FAPE") to

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

"all children with disabilities residing in the State . . . , including children with disabilities who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A). The state has the obligation of identifying and evaluating children with disabilities and developing an IEP for each child. 20 U.S.C. § 1412(a)(3) and (4). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. v. Douglas County Sch. Dist., RE-1, __ U.S. __, 137 S. Ct. 988, 999 and 1001 (2017).[1] To the maximum extent possible, children with disabilities are to be incorporated into the regular educational environment: separate classes, schools, or care facilities are permitted "only when the nature or severity of the disability of a child is such that regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). Procedurally, the IDEA requires that parents be given written prior notice of and an opportunity to participate in any meetings related to the identification, evaluation, educational placement, and provision of FAPE to the child. 20 U.S.C. § 1415(b)(1) and (3). Parents also have the right to seek mediation of disputes and/or an administrative hearing. 20 U.S.C. § 1415(b)(5) and (6). A.T.'s parents requested a hearing on December 17, 2015, after unilaterally placing A.T. at Provo Canyon School, a residential facility in Provo, Utah. The Administrative Law Judge ("ALJ") issued a fifty-one page decision on July 20, 2016, in which she concluded that:

- The district violated the IDEA, both substantively and procedurally.
- The parents' unilateral placement of A.T. at Provo was appropriate.

---

[1] The substantive prong of the IDEA analysis was, until very recently, stated as whether the IEP was "reasonably calculated to enable the child to receive educational benefits." Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 891 (1995) (quoting Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982)). Lower courts interpreted that standard to mean that an IEP is adequate as long as it confers an educational benefit that is more than *de minimus* and allows the student to make some minimal level of progress. In Endrew F., the Supreme Court clarified that, while there is no single test for determining the adequacy of the educational benefits conferred on a child, the IDEA imposes a substantive standard based on a level of progress that is reasonable in light of each child's circumstances. 137 S. Ct. at 997-99.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT       -2-

● The district must reimburse the parents for the Provo tuition and the adolescent

transportation service that conveyed A.T. to Provo.

Dkt. # 1 at 55-56.[2] The district appealed to this Court.

When reviewing a decision of an ALJ regarding the appropriateness of services offered under the IDEA, the Court must read the administrative record, consider any new evidence offered by the parties, "and make an independent judgment based on a preponderance of the evidence and giving due weight to the hearing officer's determinations." Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995). The Court has discretion when determining what weight to give the ALJ's findings. In Wartenberg, the Ninth Circuit recognized that "[d]eference to the hearing officer makes sense in a proceeding under the Act for the same reasons that it makes sense in the review of any other agency action -- agency expertise, the decision of the political branches . . . to vest the decision initially in an agency, and the costs imposed on all parties of having still another person redecide the matter from scratch." 59 F.3d at 891 (quoting Kerkam v. McKenzie, 862 F.2d 884, 887 (D.C. Cir. 1988)). In addition, a thorough and careful analysis by the ALJ increases the amount of deference that should be given to his or her findings. Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493, 1499 (9th Cir. 1996). The administrative decision in this case is comprehensive, detailed, careful, and well-reasoned: credibility and factual disputes are acknowledged and resolved with appropriate analysis, the factual bases for the legal conclusions are stated, and the correct legal standards are applied. The Court finds that deference to the ALJ's determinations is warranted, keeping in mind that it is ultimately the Court's obligation to determine whether the school district has complied with the procedural and substantive requirements of the Act and whether a placement is appropriate.

---

[2] The ALJ also specified prospective placement procedures and requirements. Dkt. # 1 at 56. Those provisions expired on July 20, 2017. The district's challenge to those provisions is therefore moot.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT     -3-

Having reviewed the administrative record and the ALJ's decision,[3] and having heard the arguments of counsel, the Court finds by a preponderance of the evidence that:

    A.T. was adopted by his foster parents when he was just under the age of four. He had a difficult and unsettled childhood before his adoption, including *in utero* exposure to drugs, numerous Child Protective Services allegations of abuse and neglect, a failed adoption, and an inability to form and/or maintain attachments. He had behavior and anger issues and was expelled from several daycare settings. A.T. attended school in the Edmonds School District from preschool to 10th grade. He always had an IEP, but his eligibility category changed over time. He was initially eligible for services based on the category "developmental delay," but the diagnoses for which he was later given services were attention deficit hyperactivity disorder ("ADHD") and/or oppositional defiant disorder ("ODD").

    A.T.'s disabilities do not necessarily impair his intellect, but they give rise to behavioral, decision-making, and interpersonal problems. His IEPs have always been exclusively behavioral and for many years have included a Behavior Intervention Plan ("BIP"). The BIPs are only two pages long, but contain detailed information regarding A.T.'s behaviors, their root causes, what triggers them, what exacerbates them, how to respond to them, how to reinforce good behavior, and what consequences should follow inappropriate behavior. It is unclear whether this information was disseminated widely enough to be helpful to either A.T. or school staff. In November 2014, the dean of students was at a loss for how to deal with A.T., noting that discipline was ineffectual and that the school "might need to do a serious meeting with family, maybe shorten day and increase supervision even more. I don't know." AR 1859. The two general education teachers who testified at the administrative hearing (both of whom taught A.T. in 9th and 10th grades) had never seen the BIPs.

---

[3] Neither party has requested that the Court consider new evidence in the context of the cross-motions for summary judgment.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT     -4-

In January 2015, A.T. was found hiding in the girls' bathroom, having locked all of the stalls except for the one next to him and having stuffed toilet paper into the cracks of the door of the stall in which he was hiding. The district determined that this odd behavior was not a manifestation of A.T.'s ADHD and suspended him for eight days. Upon his return to school, A.T.'s behavioral interventions were altered, he was assigned a one-on-one aide, and he was given an opportunity to see the school's behavioral specialist, Christine Sutton. His IEP was not amended, however, and it is not clear how much time A.T. was given with Ms. Sutton. Ms. Sutton was aware that A.T.'s truancy had increased by fourfold between 9th and 10th grades, that his grades had plummeted, and that the bathroom incident was a recurring and unexplained event. She was concerned that A.T. might be having mental health problems and suspected that he was somewhere on the autism spectrum and had a disorder related to food. Nevertheless, she did not share these concerns with the parents or initiate a reevaluation of the student, apparently unaware that the district has an obligation to assess students in all areas of suspected disability. 20 U.S.C. § 1414(b)(3)(B).

On his second day back at school after his suspension, A.T. refused his aide's request to take his assignments out of his backpack. The dean of students was called upon, but the stand off ended in a physical confrontation and the discovery that the backpack contained a powerful slingshot, 30 large ball bearings, and a lighter. A.T. was expelled[4] on January 22, 2015. The following week, the district held a thirty-minute meeting in which it determined that the incident was not a manifestation of A.T.'s ADHD and adopted a revised IEP. Although A.T.'s father signed the IEP, he stated that there was no discussion regarding its provisions or any changes to A.T.'s educational programming at the meeting. The IEP goals remained the same, with the baseline percentages and target percentages for each goal unchanged. The one-on-one aide and

---

[4] The expulsion was later reduced to a 45-day suspension.

the time with Ms. Sutton that were granted after the initial suspension were not included in the January 2015 IEP.

A.T. was either in juvenile detention or had run away from home throughout most of his 45-day suspension. The school district approved 75 minutes of behavioral tutoring per week during the suspension, the same amount he had been receiving at school pursuant to his IEP. The tutor had only one session with A.T., however, given A.T.'s detentions and elopements. No academic services were provided, although the district did approve on-line course work in March 2015. A.T. did not enroll in any on-line courses: the tutor had been advised that A.T.'s parents had taken away his computer access.

In February 2015, Dr. Stacy Cecchet, a licensed psychologist, began evaluating A.T. as a result of a court order for diagnostic clarification. Dr. Cecchet ruled out a number of possible diagnoses, but found that A.T. had developed prodromal schizophrenia. Based on testing, an extensive record review, and interviews with the parents, A.T.'s juvenile probation officer, and Ms. Sutton, Dr. Cecchet estimated that the onset of the illness occurred in the fall of 2013, at the start of A.T.'s freshman year in high school. At the administrative hearing, Dr. Cecchet explained that schizophrenia has adverse impacts on both academic performance and A.T.'s ability to get himself to school. The cognitive disorganization that is a hallmark of the diagnosis, including hallucinations and hearing voices, means that it will "be very difficult to maintain an age-appropriate focus on your academic setting, whether that's participation in the classroom, social participation, homework completion, even just going in the right order of events that he needs to do throughout the day, different classes or P.E. or things like that." AR 947. The combination of ADHD, prodromal schizophrenia, and attachment issues created a "perfect storm" leading to continuing issues with truancy. AR 950, 1015-16. A.T.'s impulsiveness due to the decrease in his prefrontal cortex and executive functioning led to snap decisions to leave home for any number of reasons, including arguments with his parents or a desire to go

skateboarding. His cognitive disorganization would then cause him to be distracted from passing thoughts of returning home or to be unable to put together a plan for figuring out where he was and how to get himself home. Dr. Cecchet also explained that the standard and predictable responses to disorganized and distracted students -- frequent reprimands for failure to sit still or transition when they're supposed to, being told no or to stop doing something, and "being told directly and accidentally that they're bad kids" -- often leads to the types of oppositional behaviors that A.T. exhibited. AR 952.

Dr. Cecchet summarized the input from A.T.'s parents and teachers as follows:

> [A.T.] is demonstrating significant levels of inattention, hyperactivity/impulsivity, executive functioning deficits, defiance and aggression, and difficulty maintaining age-appropriate peer relations. These areas of concern are supported in other areas of this assessment report and are consistently echoed across all other testing results.

AR 2193. She recommended, among other things, that A.T. participate in weekly individual and family therapy sessions, begin antipsychotic medications, avoid street drugs, work with his care team to identify and manage triggers, maintain his IEP in order to obtain training and skill development with specially-trained teachers and staff in an academic environment, add to the IEP specific strategies and behavioral interventions in the classroom, and develop a crisis plan in case the student experiences a psychiatric emergency and requires hospitalization. Dr. Cecchet strongly suggested that A.T. be enrolled in a residential treatment facility in light of his "significantly worsening dangerous behavior and elopement," specifying the Children's Long Term Inpatient Program ("CLIP") in her report. AR 2198. Dr. Cecchet believed that without proper interventions A.T. would be unable to function in a day school program (AR 1017), and that a residential program would offer him the medical, academic, and behavioral supports he needed (AR 1022). The parents and the school district were aware that CLIP had a lengthy application process and that, if accepted, the wait for a spot to open up in the public residential

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT     -7-

program was also lengthy.

At the end of April 2015, approximately a week after receiving Dr. Cecchet's report, district staff met with the parents to discuss A.T.'s return from suspension. The parents expressed a preference for the district's small alternative high school rather than returning to the comprehensive high school. There was no discussion regarding Dr. Cecchet's recommendation for residential placement. On May 7, 2015, the district held an IEP review meeting without the parents. It is unclear whether notice of the meeting was actually given, but it was not received by the parents. The district decided that A.T. should attend the alternative high school on a part-time basis in the Student Transitional Education Program ("STEP") to help him reconnect with the school environment. The district issued a prior written notice that A.T. would now be attending the alternative high school: the document does not mention that his attendance would be part time or any residential placement options. At the administrative hearing, Dr. Cecchet testified that a part-time educational setting was inappropriate for A.T. Not only did it limit the number of interventions and opportunities to practice needed skills, but it increased the amount of unstructured time he had each day which he was ill equipped to handle.

A.T. and his father visited the alternative high school in mid-May. A.T. attended the school just one day before refusing to return. The school psychologist attempted to reach A.T. by phone on May 22nd but was unable to do so despite the parents' efforts. At this point, the parents thought the district had offered all it could: they were unaware that the district could fund private residential options. From May to December 2015, A.T. remained at home, was in juvenile detention, had run away, or was in a psychiatric hospital: he never attended classes in the district again. A.T. began using illegal drugs during the summer of 2015 (between 10th and 11th grade). His parents began contacting residential schools during the summer and submitted a CLIP application on September 8, 2015. As of the time of the administrative hearing, they were still waiting for a CLIP interview. A.T. was picked up for shoplifting on September 30, 2015

(which ended a 28-day elopement) and admitted to Children's Hospital for a foot infection and psychiatric treatment. Children's recommended that he enter a residential facility. On November 30, 2015, the parents met with counsel and, the next day, notified the district that they intended to place A.T. in a private residential school and to seek reimbursement from the district. On December 14, 2015, his parents enrolled A.T. in Provo Canyon School in Utah.

Provo is a locked campus. Student life is very structured. Weekdays start with chores, hygiene, breakfast, and medication administration, followed by classroom instruction from 8:45 am to 3:20 pm. Students participate in daily group therapy sessions based on their needs, then do activities, dinner, and homework in the evenings. Behavioral issues during class are subject to graduated control methods as needed: guidance by the teacher (all but three of the sixteen teachers in the boys' school are certified in special education), then one-on-one counseling by behavioral aides in the hallway, then admission to a stabilization unit to work with a psychiatrist and therapist. If the student cannot work his way back into the classroom using one or all of these interventions, the teacher comes to the stabilization unit and provides one-on-one instruction to cover missed curriculum. There is no summer break. Weekends involve more sleep, more chores, and more leisure activities. There are clinical and medical personnel on staff in addition to the teachers, dormitory staff, and behavioral aides. Students participate in individual and family therapy sessions each week.

A.T. began his stay at Provo in the stabilization unit where he was assessed and introduced to the school regimen in a more controlled environment. The stabilization unit has increased staffing, resulting in increased therapeutic and academic services. A.T. was in the stabilization unit from December 14, 2015, to January 21, 2016.

Provo's regimen for medication management and behavioral training has improved A.T.'s abilities to focus, comply with boundaries and rules, and be cooperative. There are still numerous areas for improvement -- he has not, for example, internalized the behavioral and

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT          -9-

emotional skills needed to cope in a regular school setting -- but with the supports offered at Provo, his grades have improved. While the Provo curriculum may not be as challenging as the course work offered by the school district, he is at least able to make it to class and learn what is being taught. A.T.'s primary therapist at Provo testified that he needs the structure of the residential placement in order to participate in a school environment. A.T. would like to complete high school at Provo. He has begun expressing pride in his accomplishments, love toward his mother, and a recognition that he needs to work on his social skills to maintain friendships. Dr. Cecchet visited Provo in April 2016 and opined that it is an appropriate learning environment for A.T. and preferable to CLIP in that it has a stronger academic component.

Parents who unilaterally enroll their child in a private school are entitled to reimbursement only if (a) the district placement violated the IDEA and (b) the private placement is proper under the IDEA. Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 246 (2009). The most hotly contested issue in this case is the second element: whether the residential placement chosen by A.T.'s parents was a service related to his educational program (and therefore proper under the IDEA) or an uncovered medical service. A.T. is entitled to receive "special education and related services" at public expense. 20 U.S.C. § 1401(9). "Special education" means instruction designed to meet the unique needs of the child with a disability, including "instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(29). The term "related services" means:

> [T]ransportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility

services, and medical services, except that such medical services shall be for
diagnostic and evaluation purposes only) as may be required to assist a child with a
disability to benefit from special education, and includes the early identification
and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A).

The district argues that A.T.'s placement at Provo was an excluded "medical service," apparently on the theory that, because A.T. is intelligent and capable of performing adequately when his medical conditions are under control, any support he receives at Provo must be aimed at those medical issues, not his educational needs. The whole point of an IEP, however, is to create a special and unique program of services designed to provide educational benefits to a child who has a disability. Just because a child would be capable of learning in a general education class without support if he were not disabled does not mean that any support given is "medical." There are many supportive services that treat or ameliorate the physical or mental impacts of a disability that are not, in and of themselves, educational but are defined as a covered "related service." Supportive services offered at Provo -- including psychological services, therapeutic recreation, social work services, medication management, counseling, *etc.* -- are specifically identified as "related services" in the Act and/or are the type of services that would be offered in the school nurse's office.[5] The record shows that in order for these covered services to reach A.T., they must be offered in a structured residential setting to overcome the tendency toward elopement and truancy resulting from the "perfect storm" of his disabilities.[6] As

---

[5] The regulations adopted by the Department of Education defines "school health services and school nurse services" as "related services." 34 C.F.R. § 300.34(a).

[6] The residential aspect of the placement chosen by A.T.'s parents, standing alone, does not constitute a "medical service" as that phrase is commonly understood. A boarding school is a residential educational option that is not provided by a licensed physician, does not involve a surgically-implanted device, and is not otherwise "medical" in nature. The implementing regulations specifically allow for payment for residential services: "[i]f placement in a public or private residential program is necessary

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT         -11-

the ALJ found, "students cannot be separated from their disabilities. The District must take students as it finds them, and provide the related service of nursing (for the medically fragile student) and the environment of residential placement (for the Student here)." Dkt. # 1 at 39. The Court agrees with the ALJ and finds that A.T.'s placement in a closed environment, where educational services were part of a structured schedule and supported by aides and services that minimized the negative impacts of his disability-related behaviors, was necessary to enable A.T. to make educational progress that was appropriate in light of his individual circumstances. For all of the reasons discussed above, A.T.'s placement at a residential facility was proper under the IDEA. The district's criticisms of the Provo program -- that it was too restrictive, that it did not implement A.T.'s IEP, and that the classes offered were not challenging enough for the student -- do not alter that conclusion.

> To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

C.B. v. Garden Grove Unified Sch. Dist., 635 F.3d 1155, 1159 (9th Cir. 2011). The second

---

to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.104.

The district implicitly argues that Provo is actually a hospital, rather than a school, and should therefore be characterized as a medical facility. While it is true that Provo provides psychiatric and other medical services (beyond those which a school nurse might provide), there is no evidence in the record that would allow the Court to partition or apportion the costs of the medical services provided to A.T. at Provo (if any) from the educational and related services he received. The district's belated request that the Court "modify the ALJ's order to require the District to pay only for the educational services provided by Provo" (Dkt. # 15 at 15) is unsupported and not in keeping with the governing regulations. As was the case in Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings, 903 F.2d 635, 642 n.3 (9th Cir. 1990), the Court confines itself to the issue raised by the district in this appeal: is the district financially responsible for the parents' decision to place A.T. in a private residential facility?

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT     -12-

prong of the reimbursement analysis is therefore satisfied.[7]

With regards to the first prong of the analysis, a cursory evaluation of the district's chosen placement shows that it violated the IDEA. A.T.'s January 2015 IEP was not reasonably calculated to enable him to make progress in light of his disabilities and their impacts. His impulsiveness, hallucinations, and cognitive disorganization made it highly unlikely that he would make it to school or successfully make his transitions through a school day in the absence of constant monitoring and interventions. Even if A.T. were able to get to school, the behavioral support offered was limited to seventy five minutes a week, with no in-class aide and only sporadic (and undefined) access to Ms. Sutton. The two teachers who testified at the

---

[7] The district relies heavily on three cases in which courts in the Ninth Circuit have denied reimbursement for private residential placements. In G.R. v. Dallas Sch. Dist. No. 2, 823 F. Supp. 2d 1120 (D. Or. 2011), the student pled guilty to a sexual abuse charge and was required to participate in a treatment program at Provo for a minimum of one year or until he successfully completed sex offender treatment. The court found that Provo offered no educational benefits over a placement offered by the school district and that the decision to attend Provo was driven by his sex offender treatment requirement, not his educational needs. In Ashland Sch. Dist. v. R.J., 588 F.3d 1004 (9th Cir. 2009), R.J.'s grades were good whenever she managed to complete her assignments, there was no evidence that her failure to turn in assignments was related to a disability, and her mother opted for a residential placement because R.J. participated in risky behaviors and relationships outside of school. In Ashland Sch. Dist. v. E.H., 587 F.3d 1175 (9th Cir. 2009), the Ninth Circuit affirmed the district court's determination that a child who had been repeatedly hospitalized for suicidal and/or homicidal ideation had been placed in residential care to treat medical, not educational, problems.

There is no bright line that makes residential placements inappropriate under the IDEA: in fact, the governing regulations expressly authorize residential placement if necessary to provide special education and related services. The issue in each case is whether, given the facts regarding the nature of the student's disabilities and the supportive services offered by the district and the private placement, the placement is "necessary for educational purposes" or simply "a response to medical, social, or emotional problems that is necessary quite apart from the learning process." Clovis, 903 F.2d at 643. In all three of the cases on which the district relies, the students were either capable of benefitting from the education provided by the district (G.R. and R.J.) but the parents chose private placement for some other, non-educational reason or the student "was in no condition to devote much time or effort to schoolwork" in any setting (E.H., 587 F.3d at 1185) and the placement was deemed medical rather than educational. Here, the district asserts that A.T.'s behaviors were unrelated to his disabilities and portrays the facts of this case as if they mirror the facts in G.R., R.J., and/or E.H. Neither the assertion nor the portrayal is accurate, however, and the Court finds that the cases are readily distinguishable.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT    -13-

administrative hearing had not even seen his BIP, much less attempted to put in place the recommended interventions and behavioral strategies. The district's placement was, therefore, substantively deficient and violated the Act. The fact that A.T.'s prodromal schizophrenia went undiagnosed until April 2015 does not excuse the inappropriate educational plan. Had the district taken its evaluative, diagnostic, and planning obligations seriously (*i.e.*, had it followed the procedures mandated by the Act), A.T.'s constellation of disabilities and needs would have been addressed much earlier. Thus, the parents have established both substantive and procedural violations of the Act.

Having failed to provide an appropriate public education from which A.T. could derive any educational benefit, the district is financially responsible for the appropriate residential placement the parents were forced to find on their own. The Court affirms the ALJ's decision in its entirety.

Dated this 7th day of November, 2017.

*/s/ Robert S. Lasnik*

Robert S. Lasnik
United States District Judge